UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSOLIDATED RAIL CORPORATION
and NORFOLK SOUTHERN RAILROAD
COMPANY,

       Plaintiffs/Counter-Defendants,

v.

GRAND TRUNK WESTERN RAILROAD
COMPANY,

       Defendant/Counter-Plaintiff.

       Case No. 09-cv-10179

       Honorable Nancy G. Edmunds

_____/

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE THOMAS J. CONDON**

This matter comes before the Court on Plaintiffs' motion to exclude the expert testimony of Thomas J. Condon. For the reasons set forth below, Plaintiffs' motion is DENIED.

**I.    Facts**

    **A.    Arbitration and Tracking Rights Agreement**

On June 7, 1993, Plaintiffs sent Defendant a letter, notifying Defendant that Plaintiffs intended to exercise their right, under an 1897 Agreement, to cross Defendant's tracks. (Def.'s Mot. for Summ. J. 6.) The letter stated:

> [Plaintiffs are] notifying [Defendant] that they intend to exercise the right to access Trenton Steel Storage located just north of Harrison Street and east of your tracks in Trenton, MI, adjacent to "FN" interlocking. [Plaintiffs] intend[]

> to apply the right by installing a diamond to cross your tracks and sidetrack to access Trenton Steel Storage.

(*Id.*) The letter mistakenly identifies Trenton Steel Storage as being located to the east of Defendant's tracks, when it is actually located to the west. (*Id.*) Defendant did not agree to Plaintiffs' plan to cross, maintaining that the 1897 Agreement allows Plaintiffs to cross Defendant's tracks to service industries only to the east of the FN Interlocking, not to the west of it. (*Id.* at 7-8.) After going back and forth on this issue and failing to come to an agreement, Plaintiffs and Defendant decided to submit the dispute to arbitration. (*Id.* at 8.) Prior to the arbitration, on June 23, 1994, the parties agreed that if the arbitrators ruled in Plaintiffs' favor, then Defendant would grant Plaintiffs access to Trenton Steel Warehouse by a trackage rights agreement.

On July 13, 1994, the parties submitted a very narrow question to the arbitrator. They asked:

> Do [Plaintiffs] have the right, pursuant to the [1897 Agreement and two of the 1900s crossing] Agreements, to cross the tracks, facilities, right-of-way, and other property of [Defendant] in or near Trenton, Michigan for the purpose of providing [Plaintiffs] access to and the ability to provide rail freight transportation service to the Trenton Steel Warehouse.

(*Id.*) On January 21, 1996, the arbitration panel issued its decision, deciding in the affirmative, that Plaintiffs have the right to cross Defendant's tracks to access the Trenton Steel Warehouse ("TSW"), west of the FN Interlocking. (*Id.* at 8-9.) Following the arbitration award and pursuant to the June 23, 1994 agreement letter, Plaintiffs formed an agreement with Defendant to use Defendant's tracks for a limited purpose.

On May 1, 1996, Plaintiffs and Defendant entered into the "Trackage Rights Agreement Between [Defendant] & [Plaintiffs] to Service Trenton Steel Warehouse"

("1996 Agreement"). The 1996 Agreement states, "[Plaintiffs] wish to effectuate the Arbitration award by reaching agreement on terms to use the certain portions of the aforesaid line of railway of [Defendant] and [Defendant] is willing to grant such use on the following terms and conditions . . . ." Section 1 of the 1996 Agreement explicitly states that Plaintiffs have the right to use certain segments of Defendant's railroad "for the sole purpose of serving Trenton Steel Warehouse or its successor." Section 6 of the 1996 Agreement delineates restrictions on use. This section states:

> The Trackage Rights herein granted are subject to the following restrictions:
> (a) [Plaintiffs] shall use the Trackage for the sole purpose of delivering or picking up rail cars to and from (including the switching of such cars) [TSW] located adjacent to "FN." . . .
> (c) Except as provided in above subparagraph (a) [Plaintiffs] shall not move any rail cars of any kind, other than those cars moving to or from [TSW] or perform any local freight or switching service of any kind whatsoever, and shall not serve any other rail customers along the Trackage.

Additionally, the 1996 Agreement provided that Plaintiffs must pay Defendant a monthly retainer fee as well as certain rates "for each rail car loaded or empty delivered to or spotted" at TSW.

### C. Plaintiffs' Service to Korneffel

On December 1, 2006, Plaintiffs entered into an agreement with Korneffel, a private corporation engaged in the construction business to establish the terms on which Plaintiffs would deliver steel to Korneffel. Plaintiffs would deliver the steel by using Defendant's tracks to reach a sidetrack owned by Huron Valley Steel Corporation ("HVS"), near the fence separating the HVS property from Korneffel's property. (*Id.* at 11-12.) Defendant was unaware of this agreement. (*Id.* at 12.)

On May 14, 2008, after Defendant found out that Plaintiffs were delivering

3

railcars to Korneffel, Defendant commenced a lockout and physically prevented Plaintiffs from using its railroad tracks. (*Id.* at 13.) This resulted in 26 railcars of steel en route to Korneffel to be held up because Plaintiffs could not deliver them. (*Id.*) Defendant maintains that it has never interfered with Plaintiffs' use of its tracks to service TSW, as provided for in the 1996 Agreement, but that Plaintiffs violated that agreement when they used Defendant's tracks to provide service to Korneffel.

### D. Property

In 1974, Dana Corporation ("Dana") transferred to the Huron Valley Steel Corporation ("HVS") a parcel of land, which consisted of approximately 85.09 acres on the east side of Fort Street between King Road and Harrison Avenue ("Original HVS Parcel"). (Condon Report 4.) At the time of this transfer, the original parcel was largely vacant and contained only the Trenton Steel Warehouse building and some industrial trackage. (*Id.*) On January 7, 1987, the Original HVS Parcel was split into 3 separate parcels of land: (1) 23.29 acres, making up the existing Trenton Steel Warehouse Parcel; (2) 58.60 acres east and south of the Trenton Steel Warehouse Parcel ("Vacant Parcel"); and (3) 3.76 acres north and west of the Trenton Steel Warehouse Parcel ("Corner Parcel"). (*Id.*)

On December 11, 1987, the 58.60-acre Vacant Parcel was split into three additional separate parcels of land: (1) 20.60 acres of Trenton Commerce Park consisting of 16 separate lots; (2) 36.66 acres south of Trenton Commerce Park ("Remaining Vacant Parcel"); and (3) 1.34 acres of a Mini Parcel. (*Id.* at 4-5).

In 2002, HVS sold the southern portion of the Remaining Vacant Parcel, which consisted of 17.41 acres, to Erie Development LLC ("Erie Parcel"). The Erie Parcel

spans the southern boundary of the Original HVS Parcel and it touches the southern border of the Trenton Steel Warehouse Parcel. (*Id.* at 5.)

Before the parties entered into the Trackage Rights Agreement in May 1996, the Trenton Steel Warehouse's physical characteristics reflected that it was not intended to be a part of the Erie Parcel. It was and is gated and fenced and both the Vacant Parcel and Erie Parcel are and have been separated from the Trenton Steel Warehouse Parcel by a storm-water detention area, ditches and tall grass; and there are and have been no roads or foot paths existing between the Trenton Steel Warehouse Parcel and the Vacant Parcel and/or the Erie Parcel. (*Id.* at 5.)

David Wilson, while employed for Defendant, went to the Trenton Steel Warehouse parcel at least twice in the early 1990s, before the dispute arose in 1993. (Wilson Dep. 56:16-59:17, Dec. 9, 2009.) Paul Carey, while employed by Plaintiffs, visited the Trenton Steel Warehouse while the arbitration was going on. (Carey Dep. 29:22-30:6, March 7, 2011.)

One issue in dispute is whether the Trackage Rights Agreement gives Plaintiffs the right to access the entire property owned by Huron Valley Steel on Defendant's sidetrack, as Plaintiffs contend, or just the specific warehouse facility, as Defendant maintains.

## II.     Standard of Review

Courts considering expert testimony examine admissibility within the context of Federal Rule of Evidence 702.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education,

5

> may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The United States Supreme Court has established that Rule 702 requires district courts to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1993). See also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (expanding *Daubert's* analysis of expert scientific testimony to cover expert testimony based on "technical" and "other specialized knowledge"). Rule 702 "imposes a 'gatekeeping' duty on district courts [to] exclude unreliable and irrelevant evidence." *Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp. 2d 752, 761 (E.D. Mich. 2010) (Edmunds, J.) (citation omitted).

Expert testimony is relevant only when it will assist the trier of fact in understanding the evidence or determining a material fact in question. *Daubert*, 509 U.S. at 592-93. The question is "whether expert testimony improperly addresses matters within the understanding or common knowledge of the average juror or invades the province of jury." *United States v. Thomas*, 74 F.3d 676, 684 n.6 (6th Cir. 1996), *abrogated on other grounds by Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998). See also *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) ("If everyone knows [a particular fact], then we do not need an expert because the testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue.") (internal citation omitted).

An expert opinion that is based on scientifically valid principles will satisfy Rule

6

702, while an expert's subjective belief or unsupported speculation will not. *Smelser v. Norfolk So. RR Co.*, 105 F.3d 299, 303 (6th Cir.1997), *abrogated on other grounds by Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998). Courts are not required to admit opinions or conclusions that are connected to the existing data only by the *ipse dixit* of the expert. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Courts recognize that:

> Social science research, theories and opinions cannot have the exactness of hard science methodologies, and expert testimony need not be based on statistical analysis in order to be probative. Peer review, publication, potential error rate, etc. are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it. In such cases, the place to quibble with an expert's academic training is on cross-examination and goes to his testimony's weight, not its admissibility.

*United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008) (quotations and citations omitted)

The party offering expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

### III. Analysis

Condon, a licensed professional surveyor with over 30 years of experience, offers two opinions and Plaintiffs seek to exclude them both on separate grounds.

#### A. Opinion #1: Erie Parcel Not a "Successor" of the Trenton Steel Warehouse Parcel.

Defendant seeks to have Condon offer an expert opinion that "the Erie parcel utilized by Korneffel would not be a successor to the Trenton Steel Storage or the Trenton Steel Warehouse parcel." (Condon Dep. 132:21-24.) Plaintiffs argue that this

7

opinion is based on an unreliable methodology and should be excluded.

Condon's opinion is that Korneffel would not be a successor to the Trenton Steel Warehouse parcel because at the time of the Erie Parcel's acquisition, it was part of the Vacant Parcel, which was legally and geographically separate and distinct from the Trenton Steel Warehouse Parcel. (Condon Report 5.)

Condon states, in his deposition, that to reach his conclusion, he "relied on the deeds and the progression of the conveyances. And the fact that the Korneffel parcel was part of this vacant parcel . . . at the time of the Trackage Rights Agreement, . . . and the Trenton Steel Warehouse parcel, was separate and distinct at that time." (Condon Dep. 287:18-24, May 18, 2011.) Condon defines a successor as "following something else in an orderly sequence and it means a derogation of a split of – something emanating from the first parcel." (*Id.* at 289:8-10.) Condon maintains that this definition is the "common one that a surveyor uses" (*Id.* at 289:5-6), and he obtained this definition from his knowledge about conveyancing that he has accumulated over many years of practice as a professional surveyor (*Id.* at 291:13-17). Condon goes on to state that a piece of property is only a successor of its most recent split and is confined solely to the immediate prior parcel. (*Id.* at 297:25-298:11.) Condon's opinion was further fleshed out in a hypothetical:

> Q. Okay. So let's say that Erie Development subdivided the property into a section A that I'm writing down, a section B that I'm writing down, and a section C that I'm writing down. Do you follow?
> A. Yes.
> Q. Okay. Now, A, B, and C, are successors under your definition that you employ for purposes of your opinion to the Erie parcel, correct?
> A. Yes.
> Q. Okay. Now, let's say B subdivides, as I'm indicating here, into D. Do you see that?

8

> A. Okay.
> Q. Okay. Under your definition, D is not a successor to the Erie parcel; is that correct?
> A. It's a successor to B.
> Q. Okay. And it is not a successor to the Erie parcel, correct?
> A. That's right.

(Condon Dep. 306:8-25.) Condon maintains that his definition of a successor, aside from being developed over years of expertise and professional surveying is in the dictionary and a book written by a professional surveyor who is also an attorney. (*Id.* at 291:18-25, 298:23-299:21.)

However, Condon does not suggest that this is the definition that was used in the TRA. Instead, he states:

> Q. . . . You were not consulted -- you were not consulted by Grand Trunk Western or Conrail for purposes of drafting the Trackage Rights Agreement, correct?
> A. Absolutely not.
> Q. You have absolutely no idea what the drafters or the signatories to the Trackage Rights Agreement meant by that language, correct?
> A. I do not exactly know.
> Q. You have no idea whether those -- those parties employed a definition in their minds of successor that is entirely different and distinct from the definition of successor that you just conveyed to me, correct?
> A. I don't know what they had in their minds.
> Q. And you have -- you have no intention of offering an opinion on what the parties intended successorship to mean in the Trackage Rights Agreement, correct?
> A. That's correct.

(*Id.* at 295:3-20.)

Plaintiffs argue that Condon's opinion here should be excluded because it has not been tested, peer reviewed, and he did not consult any published materials. Plaintiffs rely heavily on *Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp. 2d 752 (E.D. Mich. 2010) (Edmunds, J.). In *Meemic*, this Court excluded expert testimony as

9

inadmissible under Rule 702 because the opinion was based primarily on the expert's "real world experiences." However, that case involved the expert testimony of an electrical engineer about the cause of a fire. In *Kumho Tire*, the Supreme Court stated:

> We also conclude that a trial court *may* consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Kumho Tire*, 526 U.S. at 141-42. Additionally, there are many cases in which peer review, publication, and potential error rate are not as relevant to the court's determination of reliability and the court's analysis depends more heavily on the knowledge and experience of the expert, rather than the methodology of theory behind it." *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008).

Plaintiffs do not dispute that Condon has decades of experience as a professional surveyor. Additionally, Condon is uniquely qualified in this case because he has performed survey work for HVS and Korneffel and has great familiarity with the property at issue. (Condon Dep. 128:8-130:3, 14616-247:7.) Condon directly applied his knowledge and experience in the same way that he would in his profession as a surveyor to render an opinion in this case. While Plaintiffs may disagree with the definition of successor that Condon uses, this does not render Condon's opinion unreliable.

Plaintiffs' motion to exclude Condon's opinion that the property used by Korneffel is not a successor to the Trenton Steel Warehouse property is DENIED.

**B.     Opinion #2:  Property Divided into Separate Parcels**

The second opinion Condon offers is that "the Erie Development property that was being used by Korneffel was at the time of the 1996 arbitration award and the 1996 Trackage Rights Agreement part of a separate and distinct parcel, legally and geographically, from that parcel occupied by the Trenton Steel Warehouse." (Condon Dep. 132:14-20.) Plaintiffs argue that this opinion will not assist the trier of fact, is irrelevant, and constitutes an inadmissible legal conclusion.

### 1. Legally Distinct

Defendant claims that this testimony is in direct response to Plaintiffs' argument that Trenton Steel Warehouse is merely another term for the 85-acre parcel that had, in the past, belonged to HVS and that the property being used by Korneffel is a successor to the Trenton Steel Warehouse parcel. In their depositions, both David Wilson and Paul Carey assert that the "Trenton Steel Warehouse," as used in the Trackage Rights Agreement ("TRA") meant the entire property owned by HVS or even the entire location that could be reached by the connection of Defendant's sidetrack to the edge of the Trenton Steel Warehouse property. However, both Wilson and Carey also admit that they have no knowledge about what property HVS actually owned at the time the parties entered into the TRA.

Condon's testimony that the parcels were separated at the time of the TRA is directly relevant to whether the Korneffel property would be considered part of the Trenton Steel Warehouse, to which Plaintiffs had access pursuant to the TRA.

Plaintiffs argue that Condon seeks to offer an opinion of law when he states that the Erie Parcel and the Trenton Warehouse Parcel were legally separate. "An expert opinion of law is inadmissible." *Chavez v. Carranza*, 559 F.3d 486, 498 (6th Cir. 2009).

However, Condon's testimony that the parcels are legally distinct is a factual determination and is allowed.[1] In *Kane v. Rippey*, the Oregon court explained the distinction, stating, "What deeds there are in the chain of title, and their form and manner of execution, are questions of fact; whether or not they vest in the defendants a good title, is a question of law." *Kane v. Rippey*, 22 Or. 299, 302 (Or. 1892).

Plaintiffs argue that this testimony is irrelevant because neither Plaintiffs nor Defendant knew that the property had been subdivided when they entered into the TRA. Even if the parties did not know that the property had been divided, though, testimony describing "Trenton Steel Warehouse" as "the entire piece of property that Huron Valley Steel owned" makes this testimony relevant.

Plaintiffs' motion to exclude Condon's testimony that the parcels were legally distinct is DENIED.

### 2. Geographically Distinct

Condon states that before the parties entered into the Trackage Rights Agreement in May 1996, the Trenton Steel Warehouse's physical characteristics reflected that it was not intended to be a part of the Erie Parcel. It was and is gated and fenced and both the Vacant Parcel and Erie Parcel were separated from the Trenton Steel Warehouse Parcel by a stormwater detention area, ditches and tall grass; and there are and have been no roads or foot paths existing between the Trenton Steel Warehouse Parcel and the Vacant Parcel and/or the Erie Parcel. (Condon Report 5.)

---

[1] Plaintiffs also argue that these are merely statements of fact, for which expert testimony is not needed. However, an expert's description of the different subdivisions of the property, the time at which they occurred, and how they relate to one another would greatly assist the trier of fact.

Plaintiffs argue that these statements are merely factual matters that can be understood by the jury without assistance and are therefore improper topics for expert testimony. *Parr v. Clark Equip. Co., Inc.*, 844 F.2d 789 (6th Cir. 1988). Expert testimony is unnecessary and may be properly excluded if all the primary facts can be accurately and intelligibly described to the jury and they are as capable as someone with specialized knowledge of understanding and drawing the correct conclusions. *Id.*

Condon states in his deposition that his experience was essential to his observations about the geographical distinctions between the properties.

> Q. And there is no specialized skill, knowledge, training, or education required to observe physical characteristics on a property, is there?
> A. There sure is when it comes to surveying the boundary law. You have to know where the boundaries are and you have to be aware of where the physical characteristics that manifest those boundaries are in relation to the boundary lines. It isn't I just go out there and I saw this and I saw that. That's real estate. That's not what surveyors do. . . .
> Q. Okay. So the specialized skill of your physical observation is to observe something and determine where it is in relation to a property boundary?
> A. That's a more accurate description of what we do.

(Condon Dep. 159:6-160:8.) Additionally, Condon states that when he is talking about geographical distinctions, he is talking about is "the manifestations along these property lines that are relevant as far as the progression of the development of the parcels." (*Id.* at 169:2-20.)

Both David Wilson and Paul Carey testify in their depositions that they went to the property at or before the time the parties entered into the Arbitration Agreement. And both Wilson and Carey testify that "Trenton Steel Warehouse" meant the entire property owned by Huron Valley Steel. The geographic distinctions between the properties, then, is directly relevant to the area that the parties may have considered to

13

be the property owned by Huron Valley Steel. Although this case does not involve a boundary-line dispute, expert testimony about how the physical characteristics of the property relate to the boundary lines is relevant and will assist the trier of fact. Plaintiffs' motion to exclude this testimony is denied.

## IV.  Conclusion

For the foregoing reasons, Plaintiffs' motion to exclude Thomas Condon's testimony is DENIED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  December 1, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 1, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager