UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSOLIDATED RAIL CORPORATION
and NORFOLK SOUTHERN RAILROAD
COMPANY,

   Plaintiffs/Counter-Defendants,

v.

GRAND TRUNK WESTERN RAILROAD
COMPANY,

   Defendant/Counter-Plaintiff.

                /

Case No. 09-cv-10179

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION IN LIMINE TO EXCLUDE GRAYDON M. MEINTS**

This matter comes before the Court on Defendant's motion to exclude Graydon M. Meints as an expert witness. For the reasons set forth below, Defendant's motion is GRANTED in part and DENIED in part.

**I. Facts**

In the late 1800s, Plaintiffs operated parallel rail lines that extended south of the city of Trenton, Michigan and north to Detroit.[1] (Pls.' Mot. for Summ. J. 2; Def.'s Mot. for Summ. J. 1.) By 1897, Defendant had tracks to the southwest of the Trenton area and

---

[1] The Detroit, Monroe & Toledo Railroad Company ("DMT") and the Toledo, Canada Southern & Detroit Railroad Company ("TCSD") are Consolidated Rail Corporation's predecessors-in-interest. DMT and TCSD were in operation in 1873. For ease of reference, all predecessors-in-interest of Plaintiffs or Defendant will be referred to as "Plaintiffs" or "Defendant" respectively.

sought to extend those tracks northward to Detroit and construct a new line of railroad in the vicinity of Trenton that would, in part, run parallel to the north-south lines then owned by Plaintiffs. (Pls.' Mot. for Summ. J. 2; Def.'s Mot. for Summ. J. 2.) Defendant's line would approach Trenton from the west, veer north and run parallel to the west of Plaintiffs' lines. (Pls.' Mot. for Summ. J. 2.) In the vicinity of Trenton, Defendant's line would cross Plaintiffs' lines and continue north, running parallel and to the east of Plaintiffs' lines. (*Id.*)

On November 11, 1897, Plaintiffs and Defendant entered into an agreement ("1897 Agreement"), allowing Defendant to put in an interlocking system "at or near Trenton" in order to cross Plaintiffs' lines.[1] In addition, the 1897 Agreement stated:

> [Plaintiffs] shall . . . have the right at any time hereafter to construct additional tracks crossing [Defendant's] track at said point and connect such additional tracks . . . with said interlocking system . . . . [Defendant] shall put in and maintain at its own expense crossings of all the spur tracks of [Plaintiffs] which run eastward from the main line of [Plaintiffs] toward Detroit River and protect the same by gates . . . . Plaintiffs shall [] have the right at any time or times hereafter to cross with spur tracks any portion of [Defendant's] tracks and right of way between Trenton and the Wabash Railway near Delray without cost or payment of compensation therefor to [Defendant]. [Plaintiffs] shall construct and maintain such crossings and guard the same by gates.
>
> This agreement shall bind the successors and assigns of the respective parties thereto.

The 1897 Agreement allowed Defendant to cross Plaintiffs' lines and extend its railway toward Detroit as Defendant desired. The 1897 Agreement also gave Plaintiffs the right to cross Defendant's new line, preventing Plaintiffs' lines from being walled in. The southern point of this "wall" began at Trenton Station, an established railroad stop at the

---

[1] The interlocking system that Defendant put in pursuant to this agreement became known as the "FN Interlocking" and still exists in the same location. (Def.'s Mot. for Summ. J. 3; Pls.' Mot. for Summ. J. 4.)

time of the 1897 Agreement, where one of Plaintiffs' lines intersected with an independent and unrelated railroad company's tracks. (Pls.' Mot. for Summ. J. 4.)

Between 1901 and 1903, another predecessor of Defendant reached a series of similar crossing agreements with Plaintiffs regarding the Trenton area. (Def.'s Mot. for Summ. J. 3.) These agreements allowed another set of mainline tracks to be built, heading northward through the Trenton area and on to Detroit, on the opposite side of Plaintiffs' tracks from Defendant's new tracks that gave rise to the 1897 Agreement. (*Id.*) By the early 1900s, except for Plaintiffs' crossing agreements with the other railroads, Plaintiffs' tracks were "walled in," as shown below.



(Def.'s Mot. for Summ. J. 3.)

## II.   Standard of Review

Courts considering expert testimony examine admissibility within the context of Federal Rule of Evidence 702.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The United States Supreme Court has established that Rule 702 requires district courts to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1993). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (expanding *Daubert's* analysis of expert scientific testimony to cover expert testimony based on "technical" and "other specialized knowledge"). Rule 702 "imposes a 'gatekeeping' duty on district courts [to] exclude unreliable and irrelevant evidence." *Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp. 2d 752, 761 (E.D. Mich. 2010) (Edmunds, J.) (citation omitted).

Expert testimony is relevant only when it will assist the trier of fact in understanding the evidence or determining a material fact in question. *Daubert*, 509 U.S. at 592-93. The question is whether the expert testimony improperly addresses matters within the understanding or common knowledge of the average juror or invades the province of jury. *United States v. Thomas*, 74 F.3d 676, 684 n.6 (6th Cir. 1996), *abrogated on other grounds by Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998). *See also Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) ("If everyone knows [a particular fact], then we do not need an expert because the testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue.") (internal citation omitted).

An expert opinion that is based on scientifically valid principles will satisfy Rule 702, while an expert's subjective belief or unsupported speculation will not. *Smelser v. Norfolk So. RR Co.*, 105 F.3d 299, 303 (6th Cir.1997), *abrogated on other grounds by*

4

*Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998). Courts are not required to admit opinions or conclusions that are connected to the existing data only by the *ipse dixit* of the expert. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Courts recognize that:

> Social science research, theories and opinions cannot have the exactness of hard science methodologies, and expert testimony need not be based on statistical analysis in order to be probative. Peer review, publication, potential error rate, etc. are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it. In such cases, the place to quibble with an expert's academic training is on cross-examination and goes to his testimony's weight, not its admissibility.

*United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008) (quotations and citations omitted)

The party offering expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

### III.  Analysis

Plaintiffs seek to have Graydon M. Meints testify as an expert on Michigan railroad history. Defendant seeks to exclude this expert witness and argues that Meints' opinions are inadmissable under Federal Rule of Evidence 702 because Meints is unqualified to offer contract interpretations and conclusions of law and those opinions improperly invade the province of the Court and the jury. Specifically, Defendant argues that: (1) Meints is not qualified to offer expert testimony; (2) Meints cannot offer testimony on the intentions of the parties in executing the 1897 Agreement; (3) Meints' opinions are not reliable; (4) Meints' opinions will not assist the trier of fact; (5) Meints offers opinions on ultimate legal conclusions; and (6) Meints is not qualified to offer an

5

opinion on the meaning of the word "Trenton" as used in the 1897 Agreement.

### A. Expert Qualifications

Defendant argues that Meints should be excluded as an expert because he has no knowledge, skill, experience, training, or education in drafting, negotiating, or interpreting contracts. Plaintiffs argue that Meints is a recognized authority on Michigan railroad history and that his experience and qualifications allow him to testify as an expert in this case.

Graydon M. Meints worked at Fidelity Savings Bank for 32 years and retired in 1996. (Meints Dep. 14:15-15:1, Feb. 9, 2011.) Meints graduated from Calvin College in 1955 with a bachelor of arts in education and a major in English. (*Id.* at 27:15-28:17.) He does not have a degree in history, geography, transportation, or cartography. (*Id.* at 58:24-59:7.) Meints admits that he has no specific training in conducting research in history. (*Id.* at 67:7-9.) He has never testified as an expert witness. (*Id.* at 9:14-16.)

Meints worked in the railroad industry for nine years, from 1955-1964, as a telegrapher. (Meints Dep. 34:14-37:4.) This job involved setting the signals so the trains could proceed through the interlocking, making decisions as to which trains could proceed and which had to be held because others had precedence, and reporting the train movements to the dispatcher and yard masters. (*Id.* at 37:17-23.) During his employment with the railroad, he was never involved in negotiating any agreements (*Id.* at 44:24-45:2) and has no experience in drafting, negotiating, or interpreting a contract like the 1897 Agreement (*Id.* at 235:19-25).

Meints states that his interest in history began as a hobby in 1970. (*Id.* at 62:7-

18.)  He joined the Kalamazoo History Society and Historical Society of Michigan in the late 1960s or early 1970s.  He states, "I think it began as a hobby, but it became a very serious interest as time passed. . . . And it now is something that occupies a good share of my time."  (*Id.* at 62:18-22.)

In the mid-1970s, Meints published his first article on the history of Kalamazoo railroad stations in *The Inside Track*, a railroad-related magazine.  (*Id.* at 80:3-7; 83:12-15.)  Meints has over forty years of experience in researching and writing about railroad history in Michigan.  (Meints Report 2.)  He has published through university publishing houses several compendiums and directories on Michigan railroad history and has published four books on railroad history that are currently available to the public.  The notes Meints compiled in his research are archived and available to the public as reference material at the University of Michigan Bentley Historical Library.  (Pls.' Resp. Ex. D.)  Meints admits that there is nothing in his books that would be comparable to the analysis of the 1897 Agreement that he undertook in this case.  (*Id.* at 102:23-103:1.)

Meints has also written at least ten articles in historical and trade publications.  (Meints Report 2; Pls.' Resp. Ex B.)  Additionally, he has presented papers based on several of his published articles to the Michigan Railroad History Conference, Michigan in Perspectives conference at Wayne State University, New York Central System Historical Society annual meeting, and the Kalamazoo County Historical Society.  (Meints Report 2.)  None of Meints' presentations have touched upon the topic of interpreting railroad contracts.  (*Id.* 121:1-23.)

Some of Meints' publications have been peer reviewed, as represented to Meints by the publishers and Meints' receipt of comments on his "The Fruit Belt Line" article.

(Meints Dep. 88:4-5, 92:21-93:20, 104:19-105:8.) Meints' *Michigan Railroad Lines*, a two-volume directory of every rail line ever built in Michigan with accompanying maps, was publicly reviewed by Clemson University Professor and History Department Chair H. Roger Grant, who described the work as "a valuable research tool" for transportation scholars, historians, and others. (Pls.' Resp. Ex F.)

Meints has been studying and writing about Michigan railroad history for decades. He has authored and published articles, authored and published books, given presentations, and remains an active researcher in Michigan railroad history. Meints is not qualified to offer expert opinions on contract interpretation, but he is qualified to offer expert opinions on the history, development, and industry custom and course of dealing in the railroad industry in the Detroit-Toledo corridor in the late 19th century.

Defendant's general objection to Meints as being unqualified to offer an expert opinion in this case is DENIED.

### B. Reliability

Defendant argues that Meints' opinions are not reliable because (1) they have not been subject to testing or peer review and (2) Meints is unable to verify that his published articles and books were subject to peer review, making it difficult for the Court to determine whether Meints' Report is the result of reliable principles and methods that have been reliably applied to the facts of this case.

Plaintiffs contend that some of Meints publications were, in fact, peer reviewed. There is evidence that the article, "The Fruit Belt Line" was peer reviewed because Meints received comments and suggestions from the publisher before publication. Additionally, the publishers for his other works also suggested that their publications go

8

through a peer review process and one of Meints' works, the *Michigan Railroad Lines* compilation, received a rave review (post-publication) from a Clemson University History Department Chair.

However, Defendant places too much emphasis on the *Daubert's* peer review factor. In *Kumho Tire*, the Supreme Court stated:

> We also conclude that a trial court *may* consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Kumho Tire*, 526 U.S. at 141-42. Additionally, there are many cases in which peer review, publication, and potential error rate are not as relevant to the court's determination of reliability and the court's analysis depends more heavily on the knowledge and experience of the expert, rather than the methodology of theory behind it." *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008).

Meints' opinion in this case is based on his decades of historical research and knowledge of Michigan railroad history. Defendant's argument that Meints' opinions should be excluded as unreliable because they have not been peer reviewed is DENIED.

### C. Assist Trier of Fact

Defendant argues that Meints' opinions are on questions of law within the sole competence of the Court and he should not be allowed to offer interpretation of unambiguous contract language. Specifically, Defendant objects to Meints' statements that (1) the 1897 Agreement phrase, "shall bind the successors and assigns of the

respective parties" carries all rights forward to all succeeding companies and (2) pursuant to the 1897 Agreement language, Plaintiffs retain the rights given in the 1897 Agreement. Plaintiffs contend that Meints is not offering a legal or contractual opinion, but a historical one.

Courts should preclude an expert witness from testifying as an expert where the witness has specialized knowledge on one subject but attempts to testify on a different subject. *Coal Res. v. Gulf & W. Indus.*, 954 F.2d 1263, 1269 (6th Cir. 1994) (holding that an expert was qualified to testify on the development and mining of a property, but not as to the cost of the coal-preparation plant). Additionally, expert testimony to interpret contract language is inadmissible unless there is a need to interpret an ambiguity or clarify or define terms of art, science or trade. *See N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997); *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir. 1981).

To the extent that Meints intends to offer opinions on the plain and unambiguous meaning of the contract language, this testimony is inadmissible. The parties have already agreed, in their joint submission of facts, that Plaintiffs and Defendant are successors of the original parties to the 1897 Agreement. It does not assist the trier of fact for an expert to testify about something to which the parties have agreed. *See Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994).

Defendant's motion to exclude Meints' statements about the unambiguous language of the 1897 Agreement is GRANTED.

**D.   Meaning of "Trenton"**

Defendant argues that Meints' opinion on the meaning of "Trenton" in the 1897

Agreement should be excluded because Meints is not a geographer, cartographer, or surveyor. Plaintiffs argue that Meints' opinion is appropriate because "Trenton" is a term of art and Meints is offering an opinion based on railroad history and the context and meaning of the term given period-specific and industry-specific language. It is well-settled that if the language of a contract is clear and unambiguous, it is to be construed according to its plain sense and meaning, but if it is ambiguous, extrinsic evidence can be offered to explain the ambiguity. *New Amsterdam Cas. Co. v. Sokolowski,* 374 Mich. 340, 342 (1965); *see also Frankenmuth Mut. Ins. Co. v. Masters,* 460 Mich. 105, 111 (1999). However, the court should not create ambiguity where the terms of the contract are clear. *New Amsterdam*, 374 Mich. at 342. Consideration of extrinsic evidence generally depends on some finding of contractual ambiguity. *City of Grosse Pointe Park v. Michigan Mun. Liab. and Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005).

There are two types of ambiguities in a contract: patent and latent. A patent ambiguity is one "that clearly appears on the face of a document, arising from the language itself." Black's Law Dictionary (7th ed.). A latent ambiguity, however, is one "that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." Black's Law Dictionary (7th ed.). "Because the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist." *Grosse Point Park*, 702 N.W.2d at 113 (quotation omitted).

Where a latent ambiguity exists, "extrinsic evidence is admissible to indicate the

actual intent of the parties as an aid to the construction of the contract." *Id.*; *McCarty v. Mercury Metalcraft Co.,* 372 Mich. 567, 575 (1964). In contract interpretation, the cardinal rule is to ascertain the intention of the parties and "to this rule all others are subordinate." *McIntosh v. Groomes,* 227 Mich. 215, 218 (1924). The extrinsic evidence offered to aid in the construction of the contract may come in the form of expert testimony on custom or practice. *Travelers Indem. Co. v. Reinsurance Co.*, 62 F.3d 74, 78 (2d Cir. 1995).

Meints seeks to offer an opinion on what "Trenton" means in the 1897 Agreement. This issue is in direct dispute and the parties have offered possible interpretations that it means a specific point on the tracks, like the FN Interlocking or a station itself, or that it means an area, including an area beyond the station to include the sidings and spurs for freight customers to ship and receive freight or even the city or town boundaries. Extrinsic evidence is allowed to prove the existence of the ambiguity, as well as resolve it.

Defendant argues that because Meints did not read or study any railroad contracts in determining the different uses of the word "Trenton," that his opinion is unreliable. However, based on Meints' research of Michigan railroads, his opinion on the names and locations used in the railroad industry at the time of the 1897 Agreement is reliable. Meints' research and knowledge about the use of named places by a railroad is general to the industry, and the fact that he did not review railroad contracts from that time period goes to the weight of his testimony, not its admissibility.

Defendant's motion to exclude Meints' testimony and opinion on the meaning of "Trenton" in the 1897 Agreement is DENIED.

### E. Ultimate Legal Conclusions

Defendant argues that Meints should not be allowed to offer the opinion that, under the 1897 Agreement, Plaintiffs have "the right to build spur tracks across [Defendant's] tracks and right of way from the southern point where [Defendant's] right to install track began restricting egress to the northern point where [Defendant's] right to install track ceased to restrict egress." (Meints Report 12.) Defendant argues that this opinion is a broad legal conclusion not allowed under Rule 702.

Expert testimony that merely offers a legal conclusion favored by the proponent is not admissible. *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) (holding that expert opinion that does little more than tell the jury what result to reach is inadmissible). However, Rule 704(a) states, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." This shifts the focus to whether the testimony is otherwise admissible. *United States v. Sheffey,* 57 F.3d 1419, 1425 (6th Cir.1995).

Meints' opinion about the location described in the 1897 Agreement is based directly on his understanding of the word "Trenton," discussed in Section D above. Because Rule 704 permits expert testimony even if it embraces an ultimate issue to be decided, Meints' opinion is admissible. Meints will be allowed to offer an opinion on the what the locations in 1897 Agreement refer to, based on his expertise as a railroad historian and the custom and industry practice in using named places at that time. However, Meints will not be allowed to offer an opinion as to what the rights of the parties based on those locations. This testimony improperly invades the province of jury. *See Thomas*, 74 F.3d at 684 n.6.

Defendant's motion to exclude Meints' opinion about the locations referenced in the 1897 Agreement is DENIED. However, to the extent that Meints' seeks to offer an opinion about the rights that the 1897 Agreement bestows on Plaintiffs', Defendant's motion to exclude that testimony is GRANTED.

### F. Parties' Intent

Defendant argues that Meints has no specialized knowledge of the parties' intentions in 1897 and any opinions on that topic is mere speculation. Plaintiffs argue that Meints' opinions about the circumstances surrounding the negotiation and drafting of the agreement is allowed as an opinion on industry custom and practice and that Rule 702 allows for expert testimony as to the intent and motivation of parties and non-parties alike.

Experts may not testify as to the legal effect of a contract. *CMI-Trading, Inc. v. Quantum Air, Inc.*, 98 F.3d 887, 890 (6th Cir. 1996) (holding the intent of the parties is an issue within the competence of the jury and expert opinion testimony will not assist the jury in determining the factual issue of intent). While experts may give opinions on ultimate issues of fact under Rule 704, a court must not allow expert testimony to infringe on its own authority to instruct the jury on law or to infringe on the jury's authority to determine ultimate issues such as the intent of a party. *See Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir. 1994) (overturning verdict where expert witness defined term "deliberate indifference"); *Woods v. Lecureux,* 110 F.3d 1215, 1220 (6th Cir.1997) (upholding district court's ruling prohibiting expert witness from defining the term "deliberate indifference").

In his report, Meints states, "It would be expected that [Plaintiffs] would have wanted to preserve their ability to build tracks to businesses to the east and west of their lines at some time in the future. I believe that the 1897 agreement allows [Plaintiffs] to build such spurs across [Defendant's] tracks." (Meints Report 11.)

At direct issue in this case is the legal effect of the 1897 Agreement between the parties. However, the terms of the contract can speak for themselves. Consideration of extrinsic evidence depends on some finding of contractual ambiguity. *Grosse Pointe Park*, 702 N.W.2d at 113. This policy reflects the principle of freedom of contract and the assumption that the parties intentionally agreed to what is presented in a contract. *Id.* Meints may not testify as to the intent of the parties in the 1897 Agreement.

Defendant's motion to exclude Meints' opinion on the intention of the parties to the 1897 Agreement is GRANTED.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to exclude the testimony of Graydon Meints is GRANTED in part and DENIED in part.

                                               s/Nancy G. Edmunds
                                               Nancy G. Edmunds
                                               United States District Judge

Dated: December 1, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 1, 2011, by electronic and/or ordinary mail.

                                               s/Carol A. Hemeyer
                                               Case Manager