UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSOLIDATED RAIL CORPORATION
and NORFOLK SOUTHERN RAILROAD
COMPANY,

        Plaintiffs/Counter-Defendants,

v.

GRAND TRUNK WESTERN RAILROAD
COMPANY,

        Defendant/Counter-Claimaint.

_____/

Case No. 09-cv-10179

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO EXCLUDE CERTAIN TESTIMONY OF DAVID WILSON
AND PAUL CAREY**

        This matter comes before the Court on Defendant Grand Truck Western Railroad

Company's motion to exclude from consideration in the summary judgment proceedings

and admission at trial certain testimony from David Wilson and Paul Carey.  For the

reasons set forth below, Defendant's motion is GRANTED in part and DENIED in part.

**I.**      **Facts**

        **A.**      **David Wilson**

        David Wilson worked for Plaintiffs from 1967 to 1984.  (Wilson Dep. 9:4-12, Dec.

9, 2009.)  He then worked for Defendant from 1984 until July of 1996.  (*Id.* at 9:15-21.)

Wilson was the vice president of operations the entire time he worked for Defendant.

(*Id.* at 32:19-24.)  His job included approving trackage rights agreements and handling

1

disputes with other railroads over the right to service customers under Defendant's prior agreements.  (*Id.* at 43:14-20.)  Wilson stated that in the entire time he worked for Defendant, he never saw a dispute similar to the one at issue in this case.  (*Id.* at 43:21-25.)

During the time from 1993 to 1996, Bill Lipton and Paul Ladue worked under Wilson, and they were responsible for overseeing and managing the joint facility agreements and addressing the dispute between Plaintiffs and Defendant that gave rise to this case.  (*Id.* at 46:6-19.)  Wilson relied on Mr. Lipton and Mr. Ladue to handle direct responsibility and report back to him generally.  (*Id.* at 46:20-23.)  In 1993, Wilson was directly involved in the dispute between Plaintiffs and Defendant about whether an agreement from 1897 afforded Plaintiffs the right to cross over Defendant's tracks to access the Trenton Steel Warehouse property.  (*Id.* at 63:9-64:24.)

David Wilson, on behalf of Defendant, and Paul Carey, on behalf of Plaintiffs, discussed the various ways that this dispute might be resolved.  If Plaintiffs had the right to cross Defendant's tracks, Wilson determined that it was in Defendant's best interest that instead of installing a diamond crossing, Defendant would grant Plaintiffs trackage rights (i.e. allow Plaintiffs limited use of Defendant's tracks).  (*Id.* at 173:7-175:21.)

In 1994, Plaintiffs and Defendant agreed to submit the dispute to arbitration and signed a letter agreement stating the provisions that would be met in the event that the arbitrators decided that Plaintiffs could cross Defendant's tracks to serve Trenton Steel Warehouse.  (Def.'s Mot. Ex. 2.)  Paul Carey signed this letter agreement on behalf of Plaintiffs and David Wilson signed on behalf of Defendant.  (*Id.*)  The letter agreement indicated that if Plaintiffs prevailed in the arbitration, Defendant would provide

2

immediate access to Trenton Steel Warehouse by a trackage rights agreement.  (*Id.*)

On July 13, 1994, Plaintiffs and Defendant submitted the dispute to arbitration.  (Def.'s

Mot. Ex. 3.)  Specifically, the parties asked the arbitrators:

> Do [Plaintiffs] have the right, pursuant to the Agreements, to cross the tracks,
> facilities, right-of-way, and other property of [Defendant] in or near Trenton,
> Michigan for the purpose of providing [Plaintiffs] access to and the ability to
> provide rail freight transportation service to the Trenton Steel Warehouse?

(*Id.*)  At that time, Wilson considered the "Trenton Steel Warehouse" to be a physical

piece of property, not a building or corporation.  (Wilson Dep. at 73:6-74:1.)  Wilson

admits, however, that he had no idea as to the amount of property owned by the owner

of Trenton Steel Warehouse at that time.  (*Id.* at 106:24-107:4.)  Wilson also stated that

he referred to Huron Valley Steel Corporation as the "Trenton Steel Warehouse."  (*Id.* at

30:25-31:4.)  Wilson did not attend the arbitration proceedings and did not actively

participate in the preparation of materials for the arbitration, nor did he review those

materials.  (*Id.* at 208:25-209:11.)

On January 21, 1996, the arbitrators ruled in Plantiffs' favor.  (Def.'s Mot. Ex. 4.)

In order to effectuate the arbitration award, Plaintiffs and Defendant entered into a

Trackage Rights Agreement ("TRA") to allow Plaintiffs access to Defendant's tracks to

service Trenton Steel Warehouse.  (Def.'s Mot. Ex. 6.)  Wilson stopped working for

Defendant in 1996 and was no longer physically present in Defendant's offices as of

March 1, 1996.  (Wilson Dep. at 79:4-9.)  Wilson was not involved in the drafting of the

TRA and had never reviewed or seen it before he prepared for his deposition in this

case.  (*Id.* at 78:19-80:2, 185:1-2.)  To the extent that Paul Ladue drafted the TRA while

3

Wilson was still employed with Defendant, though, Ladue was under Wilson's direction.
(*Id.* at 203:3-7.)

Wilson went back to work for Plaintiffs in late 1996 and continued working there
until he retired in 2000. (*Id.* at 9:20-10:7.) Wilson has no personal knowledge of the
lockout and has never heard of E.C. Korneffel Company. (*Id.* at 30:4-14.)

### B.   Paul Carey

Paul Carey worked for Plaintiffs from 1979 until 1999 when he retired. (Carey
Dep. 36:11-13, Dec. 2, 2009.) Carey held the position of "general manager, contracts"
from 1992 to 1999. (*Id.* at 35:12-36:8.) In this position, Carey was responsible for
drafting, negotiating, and managing Plaintiffs' operating agreements with other railroads,
including trackage rights agreements. (*Id.* at 68:23-69:2.) John Cornue reported to
Carey and Carey relied on Cornue for archiving and Plaintiffs' institutional memory. (*Id.*
at 101:7-21.)

Carey sought Cornue's input (as well as input from Cornue's subordinate, Bill
Bayliff) and considered it valuable, but, ultimately, Carey made his own determination
as to whether Plaintiffs had the right to cross Defendant's tracks to service Trenton
Steel Warehouse. (*Id.* at 103:16-23.) Carey was involved in the initial decision to
approach Defendant and assert that Plaintiffs believed they had a right to cross
Defendant's tracks to access Trenton Steel. (*Id.* at 116:23-25.)

Carey drafted and signed the June 23, 1994 letter agreement on behalf of
Plaintiffs that indicated that if Plaintiffs' prevailed in the arbitration, Defendant would
provide immediate access to Trenton Steel Warehouse by a trackage rights agreement.
Carey consulted closely with Plaintiffs' counsel, Robert Natalini, in formulating the exact

4

wording of the question presented to the arbitration panel, but Carey did not draft the letter. (*Id.* at 205:8-206:11.)

Carey was involved in negotiating the TRA and signed it on behalf of Plaintiffs. (*Id.* at 224:9-226:5.)  Although he was involved, Carey does not deny that Mr. Ladue, who negotiated for Defendant, may have dealt only with John Cornue on behalf of Plaintiffs. (*Id.*)

**II.   Standard**

A trial court may consider only admissible evidence in ruling on a motion for summary judgment. *See Wiley v. United States,* 20 F.3d 222, 225-26 (6th Cir. 1994) (citation and quotation omitted).  Ultimately, the decision to admit or exclude evidence is within the sound discretion of the court. *See Muzquiz v. W.A. Foote Mem. Hosp., Inc.,* 70 F.3d 422, 428 (6th Cir. 1995).  In exercising its discretion the court "must consider the relevance and prejudice, and those decisions will not be lightly overturned." *See United States v. Chambers,* 441 F.3d 438, 455 (6th Cir. 2006).

According to Federal Rules of Evidence 401 and 402, all relevant evidence is generally admissible and consists of any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

**III.   Analysis**

Defendant seeks to exclude; (1) Wilson and Carey's testimony on the June 23, 1994 letter agreement, (2)  Wilson and Carey's testimony on the May 1, 1996 Trackage Rights Agreement, (3) Wilson's testimony on the Arbitration Proceedings and Arbitration

5

Award, (4) Paragraph 8 of Wilson's Declaration, (5) Paragraphs 17 and 18 of Carey's Declaration, and (6) Paragraph 5 of Carey's Declaration.

### A.   Wilson and Carey's Testimony on the June 23, 1994 Letter

Defendant argues that Paul Carey and David Wilson's testimony regarding the June 23, 1994 letter and their understanding of the term "Trenton Steel Warehouse" in that letter is irrelevant and is inadmissible extrinsic evidence of an unambiguous contract term in the May 1, 1996 Trackage Rights Agreement ("TRA").  Plaintiffs assert that Carey and Wilson's testimony regarding the June 23, 1994 letter is appropriate because "Trenton Steel Warehouse" is ambiguous and the letter served as a "Pre-Arbitration Agreement" that set forth terms and conditions that the parties were to enforce if the arbitration came out in Plaintiffs' favor.  Because this letter set the initial terms of a potential trackage rights agreement, Plaintiffs argue that Wilson and Carey's testimony is relevant as to what the parties intended when referring to "Trenton Steel Warehouse" in the course of their dealings with one another.

It is well-settled that if the language of a contract is clear and unambiguous, it is to be construed according to its plain sense and meaning, but if it is ambiguous, extrinsic evidence can be offered to explain the ambiguity.  *New Amsterdam Cas. Co. v. Sokolowski,* 374 Mich. 340, 342 (1965); *see also Frankenmuth Mut. Ins. Co. v. Masters,* 460 Mich. 105, 111 (1999).  The court should not create ambiguity where the terms of the contract are clear.  *New Amsterdam*, 374 Mich. at 342.  Consideration of extrinsic evidence generally depends on some finding of contractual ambiguity.  *City of Grosse Pointe Park v. Michigan Mun. Liab. and Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005).

6

This reflects the principle of freedom of contract and the assumption that the parties intentionally agreed to what is presented in a contract. *Id.*

There are two types of ambiguities in a contract: patent and latent. A patent ambiguity is one "that clearly appears on the face of a document, arising from the language itself." Black's Law Dictionary (7th ed.). A latent ambiguity, however, is one "that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." Black's Law Dictionary (7th ed.). "Because the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist." *Grosse Point Park*, 702 N.W.2d at 113 (quotation omitted). Where a latent ambiguity exists, "extrinsic evidence is admissible to indicate the actual intent of the parties as an aid to the construction of the contract." *Id.*; *McCarty v. Mercury Metalcraft Co.,* 372 Mich. 567, 575 (1964).

In contract interpretation, the cardinal rule is to ascertain the intention of the parties and "to this rule all others are subordinate." *McIntosh v. Groomes,* 227 Mich. 215, 218 (1924).

> The role of the court is to ascertain, and effectuate the intent of the parties at the time of contract formation. It is the expressed, and not secret intent which is operative. Where the language of the contract is clear on its face, the court looks to it to ascertain the parties' intent. Where . . . a party claims that an ambiguity exists in the language the court then looks to see if there is extrinsic evidence which supports this contention. However, one party's uncommunicated understanding concerning the specialized meaning of contract language is not binding on the other party.

7

*Turner Holdings, Inc. v. Howard Miller Clock Co.*, 657 F. Supp. 1370, 1379-80 (W.D. Mich. 1987); *see also Various Markets, Inc. v. Chase Manhattan Bank, N.A.*, 908 F. Supp. 459, 472 (E.D. Mich. 1995) ("Whether the terms of a contract are clear or ambiguous is a question of law for the court to decide. Where there is clear and unambiguous language in an agreement, the intent of the parties is to be determined from those terms, without reference to extrinsic evidence.").

The fact that the parties may disagree as to the meaning of contract terms does not necessarily establish the existence of an ambiguity, even if one party asserts that a result different from that embodied in the terms was intended. *Steinmetz Elec. Contractors v. Int'l Bhd. of Elec. Workers,* 517 F. Supp. 428, 432 (E.D. Mich.1981) (granting the defendants' motion for summary judgment because the contract was unambiguous).

In this case, the parties disagree about the meaning of "Trenton Steel Warehouse" in the 1996 Trackage Rights Agreement ("TRA").  The question for the court is whether "Trenton Steel Warehouse" is an ambiguous term.  Looking at the contract itself, "Trenton Steel Warehouse" appears four times in the TRA.  It first appears in the title of the TRA itself, which reads "Trackage Rights Agreement Between [Defendant] & [Plaintiffs] to Service Trenton Steel Warehouse."  Second, in Section 1, the TRA states:

> [Defendant] hereby grants to [Plaintiffs] the right to operate . . . in either direction over the following segments of [Defendant]'s railroad for the sole purpose of serving Trenton Steel Warehouse or its successor (hereinafter referred to as 'Industry'), shown on the plan attached hereto, made a part hereof and marked 'Exhibit A' (hereinafter referred to as the 'Trackage').

8

The reference to a successor seems to suggest that "Trenton Steel Warehouse" could be a company or entity doing business.

The third place "Trenton Steel Warehouse" appears in the TRA is in the map attached as Exhibit A. This map shows a simplified depiction of the Trackage, over which Defendant would grant Plaintiffs access pursuant to the TRA. On the map, the words "Trenton Steel Warehouse" are boxed in, and beyond Defendant's property line, to the East. The fact that "Trenton Steel Warehouse" is boxed in on Exhibit A indicates that in the TRA, Trenton Steel Warehouse is meant to describe the actual physical warehouse on that property.

The map itself, however, is not a completely accurate depiction of the area. The TRA indicates that the Trackage includes the tracks "up to but not extending beyond . . . [Defendant] property line." In the map, the solid line that extends from Defendant's property line to the boxed in "Trenton Steel Warehouse" is not part of the Trackage. The map, however, depicts it in the same thick, solid black line that the key indicates shows the Trackage. Additionally, if the boxed in "Trenton Steel Warehouse" is the building on that property, the map incorrectly depicts that the railroad tracks run east-west, running directly into the east side of the building. In fact, the tracks curve around and enter the warehouse building on the south side.

The final place the TRA mentions "Trenton Steel Warehouse" is in the title of the General Conditions, which follow the agreement. The title reads, "General Conditions to Trackage Rights Agreement Dated as of May 1, 1996, Between [Defendant] and [Plaintiffs] Relating to Trackage Rights for [Plaintiffs] to Service Trenton Steel Warehouse at Trenton, Michigan."

9

The TRA as a whole does not appear to give a clear, unambiguous meaning to Trenton Steel Warehouse.  Defendant urges the Court to consider the Western District of Michigan's opinion in *Turner*, where the court found that there was no latent ambiguity.  In that case, the court determined that the defendant's definition of the contract language was "clearly narrower than the commonly understood meaning." *Turner*, 657 F. Supp. at 1379.  The court looked to common understanding and the dictionary definition of "under consideration" and determined that the defendant's undisclosed and uncommunicated definition, which strayed significantly from the dictionary or common meaning of the phrase, was not enough to find a latent ambiguity.

Unlike *Turner*, unfortunately, "Trenton Steel Warehouse" does not appear to have a commonly understood meaning.  Despite Defendant's claim that Trenton Steel Warehouse is unambiguously the building, Defendant's witness, Paul Ladue, states several times that he considered "Trenton Steel Warehouse" to be another name for the company that operated there.  (Ladue Dep. 16:6-17:24, 168:4-10, Nov. 10, 2009.)

Plaintiffs offer testimony from Carey and Wilson on what "Trenton Steel Warehouse" meant in the negotiation and execution of the June 23, 1994 letter.  The letter itself, in relevant part, reads:

> In the event the arbitrators decide that [Plaintiffs] may cross [Defendant's tracks] to serve Trenton Steel Warehouse, [Defendant] will permit [Plaintiffs] immediate access to Trenton Steel Warehouse.  [Defendant] agrees that [Plaintiffs] will effect the crossing and access to Trenton Steel Warehouse by operating over [Defendant] trackage to the extent necessary to cross from [Plaintiffs'] right-of-way to the premises of Trenton Steel Warehouse in an operationally practicable and efficient way that is consonant with [Plaintiffs'] desire to provide rail service. [Plaintiffs'] traversing of [Defendant]'s trackage will be pursuant to a trackage agreement incorporating, among others, the following provisions:
>
> . . .

10

2. The parties will cooperate in good faith to execute a trackage agreement incorporating the foregoing provisions and standard terms and conditions, and will execute such an agreement promptly upon receiving the arbitration decision so as not to delay [Plaintiffs'] access to the Trenton Steel Warehouse.

Paul Carey signed this letter agreement on behalf of Plaintiffs and David Wilson signed on behalf of Defendant.  The language of the letter indicates that it serves as an agreement between the parties and that it was intended to provide the provisions and terms and conditions that the parties would enforce after the arbitration award.

Because the meaning of "Trenton Steel Warehouse" as used in the TRA is unclear, extrinsic evidence of the parties' and the railroad industry's custom and use of "Trenton Steel Warehouse" will help resolve the ambiguity.  The June 23, 1994 letter set the original terms of the TRA, so the parties' understanding of "Trenton Steel Warehouse" in that letter is relevant to resolving this issue.

Defendant's motion to exclude Wilson and Carey's testimony on the June 23, 1994 letter is DENIED.

**B.    Wilson and Carey's Testimony on the May 1, 1996 Trackage Rights Agreement**

Defendant seeks to exclude Carey and Wilson's testimony on the Trackage Rights Agreement because they lack personal knowledge of the TRA.  Plaintiffs argue that Carey and Wilson did have personal knowledge of the TRA and their testimony on the subject is admissible.  Federal Rule of Evidence 602 states, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

Defendant relies on *Aspex Eyewear, Inc. v. E'lite Optik, Inc.*, CV-S-00-1116,

11

2003 WL 25730506 (D. Nev. Aug. 6, 2003).  In that case, the district court found that

deposition testimony on the drafting and negotiating of an agreement was inadmissible

under FRE 602 because the deponent stated that he was not the person who was

involved in the negotiations.  The court found that he had no personal knowledge as to

the intent of the parties with respect to the agreement, so his comments were

inadmissible.  *Aspex Eyewear*, 2003 WL 25730506, at *4.

    Similar to *Aspex Eyewear*, in this case, according to Wilson's own deposition

testimony, he stopped working for Defendant and was no longer physically present in

Defendant's offices as of March 1, 1996.  Wilson was not involved in the drafting of the

TRA and had never reviewed or seen it before he prepared for his deposition in this

case.  Wilson admits that he was not there when the TRA was entered into and that he

could not enlighten anyone on the intent of the terms of the agreement as it was entered

into at that point in time.  (Wilson Dep. at 194:21-195:3.)[1]

    The only evidence that Plaintiffs offer to support Wilson's involvement in the TRA

is that to the extent that Paul Ladue drafted the TRA while Wilson was still employed

with Defendant, Ladue was under Wilson's direction.  (*Id.* at 203:3-7.)  Wilson lacks the

personal knowledge to offer testimony on the drafting and negotiating of the TRA.  The

Court excludes Wilson from testifying about the negotiation, drafting, or intentions of the

---

[1] Plaintiffs' claim that Defendant waived its right to object to Wilson's testimony for lack
of foundation (improperly citing Fed. R. Civ. P. 32(d)(3)(B) for an objection to an error or
irregularity), Federal Rule of Civil Procedure 32(d)(3)(A) indicates, that "an objection to
a deponent's competence — or to the competence, relevance, or materiality of
testimony — is not waived by a failure to make the objection before or during the
deposition, unless the ground for it might have been corrected at that time."  Lack of
personal knowledge is an objection to a deponent's competence, and Defendant did not
waive this objection by failing to make it at the deposition.

specific parties who drafted or negotiated the TRA, to the extent that it is outside his personal knowledge.

Wilson was personally involved, however, in the dispute between Plaintiffs and Defendant from its inception in 1993 through the beginning of 1996 when he stopped working for Defendant. Wilson signed the June 23, 1994 letter that gave rise to the terms of the TRA and his testimony about what those terms meant in his course of dealing with this dispute between the parties is admissible.

Defendant also seeks to exclude Paul Carey's testimony about the TRA for lack of personal knowledge. Defendant's argument on this point is unfounded. Carey's deposition states:

> Q:    In terms of this trackage rights agreement . . . Was Mr. Cornue involved in the negotiation of this agreement on behalf of [Plaintiffs]?
> A:    I'm sure he was.
> Q:    Were you involved in it?
> A:    Yes.
> Q:    Who did you negotiate with?
> A:    Well, I don't recall if we actually negotiated the language or how the language was negotiated back in 1996, but the writing of the trackage rights document was part of John Cornue's responsibility. He generated and produced these types of documents.
> Q:    If Mr. Ladue had testified that he had dealt solely with Mr. Cornue in terms of negotiating the terms of this agreement, would you have any reason to disagree with that?
> A:    No, I would not quarrel with that.
> Q:    Now, you signed the agreement; am I correct?
> A:    Yes.
> Q:    Did you follow the normal procedure that you would in terms of reviewing and handling this type of agreement?
> A:    I did.
> Q:    I assume, being the good general manager of contracts that you were and as diligent as you were, I gather you would have read the agreement before you signed it?
> A:    Believe it or not, I did.
> . . .

13

> Q:    But at any rate, to the extent that there were changes, Mr. Cornue, if he dealt with Mr. Ladue, he would still have to work with you on the changes or could he make determinations unilaterally?
>
> A:    He would bring – in this case, he would have brought the changes to me.   And generally speaking, most of John's recommendations were accepted.

(Carey Dep. 224:9-226:5.)  Carey's deposition indicates that he not only signed the

TRA, but that he was involved in the process of its production and negotiation.

Defendant relies on the fact that Mr. Ladue, negotiating the TRA for Defendant,

only recalls dealing with John Cornue.  The fact that Carey was not the front-man in the

negotiations, though, does not mean that he lacks personal knowledge of it.  In fact,

John Cornue confirms in his deposition that Carey played a role in the TRA:

> Q:    At any rate, am I correct that you were the principal individual from [Plaintiffs] to be involved in the negotiation and the generation of the trackage rights agreement . . . ?
>
> A:    It was Paul Carey and myself, yes.
>
> Q:    Let me back up.  If Mr. Ladue testified that you were the only person he dealt with in terms of the generation of this trackage rights agreement and Mr. Carey indicated that he had no reason to disbelieve that or disagree with that, would you disagree with it?
>
> A:    I have no reason to dispute that.
>
> Q:    So it would have been you and Mr. Ladue who would have generated this trackage rights agreement with input, from your end, at least, by Mr. Carey?
>
> A:    Yes.
>          . . .
> Q:    First off, in terms of the generation of this agreement, did you speak with Mr. Carey about it?
>
> A:    Yes.
>
> Q:    And did it meet his approval?
>
> A:    Yes.

(Cornue Dep. 322:3-327:11, June 14, 2010.)

14

Defendant's motion to exclude Wilson's testimony on the Trackage Rights Agreement is GRANTED in part, as described above, and Defendant's motion to exclude Carey's testimony about the Trackage Rights Agreement is DENIED.

### C.   Wilson's Testimony on the Arbitration Proceedings and Arbitration Award

Defendant argues that Wilson's testimony regarding the arbitration proceedings and arbitration award is not based on personal knowledge and is therefore inadmissible. Wilson did not attend the arbitration proceedings and did not actively participate in the preparation of materials for the arbitration, nor did he review those materials.

To the extent that Wilson attempts to offer testimony on the specifics of the arbitration proceedings, about which he lacks personal knowledge, the Court grants Defendant's motion to exclude that testimony as outside Wilson's personal knowledge and in violation of Rule 602.

Wilson was employed by Defendant during the time that the dispute between the parties arose in 1993, however, and he signed the June 23, 1994 letter agreement that determined the scope of the issue that would be submitted to the arbitrators. The letter, from Paul Carey to David Wilson, states:

> In our recent telephone discussion regarding the above-referenced arbitration of our dispute over [Plaintiffs'] crossing [Defendant] to serve the Trenton Steel Warehouse, you stated that, while [Defendant] and [Plaintiffs] remain agreeable to arbitrating the matter, you desire that the arbitrators not be asked to set the precise manner of the crossing (that is, exactly how the crossing would be effected) in the event [Plaintiffs] are found to have the right to cross. . . . If you can agree to the provisions set forth here, [Plaintiffs] will agree that the questions submitted to the arbitrators will not include a request to set the precise terms and conditions of the crossing and access to the Trenton Steel Warehouse, but only [Plaintiffs'] right to such access.

Wilson was Vice-President of operations for Defendant, an active participant in the
negotiations that led to the arbitration, and signed the letter that determined the scope
of the issue to be presented to arbitration.

Although Wilson did not attend the arbitration proceedings nor assemble the
documents to be presented, he played a role in deciding what issue to submit to the
arbitrators.  Because of his role in the process as a whole, Wilson's recollection and
interpretation of the question that was presented to the arbitrators is within his personal
knowledge and admissible to that extent.[2]

Defendant's motion to exclude Wilson's testimony on the Arbitration is
GRANTED in part and DENIED in part.

### D.     Paragraph 8 of Wilson's Declaration

Defendant argues that paragraph 8 of Wilson's Declaration should be stricken
because it contradicts his prior deposition testimony.  Paragraph 8 of Wilson's
Declaration states, "In referencing the "Trenton Steel Warehouse" in the Pre-Arbitration
Agreement, the parties intended to allow [Plaintiffs] access to the entire location that
could be reached by use of [Defendant's] sidetrack."

Throughout his deposition, Wilson and Defendant's attorneys refer to "Trenton
Steel Warehouse" in various ways.  It is referenced as another name for the company
that operates there, a physical building, a piece of property, and the location where
Defendant's track meets the property line.  Wilson is consistent in his testimony that "in

---

[2]Defendant argues that the Arbitration Award itself is the best evidence of its meaning,
but the Arbitration Award effectively consists of a one-word – "Yes" – answer to the
question posed by the parties.

granting trackage rights, you're granting trackage rights to a physical location."  (Wilson

Dep. 73:23-24.)

In his deposition, when discussing the June 23, 1994 letter (referred to as the

"Pre-Arbitration Agreement" in Wilson's Declaration) the deposition reads:

> Q.    Okay. Am I correct that Paragraph 1 basically indicates that in the
> event the arbitrators decide favorably to Conrail, that Grand Trunk would
> permit Conrail immediate access to the Trenton Steel Warehouse, and that
> Conrail would affect the crossing and access to the Trenton Steel Warehouse
> by operating over Grand Trunk's track to the extent necessary to cross from
> Conrail's right of way to the premises of Trenton Steel, correct?
> A.    Uh-huh, yes.
> Q.    In terms of premises to the Trenton Steel, you understand that to
> mean the buildings and the grounds that is the property upon which the
> buildings were located in the track between the steel track?
> . . .
> A.    I go back to my premise that it entails the right to connect to the
> Trenton Steel Warehouse property track. . . .  It would be to connect to the
> physical -- the physical connection to the Trenton Steel track. Where that
> track went was not subject to the trackage right agreement.

(Wilson Dep. 181:23-183:3.)  Additionally, earlier in the deposition, Wilson stated,

"When I directed, before I left [Defendant], that we would agree to a trackage right

agreement to get [Plaintiffs] there, I was not – I did not intend to restrict it to per se.  I

just wanted it – so as I understand the trackage right agreement, as you're asking me,

it's to get to the property line."  (*Id.* at 113:7-12.)

These sections of the deposition are consistent with Wilson's Declaration.

Defendant's motion to strike paragraph 8 of Wilson's Declaration is DENIED.

### E.    Paragraphs 13 through 17 of Wilson's Declaration

Defendant seeks to strike paragraphs 13 through 17 of Wilson's Declaration

because they contain opinion testimony based on specialized knowledge.  Plaintiffs

contend that the matters contained in those paragraphs are within Wilson's personal

17

knowledge and are principally factual, or alternatively, are admissible under Federal

Rule of Evidence 701.  Rule 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  Courts have consistently ruled that opinion evidence on industry

practice, not limited to the specific company or personal knowledge of the witness, is

considered opinion based on specialized knowledge within the scope of Rule 702.  *See*

*Quillin v. Easton Sports, Inc.,* No. 03-151, 2005 U.S. Dist. LEXIS 38358, at *14-15 (E.D.

Tenn. Dec. 28, 2005) (finding opinions based on specialized knowledge from

involvement in the industry and not on personal observations inadmissible under Rule

701); *Med. Sales & Consulting Group v. Plus Orthopedics USA, Inc.,* 2011 U.S. Dist.

LEXIS 53766, at *17-18 (S.D. Cal. May 18, 2011) (finding opinions about industry

practices based on thirty years of experience are based on specialized knowledge not

admissible under Rule 701); *Trademark Props., Inc. v. A&E TV Networks,* No. 09-1825,

2011 U.S. App. LEXIS 7382, at *51 (4th Cir. Apr. 11, 2011) (ruling that the individuals

had not been designated as experts so they could not testify as to industry practice).

David Wilson's declaration states:

13. In my 28 years of experience in the railroad industry, I have reviewed numerous track usage agreements.

14. I have reviewed the 1996 Trackage Rights Agreement.

15. The language in "Section 6. Restriction On Use (c)" states that Conrail "shall not serve any other rail customers along the Trackage." In accordance with industry practice, as I observed in my 29 years in the industry, it is

18

common to restrict the use of the track and preclude service to customers along the track.

16. It would not be consistent with industry practice for a clause such as this to prohibit or restrict the use of privately owned industry tracks located on private property beyond the "trackage" defined in the agreement.

17. While employed at GTW, I was not aware of any agreement where GTW restricted the rail service of a trackage rights counterparty to a specific building or a specific customer.

Paragraphs 13, 14, and 17 are all statements of fact, within Wilson's personal knowledge that do not offer any opinions that would be subject to exclusion under Rule 701. Paragraphs 15 and 16, however, offer opinions based on industry practice and are based on specialized knowledge within the scope of Rule 702. Because Plaintiffs did not offer Wilson as an expert, the opinions expressed in paragraphs 15 and 16 are inadmissible.

Defendant's motion to strike paragraphs 13, 14, and 17 of Wilson's Declaration is DENIED. Defendant's motion to strike paragraphs 15 and 16 as inadmissible opinion testimony is GRANTED.

### F.     Paragraphs 17 and 18 of Carey's Declaration

Defendant argues that paragraphs 17 and 18 of Carey's July 27, 2011 Declaration should be stricken because they contain opinion testimony based on specialized knowledge. Plaintiffs contend that these paragraphs contain factual statements, not opinions.

Carey's Declaration states:

17. In my 28 years of experience in the railroad industry, I have reviewed numerous trackage rights agreements.

18. For any such agreements with which I was involved, [Plaintiffs] had never

19

restricted rail service to a specific building or a specific customer.

Both paragraphs 17 and 18 are factual statements based on Carey's personal

experience and do not offer any opinions, let alone opinions based on specialized

knowledge.  Defendant's motion to strike paragraphs 17 and 18 of Carey's Declaration

is DENIED.

### G.    Paragraph 5 of Carey's Declaration

Defendant argues that paragraph 5 of Carey's Declaration must be stricken

because it contradicts his prior deposition testimony.  Plaintiffs deny that this statement

in the declaration contradicts Carey's deposition testimony.  Paragraph 5 of Carey's

Declaration states, "I was also the principal [Plaintiffs] representative in the negotiation

and execution of the 06/23/94 pre-arbitration agreement . . . , the 07/13/94 Arbitration

Agreement . . ., and the 05/01/96 Trackage Rights Agreement between [Plaintiffs] and

[Defendant]."

First, in reference to the June 23, 1994 letter (referred to as the "pre-arbitration

agreement" in Carey's deposition), Carey negotiated, drafted, and signed the document

on Plaintiffs' behalf.  The statement that he was the principal representative for Plaintiffs

does not contradict Carey's deposition.

Second, in reference to the July 13, 1994 letter, Carey states, "I do not recall that

I was shown a draft of this particular letter in advance, although I probably had known

that we were about to file a question for the arbitrators' decision."  (Carey Dep. 210:6-9.)

He goes on to say that he was aware of the phraseology of the issue "if not before its

submission, at the time of its submission."  (*Id.* at 211:2-6.)  It is clear from his

deposition that Carey did not draft this letter, nor did he recall being shown a draft of the

20

letter before it was sent.  To state that he was Plaintiff's principal representative is, at best, an exaggeration.  Given Carey's testimony on his limited knowledge of and role in the July 13, 1994 letter, the Court finds that this section of paragraph 5 in Carey's Declaration contradicts his deposition.

Third, as indicated in Section B above, Carey and Cornue's depositions indicate that although John Cornue dealt directly with Mr. Ladue, Carey was involved in the negotiation of the May 1, 1996 TRA and signed the TRA on behalf of Plaintiffs.  When Cornue was asked if he was the principal individual involved in the negotiation and the generation of the TRA, he answered, "It was Paul Carey and myself."  Given this testimony, the Court cannot conclude that this declaration contradicts Carey's deposition.

Defendant's motion to strike paragraph 5 of Carey's Declaration is GRANTED, only as it relates to the July 13, 1994 letter to the arbitrators and DENIED as it relates to the June 23, 1994 letter agreement and the May 1, 1996 TRA.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion to exclude the testimony of David Wilson and Paul Carey is GRANTED in part and DENIED in part.


                        s/Nancy G. Edmunds
                        Nancy G. Edmunds
                        United States District Judge

Dated:  December 1, 2011

21

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 1, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer                                    
Case Manager