UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSOLIDATED RAIL CORPORATION
and NORFOLK SOUTHERN RAILROAD
COMPANY,

        Plaintiffs/Counter-Defendants,

v.

GRAND TRUNK WESTERN RAILROAD
COMPANY,

        Defendant/Counter-Plaintiff.

_____/

Case No. 09-cv-10179

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

      This matter comes before the Court on cross motions for summary judgment filed

by Plaintiffs Consolidated Rail Corporation and Norfolk Southern Railway Company and

Defendant Grand Truck Western Railroad Company.  For the reasons set forth below,

Plaintiffs' motion for summary judgment should be GRANTED in part and DENIED in

part and Defendant's motion for summary judgment should be GRANTED in part and

DENIED in part.

**I.**    **Facts**

      **A.**    **1897 Agreement**

      In the late 1800s, Plaintiffs operated parallel rail lines that extended south of the

city of Trenton, Michigan and north to Detroit.[1]  (Pls.' Mot. for Summ. J. 2; Def.'s Mot. for

Summ. J. 1.)  By 1897, Defendant had tracks to the southwest of the Trenton area and

sought to extend those tracks northward to Detroit and construct a new line of railroad in

the vicinity of Trenton that would, in part, run parallel to the north-south lines owned by

Plaintiffs.  (Pls.' Mot. for Summ. J. 2; Def.'s Mot. for Summ. J. 2.)  Defendant's line

would approach Trenton from the west, veer north and run parallel to the west of

Plaintiffs' lines.  (Pls.' Mot. for Summ. J. 2.)  In the vicinity of Trenton, Defendant's line

would cross Plaintiffs' lines and continue north, running parallel and to the east of

Plaintiffs' lines.  (*Id.*)  On November 11, 1897, Plaintiffs and Defendant entered into an

agreement ("1897 Agreement"), allowing Defendant to put in an interlocking system "at

or near Trenton" in order to cross Plaintiffs' lines.[2]  In addition, the 1897 Agreement

stated:

> [Plaintiffs] shall . . . have the right at any time hereafter to construct additional
> tracks crossing [Defendant's] track at said point and connect such additional
> tracks . . . with said interlocking system . . . .  [Defendant] shall put in and
> maintain at its own expense crossings of all the spur tracks of [Plaintiffs]
> which run eastward from the main line of [Plaintiffs] toward Detroit River and
> protect the same by gates . . . .  Plaintiffs shall [] have the right at any time
> or times hereafter to cross with spur tracks any portion of [Defendant's]
> tracks and right of way between Trenton and the Wabash Railway near
> Delray without cost or payment of compensation therefor to [Defendant].
> [Plaintiffs] shall construct and maintain such crossings and guard the same
> by gates.

---

[1] The Detroit, Monroe & Toledo Railroad Company ("DMT") and the Toledo, Canada
Southern & Detroit Railroad Company ("TCSD") are Consolidated Rail Corporation's
predecessors-in-interest.  DMT and TCSD were in operation in 1873.  For ease of
reference, all predecessors-in-interest of Plaintiffs or Defendant will be referred to as
"Plaintiffs" or "Defendant" respectively.

[2] The interlocking system that Defendant put in pursuant to this agreement became
known as the "FN Interlocking" and still exists in the same location.  (Def.'s Mot. for
Summ. J. 3; Pls.' Mot. for Summ. J. 4.)

This agreement shall bind the successors and assigns of the respective parties thereto.

The 1897 Agreement allowed Defendant to cross Plaintiffs' lines and extend its railway toward Detroit as Defendant desired.  The 1897 Agreement also gave Plaintiffs the right to cross Defendant's new line, preventing Plaintiffs' lines from being walled in.  The southern point of this "wall" began at Trenton Station, an established railroad stop at the time of the 1897 Agreement, where one of Plaintiffs' lines intersected with an independent and unrelated railroad company's tracks.  (Pls.' Mot. for Summ. J. 4.)

Between 1901 and 1903, another predecessor of Defendant reached a series of similar crossing agreements with Plaintiffs regarding the Trenton area.  (Def.'s Mot. for Summ. J. 3.)  These agreements allowed another set of mainline tracks to be built, heading northward through the Trenton area and on to Detroit, on the opposite side of Plaintiffs' tracks from Defendant's new tracks contemplated by the 1897 Agreement.  (*Id.*)  By the early 1900s, except for Plaintiffs' crossing agreements with the other railroads, Plaintiffs' tracks were "walled in," as shown below.



(Def.'s Mot. for Summ. J. 3.)

3

**B.     Arbitration and Tracking Rights Agreements**

On June 7, 1993, Plaintiffs sent Defendant a letter, notifying Defendant that

Plaintiffs intended to exercise their right, under the 1897 Agreement, to cross

Defendant's tracks.  (Def.'s Mot. for Summ. J. 6.)  The letter stated:

> [Plaintiffs are] notifying [Defendant] that they intend to exercise the right to
> access Trenton Steel Storage located just north of Harrison Street and east
> of your tracks in Trenton, MI, adjacent to "FN" interlocking. [Plaintiffs] intend[]
> to apply the right by installing a diamond to cross your tracks and sidetrack
> to access Trenton Steel Storage.

(*Id.*)  The letter mistakenly identifies Trenton Steel Storage as being located to the east

of Defendant's tracks, when it is actually located to the west.  (*Id.*)  Defendant did not

agree to Plaintiffs' plan to cross, maintaining that the 1897 Agreement allows Plaintiffs

to cross Defendant's tracks to service industries only to the east of the FN Interlocking,

not to the west of it.  (*Id.* at 7-8.)  After failing to come to an agreement, Plaintiffs and

Defendant decided to submit the dispute to arbitration.  (*Id.* at 8.)  Prior to the

arbitration, on June 23, 1994, the parties agreed that if the arbitrators ruled in Plaintiffs'

favor, then Defendant would grant Plaintiffs access to Trenton Steel Warehouse by a

trackage rights agreement.

On July 13, 1994, the parties submitted a narrow question to the arbitrator.  They

asked:

> Do [Plaintiffs] have the right, pursuant to the [1897 Agreement and two of the
> 1900s crossing] Agreements, to cross the tracks, facilities, right-of-way, and
> other property of [Defendant] in or near Trenton, Michigan for the purpose of
> providing [Plaintiffs] access to and the ability to provide rail freight
> transportation service to the Trenton Steel Warehouse.

(*Id.*)  On January 21, 1996, the arbitration panel issued its decision, deciding in the

affirmative, that Plaintiffs have the right to cross Defendant's tracks to access the

4

Trenton Steel Warehouse ("TSW"), west of the FN Interlocking.  (*Id.* at 8-9.)  Following

the arbitration award and pursuant to the June 23, 1994 agreement letter, Plaintiffs

formed an agreement with Defendant to use Defendant's tracks for a limited purpose.

On May 1, 1996, Plaintiffs and Defendant entered into the "Trackage Rights

Agreement Between [Defendant] & [Plaintiffs] to Service Trenton Steel Warehouse"

("1996 TRA").  The 1996 TRA states, "[Plaintiffs] wish to effectuate the Arbitration award

by reaching agreement on terms to use the certain portions of the aforesaid line of

railway of [Defendant] and [Defendant] is willing to grant such use on the following

terms and conditions . . . ."  Section 1 of the 1996 TRA explicitly states that Plaintiffs

have the right to use certain segments of Defendant's railroad "for the sole purpose of

serving Trenton Steel Warehouse or its successor."  Section 6 of the 1996 Agreement

delineates restrictions on use.  This section states:

> The Trackage Rights herein granted are subject to the following restrictions:
> (a) [Plaintiffs] shall use the Trackage for the sole purpose of delivering or
> picking up rail cars to and from (including the switching of such cars) [TSW]
> located adjacent to "FN." . . .
> (c) Except as provided in above subparagraph (a) [Plaintiffs] shall not move
> any rail cars of any kind, other than those cars moving to or from [TSW] or
> perform any local freight or switching service of any kind whatsoever, and
> shall not serve any other rail customers along the Trackage.

Additionally, the 1996 Agreement provided that Plaintiffs must pay Defendant a monthly

retainer fee as well as certain rates "for each rail car loaded or empty delivered to or

spotted" at TSW.

## C.   Plaintiffs' Service to Korneffel

On December 1, 2006, Plaintiffs entered into an agreement with Korneffel, a

private corporation engaged in the construction business to establish the terms on

5

which Plaintiffs would deliver steel to Korneffel. Plaintiffs would deliver the steel by using Defendant's tracks to reach a sidetrack owned by Huron Valley Steel Corporation ("HVS"), near the fence separating the HVS property from Korneffel's property. (*Id.* at 11-12.) Defendant was unaware of this agreement. (*Id.* at 12.)

On May 14, 2008, after Defendant found out that Plaintiffs were delivering railcars to Korneffel, Defendant commenced a lockout and physically prevented Plaintiffs from using its railroad tracks. (*Id.* at 13.) This resulted in 26 railcars of steel en route to Korneffel to be held up because Plaintiffs could not deliver them. (*Id.*) Defendant maintains that it has never interfered with Plaintiffs' use of its tracks to service TSW, as provided for in the 1996 TRA, but that Plaintiffs violated that agreement when they used Defendant's tracks to provide service to Korneffel.

### D.      Property

In 1974, Dana Corporation ("Dana") transferred to the Huron Valley Steel Corporation ("HVS") a parcel of land, which consisted of approximately 85.09 acres on the east side of Fort Street between King Road and Harrison Avenue ("Original HVS Parcel"). (Condon Report 4.) At the time of this transfer, the original parcel was largely vacant and contained only the Trenton Steel Warehouse building and some industrial trackage. (*Id.*) On January 7, 1987, the Original HVS Parcel was split into 3 separate parcels of land: (1) 23.29 acres, making up the existing Trenton Steel Warehouse Parcel; (2) 58.60 acres east and south of the Trenton Steel Warehouse Parcel ("Vacant Parcel"); and (3) 3.76 acres north and west of the Trenton Steel Warehouse Parcel ("Corner Parcel"). (*Id.*)

6

On December 11, 1987, the 58.60-acre Vacant Parcel was split into three additional separate parcels of land: (1) 20.60 acres of Trenton Commerce Park consisting of 16 separate lots; (2) 36.66 acres south of Trenton Commerce Park ("Remaining Vacant Parcel"); and (3) 1.34 acres of a Mini Parcel. (*Id.* at 4-5.)

In 2002, HVS sold the southern portion of the Remaining Vacant Parcel, which consisted of 17.41 acres, to Erie Development LLC ("Erie Parcel"). The Erie Parcel spans the southern boundary of the Original HVS Parcel and it touches the southern border of the Trenton Steel Warehouse Parcel. (*Id.* at 5.)

Before the parties entered into the 1996 TRA, the Trenton Steel Warehouse Parcel's physical characteristics reflected that it was not intended to be a part of the Erie Parcel. It was and is gated and fenced and both the Vacant Parcel and Erie Parcel are and have been separated from the Trenton Steel Warehouse Parcel by a storm-water detention area, ditches and tall grass; and there are and have been no roads or foot paths existing between the Trenton Steel Warehouse Parcel and the Vacant Parcel and/or the Erie Parcel. (*Id.* at 5.)

David Wilson, while employed for Defendant, went to the Trenton Steel Warehouse parcel at least twice in the early 1990s, before the dispute arose in 1993. (Wilson Dep. 56:16-59:17, Dec. 9, 2009.) Paul Carey, while employed by Plaintiffs, visited the Trenton Steel Warehouse while the arbitration was going on. (Carey Dep. 29:22-30:6, March 7, 2011.)

The central issue in dispute between the parties is whether the 1996 TRA gives Plaintiffs the right to access the entire property owned by Huron Valley Steel on Defendant's sidetrack, as Plaintiffs contend, or just the specific warehouse facility, as

Defendant maintains.

## II.     Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party.  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

8

### III.    Analysis

Plaintiffs seek summary judgment in their favor on Counts I, II, and IV of the Second Amended Complaint and all remaining counts of Defendant's Amended Counterclaim, Counts I, II, III, IV, V, VI, VII, and XI.  Defendant seeks summary judgment on Counts II, III, IV, V, VI, VII, and XI of its Amended Counterclaim and all four counts of Plaintiffs' Second Amended Complaint.  The Court will address these claims one at a time.

### A.    Breach of the 1897 Agreement

Both Plaintiffs and Defendant seek summary judgment on Plaintiffs' claim that Defendant breached the 1897 Agreement.  Plaintiffs allege that, in violation of the 1897 Agreement, Defendant blocked Plaintiffs from crossing Defendant's tracks, preventing Plaintiffs from providing freight transportation services to Korneffel.  Plaintiff also argues that they should be granted summary judgment on this count because Defendant's arguments are barred by res judicata and collateral estoppel.

Defendant claims, however, that res judicata and collateral estoppel do not apply and that the 1897 Agreement does not require Defendant to allow Plaintiffs to utilize its tracks, so Defendant did not breach the 1897 Agreement by preventing Plaintiffs from *using* Defendant's tracks to service *Korneffel.*

Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.  *Montana v. United States*, 440 U.S. 147, 153 (1979).  This means that a prior judgment has the effect of foreclosing a subsequent *claim* that has never been litigated because of a determination that it should have been advanced in an earlier action.  *Mitchell v. Chapman*, 343 F.3d 811, 818 fn. 5

9

(6th Cir. 2003).  Res judicata arises only where: (1) the prior decision was a final

decision on the merits; (2) the present action is between the same parties or their

privies as those to the prior action; (3) the claim in a present action should have been

litigated in the prior action; and (4) an identity exists between the prior and present

actions.  *Mitchell*, 343 F.3d at 819.  Michigan courts apply the doctrine of res judicata

broadly and have barred not only claims already litigated, but also every claim arising

from the same transaction that the parties, exercising reasonable diligence, could have

raised but did not.  *SHR Ltd. Part. v. Swepi LP*, 173 Fed. Appx. 433, 435 (6th Cir. 2006)

(internal citations omitted); *see also Adair v. State of Michigan*, 680 N.W.2d 386, 396

(Mich. 2004).  Res judicata is an affirmative defense and the burden of proof is on the

party urging such defense.  *E&G Finance Co. v. Simms*, 362 Mich. 592, 596-97 (1961).

Plaintiffs assert that in the arbitration, the parties litigated Plaintiffs right to cross

Defendant's tracks and Plaintiffs should therefore be granted summary judgment on this

claim.  Defendant argues that res judicata does not apply because the arbitration dealt

exclusively with Plaintiffs' right to *build tracks across* Defendant to service Trenton Steel

Warehouse, whereas this lawsuit deals with Plaintiffs' right to *utilize* Defendant's tracks.

In this case, it is undisputed that the same parties have previously gone to

arbitration over a similar and related dispute.  In the arbitration, the parties agreed to

submit a narrowly tailored question to the arbitrators.  The June 23, 1994 Letter

Agreement states, "If you can agree to the provisions set forth here, [Plaintiffs] will

agree that the questions submitted to the arbitrators will not include a request to set the

precise terms and conditions of the crossing and access to the Trenton Steel

Warehouse, but only [Plaintiffs'] right to such access."  With both parties in agreement,

10

the question submitted to the arbitrator was, "Do[] [Plaintiffs] have to right, pursuant to the Agreements, to cross the tracks, facilities, right-of-way, and other property of [Defendant] in or near Trenton, Michigan for the purpose of providing Conrail access to and the ability to provide rail freight transportation service to the Trenton Steel Warehouse?"

Although Michigan courts apply the doctrine of res judicata broadly, the requirement that the claim in a present action should have been litigated in the prior action cannot be met here.  Both parties agreed to submit a narrow question to the arbitrators and effectuate the arbitration award in the 1996 TRA.  Neither party had an opportunity to litigate the 1996 TRA because it did not exist at the time of the arbitration.

Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.  *Montana*, 440 U.S. at 153.  Collateral estoppel applies only if: (1) the precise issue raised in the present case was raised and actually litigated in the prior proceeding; (2) determination of the issue was necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom [issue preclusion] is sought had a full and fair opportunity to litigate the issue in the prior proceeding.  *Smith v. Securities & Exch. Comm'n*, 129 F.3d 356, 362 (6th Cir. 1997); *Ditmore v. Michalik*, 244 Mich. App. 569, 577 (2001).

In this case, the parties disagree on whether the second requirement has been met.  Defendant argues that while the arbitrators returned with an answer in favor of

11

Plaintiffs, that the answer was not necessarily based on the 1897 Agreement.  Plaintiffs argue, however, that the only way the arbitrators could have answered the question in the affirmative would be based on the 1897 Agreement.

The question presented to the arbitrators was whether, pursuant to "the Agreements," Plaintiffs had the right to cross Defendant's tracks in order to access the Trenton Steel Warehouse.  The agreements referenced in the July 13, 1994 letter to the arbitrators include the 1897 Agreement as well as two similar agreements, giving Plaintiffs crossing rights over other tracks, from June 25, 1901 and June 1, 1903.

In the opening argument to the arbitrators, Plaintiffs focused mostly on the 1897 Agreement, but they also argued that in the alternative, Plaintiff may cross Defendant's tracks at the location of a former siding crossing, pursuant to a 1903 Agreement. Plaintiffs represent that this 1903 Agreement is different from the one mentioned in the direct question to the arbitrators.  In issuing their decision, the arbitrators stated, "After consideration of all written submission, the Stipulations of Fact, and the testimony and argument presented at the hearing, the Arbitrator's response to the Question Presented for Arbitration is 'YES.'"

Plaintiffs argue that the crossing rights under the 1897 Agreement was "the core issue submitted" to the arbitration panel.  In the arbitration, however, the parties presented two other agreements to the arbitrators with the 1897 Agreement, as well as Plaintiffs' separate crossing scheme based on yet another 1903 agreement.  None of those other agreements were presented to this Court, so this Court cannot with determine that the arbitrators did not rely on any of them or that the determination of Plaintiffs' crossing rights given under the 1897 Agreement was necessary to the

12

outcome of that proceeding.  Plaintiffs have failed to meet their burden and collateral

estoppel does not apply.

Additionally, the current dispute is centered on Plaintiffs' right to *use* Defendant's

tracks to access Korneffel, via the Trenton Steel Warehouse property, which is a

different issue than that presented to the arbitrators and beyond the scope of the 1897

Agreement.

The 1897 Agreement reads, in relevant part:

[Plaintiffs] shall . . . have the right at any time hereafter to construct additional tracks crossing [Defendant's] track at said point and connect such additional tracks . . . with said interlocking system . . . .  [Defendant] shall put in and maintain at its own expense crossings of all the spur tracks of [Plaintiffs] which run eastward from the main line of [Plaintiffs] toward Detroit River and protect the same by gates . . . .  Plaintiffs shall [] have the right at any time or times hereafter to cross with spur tracks any portion of [Defendant's] tracks and right of way between Trenton and the Wabash Railway near Delray without cost or payment of compensation therefor to [Defendant]. [Plaintiffs] shall construct and maintain such crossings and guard the same by gates.

(Pls.' Mot Summ J. Ex. 8.)

The 1897 Agreement is a crossing agreement, allowing Plaintiffs to cross over

Defendant's tracks in the event that Plaintiffs desire to build tracks and want to provide

rail service to property or customers on the other side of Defendant's tracks.  In this

case, though, Plaintiffs did not build any tracks that they needed to cross Defendant's

tracks to reach.  Instead, pursuant to the 1996 TRA, Plaintiffs were using Defendant's

tracks.  The TRA is a separate and distinct agreement between the parties that contains

different rights and obligations than the 1897 Agreement.   This is easily illustrated by

the fact that Plaintiffs, pursuant to the TRA, were required to pay to Defendant a fixed

amount for each rail car loaded or empty delivered to or spotted at the Trenton Steel

13

Warehouse and a monthly retainer fee.  According to the 1897 Agreement, however, Plaintiffs were given the right at any time to cross Defendant's tracks and right of way "without cost or payment of compensation therefor to [Defendant]."  Plaintiffs do not allege that Defendant breached the 1897 Agreement by charging Plaintiffs to cross Defendant's tracks because Plaintiffs were not solely crossing, but actually *using* Defendant's tracks.

The 1897 Agreement, which contemplated Plaintiffs needing to cross Defendant's tracks at specific locations in order to reach additional tracks owned by Plaintiffs, is not applicable to the current dispute between the parties regarding Plaintiffs' use of Defendant's tracks.  The 1897 Agreement does not address and did not contemplate that Plaintiffs would operate on Defendant's tracks, but merely gave the right to cross them.[3]

Plaintiffs argue that the June 23, 1994 letter ("Pre-Arbitration Agreement") and the May 1, 1996 Trackage Rights Agreement together represented an agreement between the parties that Plaintiffs would exercise their crossing rights under the 1897 Agreement through the use of Defendant's tracks, rather than constructing a crossing of their own.  Therefore, by preventing Plaintiffs from using Defendant's tracks, Defendant deprived Plaintiffs of its crossing rights.  The Pre-Arbitration Agreement states, "If you can agree to the provisions set forth here, [Plaintiffs] will agree that the questions submitted to the arbitrators will not include a request to set the precise terms and

---

[3] While the Court agrees with Plaintiffs that the 1897 Agreement and subsequent arbitration give Plaintiffs the right to cross Defendant's tracks, that is not the dispute currently before the Court.

14

conditions of the crossing and access to the Trenton Steel Warehouse, but only

[Plaintiffs'] right to such access."  The letter continues:

> In the event the arbitrators decide that [Plaintiffs] may cross [Defendant] to
> serve Trenton Steel Warehouse, [Defendant] will permit [Plaintiffs] immediate
> access to Trenton Steel Warehouse.  [Defendant] agrees that [Plaintiffs] will
> effect the crossing and access to Trenton Steel Warehouse by operating over
> [Defendant's] trackage to the extent necessary to cross from [Plaintiffs'] right-
> of-way to the premises of Trenton Steel Warehouse in an operationally
> practicable and efficient way that is consonant with [Plaintiffs'] desire to
> provide rail service.

This letter, then, does not anticipate that the arbitrators will determine the full

crossing rights that Plaintiffs have; rather, it is specifically and intentionally limited to

allowing Plaintiffs to use Defendant's tracks "to the extent necessary to cross from

[Plaintiffs'] right-of-way to the premises of Trenton Steel Warehouse."

Similarly, the 1996 TRA is specifically limited to Defendant granting Plaintiffs "the

right to operate its trains, locomotives, cars and equipment with its own crews . . . in

either direction over the following segments of [Defendant]'s railroad for the sole

purpose of serving Trenton Steel Warehouse or its successor."  The rights that

Defendant granted Plaintiffs in the TRA are not the same rights that Plaintiffs acquired

in the 1897 Agreement.  The 1897 Agreement did not afford Plaintiffs the right to utilize

Defendant's tracks, and while the parties entered into the TRA to effectuate Plaintiffs'

ability to access the Trenton Steel Warehouse, this does not mean that it represented

the rights and obligations of the 1897 Agreement.

Viewing the evidence in the light most favorable to Defendant, Plaintiffs' motion

for summary judgment for breach of the 1897 Agreement is DENIED.  Viewing the

evidence in the light most favorable to Plaintiffs, Defendant's motion for summary

15

judgment against Plaintiffs' claim for breach of the 1897 Agreement is GRANTED.

> **B.    Declaratory Judgment of Parties' Rights under 1897 Agreement**

Plaintiffs seek declaratory judgment that they have the right to cross Defendant's tracks to serve Korneffel and other locations pursuant to the 1897 Agreement. Defendant sought declaratory judgment of the same in its Amended Counterclaim, but in its motion for summary judgment, Defendant argues that there is no "case or controversy" for this Court to decide and the issue is not ripe for determination because Plaintiffs have never built tracks to cross onto or proposed a specific crossing scheme.

According to 28 U.S.C. § 2201(a), "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  Federal courts' constitutional authority extends only to actual cases or controversies.  *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983).  To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision; otherwise the case is moot.  *Id.* The requirements of case or controversy are no less strict under the Declaratory Judgment Act than in any other suits.  *Alvatar v. Freeman*, 319 U.S. 359, 363 (1945).  The Supreme Court established that in order to be ripe for adjudication, "it must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937).

16

Plaintiffs argue that Defendant's Count I of its counterclaim, asking for declaratory judgment of the parties' rights under the 1897 Agreement, precludes its present argument that it is not ripe for adjudication. While the Court recognizes that Defendant has flip-flopped on this issue, the Court ultimately determines whether an issue is ripe and constitutes a present case or controversy.

Both parties have spent a significant amount of space in the record on the 1897 Agreement and the rights that it does or does not confer. However, the dispute as it actually exists between the parties is not about the 1897 Agreement or the exact crossing rights that Plaintiffs have over Defendant's tracks. The dispute between the parties is completely centered around the trackage rights that Plaintiffs do or do not have to *use*, not merely *cross*, Defendant's tracks to access the "Trenton Steel Warehouse."[4] Defendant did not lock out Plaintiffs because the parties disagreed about the rights established in the 1897 Agreement; Defendant locked out Plaintiffs because the parties disagreed about the rights established in the May 1, 1996 Trackage Rights Agreement.

As stated above, the 1897 Agreement gave Plaintiffs the right to cross Defendant's tracks, contemplating that Plaintiffs would use their rights as stated in the 1897 Agreement to "at any time hereafter to construct additional tracks crossing [Defendant's] track at said point and connect such additional tracks . . . with said interlocking system." Because Plaintiffs have not constructed any tracks that need such a crossing, the 1897 Agreement is not at issue in the current dispute between the

_____

[4] When Plaintiffs construct their own tracks and seek to cross over Defendant's tracks to access the "Trenton Steel Warehouse" or other properties, then the 1897 Agreement will be directly at issue.

17

parties.  There is no actual injury that can be redressed by a declaration of the rights of the parties under the 1897 Agreement.  Even if the Court were to declare the rights of the parties under the 1897 Agreement, it would not affect the current dispute about Plaintiffs' right to use Defendant's tracks to access the Korneffel property.

Plaintiffs' motion for a declaration of the rights of the parties under the 1897 Agreement is DENIED.

### C.    Breach of the July 1994 Arbitration Agreement

Both Plaintiffs and Defendant seek summary judgment on Plaintiffs' claim that Defendant breached the July 13, 1994 letter to the American Arbitration Association ("Arbitration Agreement").  The Arbitration Agreement, signed by both parties, states:

> [Plaintiffs and Defendant] seek to have the arbitrator decide the following question:
>> Do[] [Plaintiffs] have the right, pursuant to the Agreements,[5] to cross the tracks, facilities, right-of-way, and other property of [Defendant] in or near Trenton, Michigan for the purpose of providing Conrail access to and the ability to provide rail freight transportation service to the Trenton Steel Warehouse?
>
> [Plaintiffs and Defendant] agree to be bound by the arbitrator's determination of the above issue and to abide by such order as the arbitrator may enter pursuant to that determination.

Plaintiffs argue that Defendant breached its agreement to be bound by the arbitrator's decision when Defendant prevented Plaintiffs from crossing its tracks to service customers at that location in May 2008.  Defendant argues that it did not agree to be bound by the arbitrator's determination that Plaintiffs could *use Defendant's* tracks to service *Korneffel*.

---

[5] As stated above, the agreements included the 1897 Agreement, as well as 1901 and 1903 agreements that purportedly gave Plaintiffs crossing rights over other railroad tracks.  Neither the 1901 or 1903 agreements are at issue in this case and have not been attached to any of the filings.

18

The Arbitration Agreement clearly states the question to the arbitrators as whether Plaintiffs have the right to *cross* Defendant's property and tracks.  There is nothing in the question posed or the explanation of the dispute that suggests Plaintiffs have any rights *to use* or were seeking from the arbitrators any determination about Plaintiffs' *use of* Defendant's tracks.  Like the 1897 Agreement, the Arbitration Agreement specifically addresses Plaintiffs' right to cross Defendant's tracks, but does not refer to, decide, or grant any rights to use Defendant's tracks.

Plaintiffs' motion for summary judgment for breach of the Arbitration Agreement is DENIED.  Defendant's motion for summary judgment for breach of the Arbitration Agreement is GRANTED.

**D.     Breach of 1996 Trackage Rights Agreement**

Both Plaintiffs and Defendant seek summary judgment on Defendant's claim that Plaintiffs breached the Trackage Rights Agreement ("TRA").  Defendant argues that the TRA gave Plaintiffs the right to service only the Trenton Steel Warehouse, which is the actual warehouse building adjacent to the FN Crossing.  Plaintiffs argue that "Trenton Steel Warehouse" was the name for the property as a whole that had been owned by Huron Valley Steel Corporation ("HVS"), or that Trenton Steel Warehouse was another name for HVS, thereby giving Plaintiffs' access to Korneffel outside the scope of the TRA once on the private property of HVS.

The heart of the issue between the parties is the meaning of "Trenton Steel Warehouse" in the 1996 Trackage Rights Agreement ("TRA").  The Court must determine whether "Trenton Steel Warehouse" is an ambiguous term.

19

It is well-settled that if the language of a contract is clear and unambiguous, it is to be construed according to its plain sense and meaning, but if it is ambiguous, extrinsic evidence can be offered to explain the ambiguity.  *New Amsterdam Cas. Co. v. Sokolowski,* 374 Mich. 340, 342 (1965); *see also Frankenmuth Mut. Ins. Co. v. Masters,* 460 Mich. 105, 111 (1999).  The court should not create ambiguity where the terms of the contract are clear.  *New Amsterdam*, 374 Mich. at 342.  Consideration of extrinsic evidence generally depends on some finding of contractual ambiguity.  *City of Grosse Pointe Park v. Michigan Mun. Liab. and Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005). This reflects the principle of freedom of contract and the assumption that the parties intentionally agreed to what is presented in a contract.  *Id.*

There are two types of ambiguities in a contract: patent and latent.  A patent ambiguity is one "that clearly appears on the face of a document, arising from the language itself."  Black's Law Dictionary (8th ed. 2004).  A latent ambiguity, however, is one "that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed."  Black's Law Dictionary (8th ed. 2004).  "Because the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist." *Grosse Point Park*, 702 N.W.2d at 113 (quotation omitted).  Where a latent ambiguity exists, "extrinsic evidence is admissible to indicate the actual intent of the parties as an aid to the construction of the contract."  *Id.*; *McCarty v. Mercury Metalcraft Co.,* 372 Mich. 567, 575 (1964).

20

In contract interpretation, the cardinal rule is to ascertain the intention of the parties and "to this rule all others are subordinate." *McIntosh v. Groomes,* 227 Mich. 215, 218 (1924).

> The role of the court is to ascertain, and effectuate the intent of the parties at the time of contract formation. It is the expressed, and not secret intent which is operative. Where the language of the contract is clear on its face, the court looks to it to ascertain the parties' intent. Where . . . a party claims that an ambiguity exists in the language the court then looks to see if there is extrinsic evidence which supports this contention. However, one party's uncommunicated understanding concerning the specialized meaning of contract language is not binding on the other party.

*Turner Holdings, Inc. v. Howard Miller Clock Co.*, 657 F. Supp. 1370, 1379-80 (W.D. Mich. 1987); *see also Various Markets, Inc. v. Chase Manhattan Bank, N.A.*, 908 F. Supp. 459, 472 (E.D. Mich. 1995) ("Whether the terms of a contract are clear or ambiguous is a question of law for the court to decide. Where there is clear and unambiguous language in an agreement, the intent of the parties is to be determined from those terms, without reference to extrinsic evidence.").

The fact that the parties may disagree as to the meaning of contract terms does not necessarily establish the existence of an ambiguity, even if one party asserts that a result different from that embodied in the terms was intended. *Steinmetz Elec. Contractors v. Int'l Bhd. of Elec. Workers,* 517 F. Supp. 428, 432 (E.D. Mich.1981) (granting the defendants' motion for summary judgment because the contract was unambiguous).

Looking at the contract itself, "Trenton Steel Warehouse" appears four times in the TRA. It first appears twice in titles of the TRA itself, which read "Trackage Rights Agreement Between [Defendant] & [Plaintiffs] to Service Trenton Steel Warehouse" and

21

"General Conditions to Trackage Rights Agreement Dated as of May 1, 1996, Between [Defendant] and [Plaintiffs] Relating to Trackage Rights for [Plaintiffs] to Service Trenton Steel Warehouse at Trenton, Michigan."

Third, in Section 1, the TRA states:

[Defendant] hereby grants to [Plaintiffs] the right to operate . . . in either direction over the following segments of [Defendant]'s railroad for the sole purpose of serving Trenton Steel Warehouse or its successor (hereinafter referred to as 'Industry'), shown on the plan attached hereto, made a part hereof and marked 'Exhibit A' (hereinafter referred to as the 'Trackage').

The reference to a successor seems to suggest that "Trenton Steel Warehouse" may be a company or entity doing business.

The final place "Trenton Steel Warehouse" appears in the TRA is in the map attached as Exhibit A.  This map shows a simplified depiction of the Trackage, over which Defendant would grant Plaintiffs access pursuant to the TRA.  On the map, the words "Trenton Steel Warehouse" are boxed in, and beyond Defendant's property line, to the East.  The fact that "Trenton Steel Warehouse" is boxed in on Exhibit A indicates that in the TRA, Trenton Steel Warehouse is meant to describe the actual physical warehouse on that property.

The map itself, however, is not a completely accurate depiction of the area.  The TRA indicates that the Trackage includes the tracks "up to but not extending beyond . . . [Defendant] property line."  The line that extends from Defendant's property line to the boxed in "Trenton Steel Warehouse" is not part of the Trackage.  On the map, however, that line is depicted in the same thick, solid black line that the key indicates shows the Trackage.  Additionally, if the boxed in "Trenton Steel Warehouse" is the building on that property, the map incorrectly depicts that the railroad tracks run east-west, running

22

directly into the east side of the building.  In fact, the tracks curve around and enter the warehouse building on the south side.

The TRA as a whole, then, does not appear to give a clear, unambiguous meaning to Trenton Steel Warehouse.  The two most plausible meanings that the TRA suggests for Trenton Steel Warehouse are the actual warehouse building and the company doing business on that property.

Looking outside the TRA, the ambiguity remains.  Despite Defendant's claims that Trenton Steel Warehouse is unambiguously the warehouse structure, its witness, Paul Ladue admits that Trenton Steel Warehouse is used in different ways.  In his deposition, Ladue states:

> Q.    And you mentioned two names, Trenton Steel Warehouse and Trenton Steel Processing.  What is the difference, if any?
> A.    The company has gone by a couple of different names, some of which I believe were DBAs and some of which were generally how they referred to themselves or how folks referred to the company. They've gone by Trenton Steel Processing, Trenton Steel Warehouse, Huron Valley Steel, and there's probably a couple of others that they either have become known as or had been referred to as.
> Q.    And when you think of any of at least those three you think of the same entity?
> A.    Yes. Or I think of the same facility.
> Q.    And when you say "facility," what do you mean?
> A.    The specific location, the building and the structure that the GTW predecessor companies actually built into in 1963.

(Ladue Dep. 17:4-24.)  Later in the deposition, Ladue states that it is Defendant's position that Trenton Steel Warehouse is "a specific customer known as Trenton Steel Warehouse, Trenton Steel Processing, Huron Valley Steel, and it is a specific facility, specific building at a specific location."  (Ladue Dep. 168:4-10.)

In the July 13, 1994 letter to the arbitrators ("Arbitration Agreement"), the parties

23

define "Trenton Steel Warehouse" as "the facility of Trenton Steel Processing and Storage, d/b/a Huron Valley Steel Corporation (and its successors and assigns) ('Trenton Steel Warehouse'), located in the Trenton Commercial Industrial Park."  This is the definition of Trenton Steel Warehouse that the parties submitted to the arbitrators with the question the parties asked the arbitrators to decide about Plaintiffs' crossing rights to access Trenton Steel Warehouse.  This definition appears to support Defendant's argument that it is the actual building.

David Wilson, who worked for Defendant at the time of this dispute, used Trenton Steel Warehouse to refer to a corporate entity throughout his deposition.  He states, "Trenton Steel Warehouse was in the process of bidding on a contract . . . I met one or two times with the Trenton Steel personnel to discuss service into their facility." (Wilson Dep. 57:6-14.)  Wilson knew of Huron Valley Steel Corporation, but he called them Trenton Steel Warehouse.  (Wilson Dep. 30:25-31:4.)[6]

During the lockout, when Defendant prevented Plaintiffs from delivering to Korneffel, Defendant referred to "Trenton Steel" as a customer, stating, "[Plaintiffs are] not switching Trenton Steel it is still closed this is a new customer [Plaintiffs are] using our leads to switch."  Additionally, Paul Ladue wrote an email to Plaintiffs stating, "As you are aware, the customer that [Plaintiffs have] been servicing on [Defendant] tracks has no relationship to Trenton Steel Warehouse, is not located at the same facility and is NOT a successor to Trenton Steel Warehouse."

Paul Carey, who worked for Plaintiffs at the time of the dispute, is consistent that

---

[6] Later in the deposition, Wilson testified that he could not recall whether, at that time, he equated Huron Valley Steel Corporation to the Trenton Steel Warehouse facility. (Wilson Dep. 169:9-171:8.)

throughout this time period, his "understanding is that the customer who tendered traffic there was Huron Valley Steel Corporation. And that Trenton Steel Warehouse, as I've previously stated, is a description of any area of property." (Carey Dep. 231:19-22.) Carey states that Plaintiffs' position is that "the entire area was identified to us as Trenton Steel Warehouse, and [Defendant's] interest and control under this agreement governs the subject trackage. And GTW's rights to dictate terms end when [Plaintffs] pass into the Trenton Steel Warehouse property, and what happens there is no business of [Defendant's]." (Carey Dep. 233:14-19.)

At different times, Plaintiffs and Defendant both refer to Trenton Steel Warehouse as another name for HVS, for the actual warehouse structure, and to the property in general.

Defendant argues that even if Trenton Steel Warehouse is another name for HVS, Korneffel is not a successor of Huron Valley Steel Corporation and that the facility referred to in the Arbitration Agreement does not encompass the land and business that Korneffel is using. Plaintiffs contend that they did not breach the TRA because they used Defendant's trackage to access the sidetrack owned by HVS, as contemplated by the TRA. The fact that the steel was ultimately delivered to Korneffel, Plaintiffs argue, is something that happened on HVS private property, is outside the Trackage, and is not covered by the TRA.

In viewing the evidence in the light most favorable to the non-moving party, there are genuine issues of fact as to whether Plaintiffs violated the TRA when it delivered steel to Korneffel, via HVS' property. Plaintiffs' and Defendant's motions for summary judgment that Plaintiffs breached the TRA are DENIED.

**E.      Declaratory Judgment of Parties' Rights under Trackage Rights Agreement**

Based on the facts and reasoning from Section D, above, there are genuine

issues of fact and Plaintiffs' and Defendant's motions for summary judgment to grant

declaratory judgment of the parties' rights under the TRA are DENIED.

**F.      Intentional Interference with Prospective Economic Relations**

Under Michigan law,

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.

*Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003) (internal citations

omitted).  In order to establish a claim for tortious interference with a contractual or

business relationship, the party "must allege the intentional doing of a per se wrongful

act or the doing of a lawful act with malice and unjustified in law for the purpose of

invading the contractual rights or business relationship of another."  *Feldman v. Green*,

360 N.W.2d 881, 891 (Mich. Ct. App. 1984).

A malicious motive will be inferred from a wrongful act, done intentionally, without

just cause or excuse.  *Feldman*, 360 N.W.2d at 887 (ruling "this does not necessarily

mean actual malice or ill will, but the intentional doing of a wrongful act without legal or

social justification").  If the interference is an incident of competition, or the exercise of

like rights by others, "it is *damnum absque injuria,* unless some superior right by

26

contract or otherwise is interfered with. But if it comes from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing." *Id.* at 887.

### a. Defendant

Both parties seek summary judgment on Plaintiffs' allegation that Defendant intentionally interfered with Plaintiffs' prospective economic relations.  Plaintiffs argue that they had a valid contract with SDI to ship freight to and from SDI's plant in Indiana, including to and from Korneffel and that they had access to Korneffel's property pursuant to the 1897 Agreement and the Arbitration Award.   Plaintiffs allege that Defendant intentionally; (1) prevented Plaintiffs from continuing its business relations with SDI for delivery of freight to Korneffel, (2) required Plaintiffs to use Defendant's railcars to deliver freight to Korneffel, acquiring delivery revenues and making Plaintiffs' services too expensive to be competetive, and then (3) actively solicited and entered into contractual relationships for the delivery of freight to Korneffel.  Defendant argues that Plaintiffs had no right to use Defendant's tracks to service the Korneffel property and, as such, the separate agreements that Plaintiffs may have made with third parties were made "at the obvious peril of not being able to fulfill such commitments."

Plaintiffs argue that Defendant's action of literally placing a padlock on a track and intentionally preventing Plaintiffs from being able to make its freight delivery was done with malicious intent.  James Binder, Defendant's manager of business development and real estate, and Richard Long, Defendant's account manager, both stated that they had never heard of another occasion in which a railroad locked out another rail carrier from a facility.  (Pls.' Mot. Summ. J. Ex. 36 at 46:10-15; Pls.' Resp.

27

Ex. 44 at 78:7-14).  James Binder stated that he was the sole person for Defendant

responsible for the SDI account and prior to May of 2008, he had never made a sales

pitch to SDI to deliver freight to Korneffel.  (Binder Dep. 49:1-7.)

Defendant claims, however, that it prevented Plaintiffs from crossing its tracks,

not to induce Korneffel to break its contract with Plaintiffs, but because Defendant

believed Plaintiffs were using Defendant's tracks beyond the scope of the agreed upon

terms in the TRA.

Paul Ladue, Region Director of Contracts and Administration for Defendant,

stated that in early May, 2008, Defendant experienced substantial train delays on its

mainline tracks through the Trenton area due to Plaintiffs use of the FN Interlocking and

Defendant's tracks to deliver steel to Korneffel.  (Ladue Aff. ¶ 27, June 29, 2011.)

When Defendant sent someone to see why there were delays, Defendant learned that

Plaintiffs were delivering steel to Korneffel.  On May 14, 2008, the day that Defendant

initiated the lockout, Defendant emailed Plaintiffs, forwarding an internal email chain

that stated:

> [Plaintiffs are] not switching trenton steel it is still closed this is a new
> customer [Plaintiffs are] using our leads to switch. We have spoke[n] with this
> customer in the past about the new business but we never heard anything
> back from him. The agreement is only for trenton steel not for any new or old
> business that may come aboard. The agreement of May 1st 1996 states this.
> The track is locked out and [Defendant] dispatchers have been advised by
> me to not allow [Plaintiffs] to enter this track.

(Def.'s Mot. Summ. J. Ex. 26.)

Additionally, when Plaintiffs sent Defendant the rail car count, as required by the

TRA, they indicated that the delivered cars to "ECKORNEFF" (the railroad term for E.C.

Korneffel Company) were included in the car count to "Trenton Steel Warehouse or its

28

successor." (Pls.' Mot. Summ. J. Ex. 37.)  Defendant's employee Paul Ladue
responded:

> [Defendant] disagrees with your reference to a 'successor' of Trenton Steel
> Warehouse.  As you are aware, the customer that [Plaintiffs have] been
> servicing on [Defendant] tracks has no relationship to Trenton Steel
> Warehouse, is not located at the same facility and is NOT a successor to
> Trenton Steel Warehouse.  [Plaintiffs have] no rights over [Defendant] tracks
> to serve E.C. Korneffel Company.

(Id.)  These emails support Defendant's argument that it initiated the lockout because
Defendant thought Plaintiffs were violating the terms of the May 1, 1996 Trackage
Rights Agreement by servicing a new and different business or location than the
Trenton Steel Warehouse.

Defendant has consistently argued that Plaintiffs violated the TRA by using
Defendant's tracks to provide rail service to Korneffel, not only because it was a new
industry specifically disallowed by the TRA, but also because Plaintiffs failed to pay
Defendant for each rail car loaded or empty delivered to or spotted at Trenton Steel
Warehouse, as required by the TRA.  Defendant maintains that Plaintiffs' blatant
violation of the TRA was the reason Defendant initiated the lockout.

This justification or excuse, if taken to be true, negates Plaintiffs' claim of malice.
Taking the evidence in the light most favorable to Defendant, Plaintiff is not entitled to
summary judgment for intentional interference with prospective economic relations
because there was no malicious intent.  Defendant justified the lockout by claiming
Plaintiffs breached the 1996 TRA.  This indicates that the lockout was motivated by
legitimate business reasons.  Even if the Court determines that Defendant is incorrect
that the TRA prohibited Plaintiffs' use of Defendant's tracks to provide rail service to

Korneffel, there is no evidence in the record that suggests that Defendant did not have the honest belief that Plaintiffs violated the TRA.

Plaintiffs point to Defendant's actions after the lockout as evidence of its inappropriate intent, indicating that Defendant sought out Korneffel's rail business. Paul Ladue admits that since the lockout, Defendant "has provided rail service to Korneffel using its own tracks and Korneffel's new private track." (Ladue Aff. ¶ 28.) Plaintiffs argue that Defendant used the lockout to market its services to Korneffel and cites to a series of internal emails to and from various employees of Defendant. In the first mention of obtaining Korneffel's business, William Albritton writes:

> Who is the account manager for this customer or is there one? The owner has contacted me about service and we are still waiting on [Plaintiffs] to deliver to cars. He is looking for some rate information and needs it asap. Could someone let me know who will be contacting him at 734-676-2131, he is not happy with the other railroads due to lack of communication and I don't want him to have that perception at all about us.

(Pls.' Resp. Ex. 48.) This email indicates that Korneffel contacted Defendant about obtaining services and not the other way around.

Even if Defendant sought out Korneffel's business, there is nothing in the record to suggest that Defendant acted maliciously in initiating the lockout. All of the evidence supports Defendant's argument that it had (and continues to have) the belief that Plaintiffs violated the TRA and were locked out because of that contract violation.

Viewing all the evidence in the light most favorable to Plaintiffs, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's claim for intentional interference with prospective economic relations.

### b.      Plaintiffs

Defendant argues that Plaintiffs' use of Defendant's tracks to service Korneffel constituted tortious interference with Defendant's prospective business relationship.  As above, Defendant "must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another."  *Feldman*, 360 N.W.2d at 891. Defendant alleges Plaintiffs used Defendant's tracks illicitly to compete against it for a customer that Plaintiffs would not have been able to service and that Plaintiffs could not have a reasonable belief that they had the right to service Korneffel because the language of the TRA is clear.

These are the only facts that Defendant puts forth to establish Plaintiffs' intentional interference.  Defendant failed to allege any facts to support its allegation of malicious intent other than the contract language of the TRA.  Additionally, Plaintiffs argue that Defendant's claim fails because nothing precluded Defendant from contracting with Korneffel, as Plaintiffs never had an exclusive relationship with Korneffel.  Curtis Korneffel confirmed in his deposition that he did not consider his company to be primarily Plaintiffs' customer.  (Korneffel Dep. 134:6-135:11, Sept. 15, 2009.)

The fact that Defendant thinks the TRA's terms are clear is insufficient to establish Plaintiffs' malicious intent.  Defendant attempts to rest upon its allegations and fails to set forth specific facts showing that there is a genuine issue for trial. Defendant's motion for summary judgment alleging Plaintiffs intentionally interfered with Defendant's prospective business relations is DENIED and Plaintiffs' motion for summary judgment against Defendant's claim of intentional interference with a

31

prospective business relation is GRANTED.

**G.    Unfair Competition**

Defendant argues that Plaintiffs engaged in unfair competition when they entered

into the Sidetrack Agreement with Korneffel.  Michigan law applies unfair competition

claims to "any conduct that is fraudulent or deceptive and tends to mislead the public."

*ATCO Indus., Inc. v. Sentek Corp.*, 2003 WL 21582962, at *3 (Mich. Ct. App. July 10,

2003) (internal citations omitted).  Unfair and unethical trade practices that are harmful

to one's competitors or to the general public are prohibited.  Id.  The Michigan Supreme

Court established:

> Each case must depend upon its own facts, but where it is clearly established
> that an attempt is being made by one person to get the business of another
> by any means that involves fraud or deceit, a court of equity will protect an
> honest trader and restrain a dishonest one from carrying out his scheme.

*Clipper Belt Lacer Co. v. Detroit Belt Lacer Co.*, 194 N.W. 125, 128 (Mich. 1923).

Defendant argues that Plaintiffs engaged in unfair competition by representing to

Korneffel, in the "Sidetrack Agreement" that Plaintiffs signed with Korneffel, that

Plaintiffs had the right to use Defendant's tracks to provide service to Korneffel.  Section

2.2 of the Sidetrack Agreement states, "Under rights granted by [Defendant], operate

over [Defendant] as necessary in order to access the industrial lead track of [Defendant]

that connects to the Sidetrack."  (Def.'s Mot. Summ. J. Ex 23.)  Defendant alleges that

Plaintiffs could not have a reasonable belief that they actually had the rights they

represented in the Sidetrack Agreement.

When Plaintiffs first began shipping steel to Korneffel, they used

"TRESTREPRO" (meaning Trenton Steel Warehouse) to designate the shipping

location.  By June 2007, however, Plaintiffs began using "ECKORNEFF" as the shipping

location.  Defendant alleges that this indicates that Plaintiffs had "dropped even the

pretense that it was legitimately operating within the limits of the TRA."  (Def.'s Mot.

Summ. J. 12.)  The fact that Plaintiffs were not hiding the shipping location, however,

could also indicate that Plaintiffs honestly and reasonably believed that they were

operating within their rights.  In fact, Plaintiffs have consistently alleged that they believe

they have the right to provide service to Korneffel.

Other than bare assertions, Defendant has failed to present any facts of Plaintiffs'

deceit, fraud, or bad faith.  There is nothing in the record that indicates that Plaintiffs

engaged in fraud or deceit.  Defendant's motion for summary judgment on its claim of

unfair competition is DENIED.  Plaintiffs' motion for summary judgment on Defendant's

claim of unfair competition is GRANTED.

### H.    Unjust Enrichment

Defendant argues that Plaintiffs were unjustly enriched because they used

Defendant's tracks without authorization and retained profits from their unauthorized

use.  Plaintiffs maintain that Defendant's claim should be dismissed because unjust

enrichment cannot be brought if there is a contract covering the matter.

In order to sustain a claim of unjust enrichment, a plaintiff must establish (1) the

receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the

plaintiff because of the retention of the benefit by the defendant.  *Barber v. SMH (US),*

*Inc.,* 202 Mich. App. 366, 375 (1993); *Michigan Ed. Employees Mut. Ins. Co. v.*

*Morris,* 460 Mich. 180, 198 (1999).  The law will imply a contract to prevent unjust

enrichment only if the defendant has been unjustly or inequitably enriched at the

33

plaintiff's expense.  Michigan law allows courts to imply a contract in order to prevent

unjust enrichment, but "a contract will be implied only if there is no express contract

covering the same subject matter."  Barber, 202 Mich. App. At 375; *see also Johnson*

*Controls, Inc. v. Jay Indus., Inc*., 459 F.3d 717, 730 (6th Cir. 2006) (holding that

because the contract covered the subject matter of the litigation, it was impermissible to

imply a contract between the parties).

In this case, Defendant claims that Plaintiffs were unjustly enriched when

Plaintiffs retained profits from using Defendant's tracks without authorization.  There is

no dispute that the parties entered into the May 1, 1996 Trackage Rights Agreement.

The scope of the rights conferred by that agreement is directly at issue in this litigation

and squarely covers the issue of Plaintiffs' right to use Defendant's tracks to service

Korneffel.  There is no reason for an unjust enrichment claim where there is a contract

and any damages or restitution will be covered by the breach of contract claim.

Defendant's motion for summary judgment on the unjust enrichment claim is

DENIED.  Plaintiffs' motion for summary judgment on Defendant's unjust enrichment

claim is GRANTED.

## IV.   Conclusion

For the foregoing reasons, the motions for summary judgment are GRANTED in

part and DENIED in part.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 6, 2012

34

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 6, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager