UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CONSOLIDATED RAIL CORPORATION
and NORFOLK SOUTHERN RAILROAD
COMPANY,

      Plaintiffs/Counter-Defendants,

v.                              Case No. 09-cv-10179

GRAND TRUNK WESTERN RAILROAD        Honorable Nancy G. Edmunds
COMPANY,

      Defendant/Counter-Plaintiff/Third-
      Party Plaintiff,

v.

CSX TRANSPORTATION, INC.,

      Third-Party Defendant.

_____/


**OPINION AND ORDER**

This matter comes before the Court on four of the parties' motions in limine:[1]

(1) Plaintiffs' motion to exclude evidence of reconsignment discussions after the lockout [166];

(2) Plaintiffs' motion to exclude evidence of the Cornue memorandum [167];

---

[1] At the hearing on February 14, 2012, Defendant withdrew its Motion for Leave to Conduct Limited Additional Discovery Regarding Plaintiff Norfolk Southern Railway Company's Lack of Standing [168].

1

(3) Defendant's motion to preclude Carey from testifying at trial [161]; and

(4) Defendant's motion to exclude evidence of Conrail's damages and Norfolk Southern's alleged lost profits [169].

For the reasons set forth below: Plaintiffs' motion to exclude evidence of reconsignment discussions after the lockout is DENIED; Plaintiffs' motion to exclude evidence of the Cornue memorandum is GRANTED in part and DENIED in part; Defendant's motion to preclude Carey from testifying at trial is DENIED, and; Defendant's motion to exclude evidence of Conrail's damages and Norfolk Southern's alleged lost profits is GRANTED in part and DENIED in part.

## I.    Plaintiffs' Motion to Exclude Reconsignment Discussions After the Lockout

### A.    Facts

On May 14, 2008, after learning that Plaintiffs were delivering railroad cars to Korneffel, Defendant locked out and physically prevented Plaintiffs from using its railroad tracks.  This prevented Plaintiffs from delivering 26 railcars of steel that were en route to Korneffel.  After the lockout, there were a series of emails and conversations among employees at Norfolk Southern ("NS") in an effort to figure out how to get the stranded railcars delivered to Korneffel.  The email chain was started on May 16, 2008, by Curt Korneffel, who emailed people at NS "asking NS and/or Conrail to get the switching agreement resolved with [Defendant]" so Korneffel could get the railroad cars it needed and going forward would not face similar issues.  (Pls. Mot. Ex. 1.)

On May 21, 2008, a week after the lockout began and five days after Korneffel's email, Phil Lynch, a NS employee, sent an email to other NS employees, stating, "I spoke with our joint facilities group along with Curt Korneffel.  The temporary solution we came

2

up this [sic] was to have *(unexplained gap)* To the Trenton Steel Facility where Curt's crew can unload cars as in the past, the feeling here is that [Defendant] can't refuse to let [Plaintiffs'] crew deliver to Trenton Steel." (Pls. Mot. Ex. 1.) Meghan Achimasi, Product Manager for NS Metals Marketing, responded, "Outstanding! Thanks for all of your help in getting this resolved; I hope our friends at [Defendant] will concur." (*Id.*)

This reconsignment option received initial support among NS employees and was relayed to the shipper. No such reconsignment, however, ever took place. Instead, the parties entered a joint-line arrangement, where Plaintiffs compensated Defendant to deliver the steel to Korneffel on behalf of Plaintiffs.

Defendant intends to admit evidence of this post-lockout suggestion to reconsign railcars to Trenton Steel. Plaintiffs seek to exclude this evidence as irrelevant and prejudicial.

### B.    Analysis

Under the Federal Rules of Evidence, only relevant evidence is admissible, and even relevant evidence may be excluded if its probative value is significantly outweighed by the danger of unfair prejudice. Fed. R. Evid. 402, 403. Plaintiffs argue that evidence of the post-lockout suggestion that the railcars be reconsigned is irrelevant because; (1) the conversations occurred after the lockout, (2) it was suggested by someone who had never read the TRA, and (3) the reconsignment never actually took place. Plaintiffs also argue that Defendant seeks to admit this evidence to portray Plaintiffs in a bad light by implying that they were attempting to deceive Defendant.

Defendant argues that this evidence is probative of whether Plaintiffs themselves believed their pre-lockout conduct complied with the TRA. Defendant states that it intends

to introduce evidence indicating that before the lockout, from 2006 to 2007, Plaintiffs labeled the consignee of shipments to Korneffel as "TRESTEPRO" (meaning "Trenton Steel Processing and Storage"). Defendant argues that this evidence, just as the evidence about the post-lockout reconsignment, indicates that Plaintiffs knew Korneffel was outside the scope of the TRA.

> Under Michigan law:
>
> If the contract in question were ambiguous or "doubtful," extrinsic evidence, particularly evidence which would indicate the contemporaneous understanding of the parties, would be admissible as an aid in construction of the disputed terms. The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation.

*Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003) (citations omitted).

Plaintiffs' conduct and statements relating to the fact that they thought Defendant might allow the railcars passage under the TRA is relevant to this case. It is probative of Plaintiffs' understanding of the TRA and is not substantially outweighed by any prejudice to Plaintiffs.

In addition to testimony regarding Mr. Lynch's suggestion of reconsignment, Plaintiffs also object to Defendant's proposed exhibits 68-74 and portions of proposed exhibits 77-79, as it relates to emails sent between May 21 and May 23 regarding this reconsignment. For the same reasons as stated above, these emails are relevant and admissible.

Plaintiffs' motion to exclude evidence of the reconsignment discussions after the lockout is DENIED.

4

II.    **Plaintiffs' Motion to Exclude the Cornue Memo**

A.    **Facts**

In 1993, Plaintiffs wanted to access potential business on the other side of
Defendant's tracks.  In an effort to accomplish this, Plaintiffs evaluated their rights to
cross Defendant's tracks.  On June 16, 1993, John Cornue, a Conrail employee, wrote
a memo to V.K. Dailida, which was cc'd to Bill Bayliff and bcc'd to Paul Carey, all of
whom were Conrail employees.

The subject of the memo is "Industrial access across the GTW in the Detroit,
(Delray) - Trenton, Michigan Corridor" and the memo discusses Plaintiffs' right to cross
Defendant's tracks under the 1897 Agreement.  Cornue concludes that Plaintiffs' right to
cross Defendant's tracks "applies only in an easterly direction."  The memo also states,
"Review of the agreements in this corridor indicate that Conrail has the right to cross the
GTW in an easterly direction but not to the west over the former Detroit & Toledo Shore
Line Railroad Company, (now GTW)."

Cornue concludes the memo by writing, "This should serve to summarize our
evaluation of various records in this office and should serve to satisfy numerous recent
inquiries concerning Conrail's access to Trenton Steel, Monsanto, etc., in this corridor."
(Def. Resp. Ex. 1.)

On July 5, 1993, Paul Carey wrote at the top of the memo, "A VERY NICE JOB;
THIS ACCOUNT HAS $6MM POTENTIAL FOR CR."  (Id.)

B.    **Analysis**

Plaintiffs seek to exclude the Cornue Memo as irrelevant because it deals with

5

the Plaintiffs' crossing rights under the 1897 Agreement.  Defendant argues that it has

no intention of eliciting testimony on the 1897 Agreement or the crossing rights

conferred by it.  Defendant states that it seeks to admit the Cornue memo for its

reference to Trenton Steel in the last paragraph and for Paul Carey's handwritten notes,

referencing an "account."  These topics, as representative of Plaintiffs' position on the

meaning of "Trenton Steel Warehouse" are relevant and admissible.  Plaintiffs respond,

however, that the handwritten notes cannot be divorced from the substance of the

memo, which will inevitably require extensive questioning to explain the context.

Plaintiffs' statements about Trenton Steel as an account are relevant to this case.

The Court agrees that segments of the memo could lead to unnecessary confusion and

potential prejudice and hereby orders that this exhibit must be admitted in a redacted

form.  The Court hereby orders that the last sentence in the third paragraph, reading

"This right applies only in an easterly direction" and the second to last paragraph in its

entirely be redacted before this memo can be introduced into evidence.

Plaintiffs' motion to exclude evidence of the Cornue memorandum is GRANTED

in part and DENIED in part.

## III.    Defendant's Motion to Preclude the Testimony of Paul Carey

Defendant seeks to preclude Plaintiffs' witness Paul Carey from testifying

because Defendant argues that Carey is an improperly paid fact witness.

### A.    Facts

Paul Carey worked for Plaintiffs from 1979 until 1999 when he retired.  (Carey

Dep. 36:11-13, Dec. 2, 2009.)  Carey held the position of "general manager, contracts"

6

from 1992 to 1999.  (*Id.* at 35:12-36:8.)  Upon retiring, Carey entered into a consulting

agreement with Plaintiffs in August 1999.  (Pls. Resp. Ex. A.)  This Consulting

Agreement provided that Plaintiffs, "in anticipation of and in preparation for regulatory or

other litigation, has agreed to purchase, and [Carey] agreed to provide certain services"

to "advise and participate in activities related to" specific disputes in which Plaintiffs

were involved at the time.[2]  (Id.)  According to the terms of the Consulting Agreement,

Carey was to submit a monthly bill to Plaintiffs for all services rendered and would be

paid a rate of $85 an hour in addition to reimbursement for travel and other out-of-

pocket expenses.  (Id.)  The Consulting Agreement states that it "shall terminate on

January 1, 2000, unless both parties agree in writing to extend the agreement beyond

that date, and unless by that date Conrail is involved in an ongoing legal proceeding

with respect to the [REDACTED] matter, and in that connection is making significant

use [of Carey's] services, in which case this Agreement will continue until the

proceeding has been finally resolved."  (Id.)  There is no indication, and neither party

has alleged that the matter referred to in the Consulting Agreement is related to the

current matter before this Court.  Carey and Jonathan Broder, Assistant Vice President

in the legal department at Conrail, signed the Consulting Agreement.  (Id.)

On May 8, 2009, Plaintiffs filed their Initial Disclosures, indicating that Paul Carey

was a former Conrail employee who may have discoverable information relevant to the

disputed facts in this matter, pursuant to Rule 26(a)(1)(A)(I).  (Pls. Resp. Ex. D.)

---

[2] The specifics of the nature of the disputes that were the subject of this Consulting
Agreement and parties involved has been redacted from the document provided to the
Court.

7

On May 22, 2009, Defendant filed its "Notice of Taking Depositions" of several individuals, including Paul Carey, which indicates that Defendants would depose Carey on July 14, 2009.  (Def. Mot. Ex. 1.)

In September 2009, Carey was contacted by several people from Conrail and Pepper Hamilton and asked about helping Plaintiffs in this matter.  On September 30, Carey flew to Detroit to meet with Plaintiffs' counsel and conducted a site visit to the railroad tracks in the Trenton area.

On October 14, 2009, Plaintiffs' Attorney, Laurence Shiekman wrote a letter to Carey to "confirm the arrangements of your work on this matter" and stated that "Pepper Hamilton LLP ("Pepper"), in its role as counsel for [Plaintiffs], has engaged you to assist us in evaluating claims and developing facts relevant to this [current case]."  (Def. Mot. Ex. 2.)  The letter goes on to describe Carey's duties and role under the "engagement." It states:

> At this time, we are not engaging you to provide testimony at any trial. Depending upon the opinions and conclusions that you may reach as a result of your work on this matter, we may determine at a later date to expand the scope of your engagement to include such testimony.  In that event, it is likely, but not certain, that we would be required to make you available for deposition.

(Id.)  In reference to compensation, the letter states:

> Conrail will pay you directly for your services on the same basis as under the earlier Amtrak arrangement,[3] and will also reimburse your reasonable expenses in connection with this engagement. . . . However, in no event will Conrail's obligation to pay your fees be contingent upon the content of any testimony you may offer or upon the outcome of the litigation.

(Id.)  Jonathan Broder, an attorney at Conrail, was cc'd on the letter.  (Id.)

---

[3] It is unclear whether the "Amtrak arrangement" is the same matter referenced in the original Consulting Agreement from August 1999.

On December 2, 2009, Defendant deposed Carey.  At the beginning of that deposition, Defendant's counsel asked Carey if he was being compensated to be at the deposition that day, and Carey answered "Yes."  (Carey Dep. 10:1-3, Dec. 2, 2009.) Counsel for Plaintiffs and Defendant then had a discussion where Plaintiffs' Attorney, Matthew Lund, stated, "Mr. Carey has been retained as a consultant by the railroads for purposes of this case."  The deposition then continues:

> Q:      I want to know, sir, what kind of compensation you're receiving, if you can tell me, please.
> MR. LUND:   I'm going to direct you not to answer that question to the extent you believe you're being paid pursuant to a consulting relationship.  The terms of the consulting relationship are confidential.  They are protected by the work product doctrine and/or the attorney-client privilege.  So you can make a record of your questions, and if you think they're discoverable, then we can either resolve that later or not.  You can make a record of your questions, but I'm going to direct him not to answer. . . . Mr. Carey is not being produced as a consultant for deposition today.  He is retained as a non-testifying expert at this point.  If Mr. Carey is going to be a testifying expert, we will reproduce him for deposition on the matters in which he will testify pursuant to Rule 26(a)(2). . . . Mr. Carey is being produced today as a fact witness and he is not testifying as a consultant.  He will be instructed not to answer anything in his role as a consultant.  He will answer his questions in his role as a former employee, an officer of the railroad, and he will answer his questions as a corporate designee, not as a consultant.

(Carey Dep. 10:6-12:18, Dec. 2, 2009.)  Defendant filed a motion to compel further testimony from Carey on the compensation issue.  Plaintiffs objected to this and submitted a response as well as a Declaration signed by Carey.

Carey's Declaration stated that since his retirement from Conrail in 1999, he has "assisted Conrail under the terms of the Consulting Agreement on certain matters, including testifying as a witness in actions implicating issues that arose during [his] scope of employment."  (Carey Declaration ¶ 5, March 15, 2010.)  Carey further states:

In all circumstances, because of other consulting opportunities available to me and other work I now do, the payments by Conrail compensate me for my time and costs and are not at all dependent on the content of my testimony or the outcome of any litigation. . . . Any compensation I have ever received from Conrail under the Consulting Agreement as been a fixed amount based solely on my time and expenses.  It has never been, and is not in this case, an inducement to testify favorably.

(Id. at ¶¶ 6, 11.)

The Declaration further stated, "In September of 2009, I spoke with Jonathan Broder, Vice President and General Counsel of Conrail, about the Action, and was asked to confer with Laurence Shiekman, an attorney from Pepper Hamilton, who asked me to provide consultation as a non-testifying expert and to attend a site visit of the trackage at issue.  I agreed to be a non-testifying consultant for Conrail under the terms of my pre-existing Consulting Agreement and attend a site visit in that capacity."  (Id. at ¶¶ 7-8.)

On April 22, 2010, this Court granted Defendant's motion to compel discovery of the documents that were shown to Carey to prepare him for his deposition and Defendant's request to conduct a second deposition related to Carey's Consulting Agreement with Plaintiffs and his compensation pursuant to that agreement.  On March 7, 2011, Defendant deposed Carey for a second time.

Carey stated that he was first contacted about this case by Jonathan Broder from Conrail, who called and told Carey that he would be getting a call from Mr. Shiekman about the possibility of Carey helping in this matter.  (Carey Dep. 21:17-21, March 7, 2011.)  Mr. Shiekman then called Carey and told him that someone from Pepper Hamilton would be calling to arrange for Carey to come to Detroit for a meeting.  (Id. at 21:22-22:3.)  When asked if Carey was curious why Mr. Shiekman was going to have

10

someone from his office call, Carey testified that he had "worked with Mr. Broder and

Mr. Shiekman over a period of years and did not feel a need to question him at that

moment." (Id. at 24:4-12.)

Carey indicated that the first date he billed on this matter was September 30,

2009, when he flew to Detroit to meet with Plaintiffs' attorneys about this case. (Id. at

13:10-14:20.) Defense counsel then asked a series of questions about Carey's visit to

the Detroit area, the site visit to Trenton, what occurred, and the conversations he had

with Plaintiffs' counsel during that visit. (Id. at 24:17-37:11.) Carey testified that he

reviewed documents that Plaintiffs' counsel sent him between this visit and his

December deposition. (Id. at 37:12-39:15.)

The deposition continued:

Q:    Now, you were retained as a consultant in this matter? Is that your
understanding?
A:    Yes, sir.
Q:    Do you have a consulting agreement of some sort?
A:    There was an agreement that John Broder had drawn up for a number
of Conrail people who had institutional memory and other experience useful
to Conrail who were retiring at about the same time that I retired and
suggested that this could be a basis for us to assist him in any further needs
to the extent we were willing and available. And that document was created
in 1999, at or about the time of my retirement.
Q:    Did you actually sign this document?
A:    I believe I did.
Q:    Do you know where a copy of it is, by any chance?
A:    No, sir, I don't.
Q:    Do you have a written consulting agreement with Mr. Shiekman's
office relating to this matter?

(Id. at 39:24-41:11.) Mr. Shiekman then objected and stated that the extent to which

Carey may or may not have a consulting agreement with Pepper Hamilton was

protected from disclosure under Rule 26(b)(4)(B) and was not subject to discovery

11

absent a showing of some exceptional circumstance.  The deposition continued:

> Q.     Sir, do you have a written agreement with Mr. Shiekman's law firm whereby you're serving as a consultant in this lawsuit?
> A.     My understanding is that I'm a consultant to Conrail.
> Q.     My question is, do you have a written agreement with Mr. Shiekman's law firm whereby you've agreed to serve as a consultant in this lawsuit?
> A.     I don't have anything that I consider to be a consulting agreement with this firm.
> Q.     Do you have a written agreement with Conrail whereby you're serving as a consultant in this lawsuit?
> A.     I believe that my service in this matter is undertaken in accordance with the arrangement established in 1999 of which I had described earlier.
> Q.     But you have no specific agreement with Conrail to serve as a consultant in this particular lawsuit, you go back to the agreement that you had?
> A.     Yes, sir.
> Q.     And that general agreement, did that provide for you to serve as a consultant in lawsuits, based on your recollection?
> A.     It has been used in litigation, yes, sir.
> Q.     Does it specifically provide for that in the agreement, as you recall, since I don't have the agreement?
> A.     It might have, but I don't recall the manner in which it was written.
> Q.     Does it specify a dollar amount that you're supposed to be paid?
> A.     In the initial form, it did, and the answer is yes.
> Q.     And are you being paid consistently with that agreement?
> A.     I am entitled to payment consistent with that agreement, yes, sir.
> Q.     When you commenced your involvement in this matter, was it your understanding that you would be serving as a consultant under that agreement?
> A.     Yes, sir.
> Q.     And that understanding was when, right from the start of this when you spoke to Mr. Lund for the first time?
> A.     That has applied generally with all of my contacts with Pepper, Hamilton, and Scheetz on matters dealing with Conrail, yes, sir.

(Id. at 43:4-45:9.)  At this time, Carey did not mention the October 14, 2009 letter from

Pepper Hamilton, discussing Carey's engagement in this particular case and Plaintiffs'

attorney made no attempt to disclose this document.

    At the end of the deposition, Mr. Lozier returned to the same vein of questioning,

which resulted in the October 14, 2009 letter agreement being disclosed:

> Q.      Sir, do you have any agreement with Pepper Hamilton, putting aside just the taking of your deposition, for you to serve as a consultant regarding this matter? I don't care about any other cases.
> A.      You mean a formal agreement, such as a document?
> Q.      Verbal agreement even.
> A.      Not really.
> Q.      And you have no have written agreement, right?
> MR. SHIEKMAN: Let me take a minute with Mr. Carey.
> THE WITNESS: Okay. Excuse me, please.
> (At this point, a short recess was taken, after which time the deposition resumed.)
> - - -
> THE WITNESS: I have misspoken on the record and I apologize for that.

(Id. at 62:5-63:1.)  Carey stated that "the arrangement as a service to Conrail is what's been on my mind and – through this undertaking.  And I obviously had misspoken having forgotten the existence of this letter, which I did not countersign, as you can see, in the way I normally do an agreement.  But clearly, this has the effect of an agreement in the manner that Mr. Shiekman describes."  (Id. at 65:25-66:7.)

When Mr. Broder first called Carey, Carey assumed that he would be consulting on behalf of Conrail, but the letter indicates that it was Mr. Shiekman's intention that he would be working for Pepper Hamilton.  (67:14-68:8.)  Carey, however, added that "as an operating witness, it was a distinction without a difference except as it may have specific legal implications where I am not qualified to judge."  (Id. at 68:17-20.)  Neither Carey, Pepper Hamilton, nor Conrail produced this October 14, 2009 letter to Defendant until the end of Carey's March 7, 2011 deposition.

In his March 7, 2011 deposition, Carey testified that his billing rate was $125 per hour.  (Id. at 53:1-3.)  When asked if this was what the "Amtrak Agreement" provided for, Carey indicated that the rate was originally $85, but he pointed out to Mr. Broder that he had done some work for another party and his rate had gone up to $125 and

13

that Mr. Broder accepted that.  At the time of the deposition, Carey had worked an estimated 32.5 hours at a rate of $125 per hour, for a total of $4,062.50.  At the time of the deposition, although Carey had logged his time since September 2009, he had not yet billed Plaintiffs for any of the work.

On August 3, 2011, Defendant indicated in its Response to Plaintiffs' motion for summary judgment that it would be filing this motion in limine to preclude Carey's testimony.  On August 26, 2011, in response to that statement, Plaintiffs sent Defendant a letter as part of the meet and confer process.  Over the next month, Plaintiffs and Defendant exchanged letters about this topic, unable to come to an agreement. Defendant requested that Plaintiffs produce a copy of the original 1999 Consulting Agreement and Mr. Shiekman responded, "Neither Conrail, Pepper Hamilton, nor Mr. Carey possess a copy of the agreement.  If a copy was available, we would have produced it in response to GTW's numerous document requests."  (Def. Mot. Ex. 10.)

On September 19, 2011, Mr. Shiekman sent a final letter, ending it with "I do not believe that further correspondence would be fruitful.  If you have further questions, please call me to discuss."  (Def. Mot. Ex. 12.)  On September 20, 2011, Plaintiffs provided a redacted copy of the 1999 Consulting Agreement to Defendant, indicating that Conrail had located a copy of the original agreement.  (Pls. Resp. Ex. B.)

### B.    Analysis

Defendant argues that Carey should be precluded from testifying because he is an improperly paid fact witness and charged an unreasonable rate of $125 per hour for his time providing factual testimony.  Plaintiffs contend that Carey was not paid for his testimony, but rather was properly compensated for his expenses and paid a

14

reasonable rate for time lost, while meeting with Plaintiffs, reviewing documents, and being deposed in this matter.

Public policy forbids compensation of fact witnesses beyond expenses incurred and the reasonable value of time lost. *Hamilton v. Gen. Motors Corp.*, 490 F.2d 223 (7th Cir. 1973); 18 U.S.C. § 201(I); MRPC 3.4(b). 18 U.S.C. § 201(c)(3) provides:

> Whoever directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such a person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom; shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(3). The Sixth Circuit has held that §201(c)(3) does not limit the prohibition of paying for testimony solely to false testimony and that it "clearly prohibits demanding or accepting anything of value in exchange for testimony." *United States v. Blaszak*, 349 F.3d 881, 887 (6th Cir. 2003). However, subsection (d) of the provision carves out certain exceptions to the general prohibition in subsection (c):

> [P]aragraphs (2) and (3) or subsection (c) shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying.

18 U.S.C. § 201(d). So, while compensating a witness for testimony is inappropriate, there is an exception for payment for "reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding." This exception also extends to the time that a witness spends reviewing documents and meeting with attorneys. ABA Formal Op. 95-402 (seeing no reason to

15

draw a distinction between compensating a witness for time spent in actually attending a deposition or a trial and compensating the witness for time spent in pretrial interviews with the lawyer or reviewing and researching records).  A lawyer, acting on his client's behalf, may compensate a non-expert witness for time spent preparing for or in attending a deposition or trial, provided that the payment is not conditioned on the content of the testimony.  *Id.*

Defendant relies heavily on three cases, all of which can be distinguished from the current case.  In *Hamilton*, the court refused to allow an executor to recover fees for decedent's services, where there was no express contract or agreement or understanding that the witness would be paid for his assistance, the decedent had never requested payment, and he was never promised any payment.  *Hamilton*, 490 F.2d at 226.  The Seventh Circuit determined that the reimbursable costs for travel, expenses, and the value of time spent on the matter could only accrue as expended and there would be no implied agreement for any lump-sum payment at the end of the litigation.  *Id.* at 229.  The court stated, "If he had any additional claims (for lost time, for example), he had an opportunity to make them as the time was expended."  *Id.*  While the court in *Hamilton* supported the general ban on compensating a witness for his testimony, it indicates that it would have allowed the decedent witness to be compensated for lost time, had he made a claim at the time.

Defendant also relies on *Rocheux International of New Jersey, Inc. v. U.S. Merchants Financial Group, Inc.*, where the New Jersey District Court precluded a witness from testifying because he was "an improperly paid fact witness" and counsel's decision to pay the witness for his testimony "cast a cloud over the legitimacy of that

16

testimony." *Rocheux*, No. 06-6147, 2009 U.S. Dist. LEXIS 93082 (D. N.J. Oct. 5, 2009).

In *Rocheux*, the proposed witness was a disgruntled former employee of the defendant

and he contacted the plaintiff during the discovery period of the case "offering allegedly

damaging testimony regarding that Defendant's business practices in exchange for a

fee." Id. at *2. The plaintiff's attorney "arranged for payment of more than $4,000 to

[the witness] *for his testimony*." *Id.* (emphasis added). The plaintiff's attorney then

designated this witness as an expert, presumably to account for the fee being paid to

him, despite the factual nature of his proposed testimony and that he submitted no

expert reports. Id. at *3-4. The court determined that there was no basis for the witness

to be designated as an expert, plaintiff's counsel had designated the witness as an

expert solely to justify paying him a fee, and that the fee "most certainly did not

compensate for his costs of attending trial or lost time during trial." Id. at *5.

In this case, Plaintiffs did not designate Paul Carey as an expert. In fact, they

identify him as a person who may have discoverable material in their initial disclosures

on May 8, 2009, before Defendant sent out any notice of depositions and later

presented him as a 30(b)(6) witness on various topics. Furthermore, the record in

*Rocheux* shows that the plaintiff's attorney paid the witness "for his testimony" and that

exact language is used by the court and is the basis on which the court excluded him.

In this case, however, Plaintiffs had a history of using Carey's services under a

consulting agreement, Carey did not seek them out as a disgruntled employee

attempting to get paid for damaging testimony against his former employer, and the

October 14, 2009 letter to Carey specifically states that they were interested in his

service as a consultant and not engaging Carey to provide testimony at any trial.

17

Defendant also relies on a case in this Court, where the defendant was precluded from hiring a non-party's former employee as a consultant. *Nissan N. Am., Inc. v. Johnson Elec. N. Am., Inc.*, No. 09-11783, 2011 U.S. Dist. LEXIS 51115 (E.D. Mich. May 12, 2010). In *Nissan*, the plaintiff alleged that the defendant, a tier-2 supplier for the plaintiff, sold defective product to plaintiff's tier-1 supplier, a non-party in the lawsuit. The tier-1 supplier designated Andrew Chudzinski, a former employee, as its corporate designee under Rule 30(b)(6). A few months after that, the defendant attempted to hire Chudzinski and retain him as an "expert/consultant" in the litigation.

Chudzinski declined the employment offer but accepted the consulting agreement, which provided that he could not assist any other individual or entity in the litigation, could not discuss any aspects of the litigation with others, and would receive compensation at a rate of $350 per hour. The plaintiff and Chudzinski's former employer objected and, as a result, the defendant sent a new consulting agreement indicating that Chudzinski was being compensated for his time and not his testimony, that he could act as a witness for the tier-1 supplier (his former employer), he could speak with counsel for the plaintiff or the tier-1 supplier, and thereafter he would be compensated at a rate of $150 per hour.

This Court determined that the original consulting agreement in *Nissan* violated MRPC 3.4, which prohibits a partly from unlawfully obstructing another party's access to evidence and, in certain circumstances, from requesting that a person refrain from giving relevant information to another party. MRPC 3.4(a); MRPC 3.4(f). Additionally, the Court determined that there was no explanation for the dramatic decrease to Chudzinski's hourly rate, other than that the defendant was paying for testimony under

18

the original agreement.  The Court continues, "The amendment to the consulting

agreement arguably may have eliminated counsel's technical violations of MRPC 3.4.

However, the Court finds that defense counsel so clearly violated their ethical

obligations with respect to the original agreement that the taint of the original contract

infects both agreements."  Def. Mot. Ex. 14, at 8.

In this case, unlike *Nissan*, Carey was not a witness for Defendant or an adverse

non-party before Plaintiffs approached him about a consulting agreement.  The

agreement does not indicate that Carey was not allowed to discuss the litigation with

Defendant or anyone else.  Additionally, Carey was originally approached with the

understanding that he would be paid $85 per hour that was later increased to $125 per

hour.  It appears by the court's statement in *Nissan*, then, that Plaintiffs agreement with

Carey—which is similar to the second agreement in Nissan (without being in the

shadow of a suspicious first agreement)—does not violate MRPC 3.4.

This conclusion is also in line with the American Bar Association's opinion that

"as long as it is made clear to the witness that the payment is not being made for the

substance or efficacy of the witness's testimony, and is being made solely for the

purpose of compensating the witness for the time the witness has lost in order to give

testimony in litigation in which the witness is not a party, the Committee is of the view

that such payments do not violate the Model Rules."  ABA Formal Op. 96-402.

Plaintiffs contend that the circumstances of this case are most closely related to

*Prasad v. MML Investors Servs., Inc.*, No. 04 Civ. 380, 2004 WL 1151735 (S.D.N.Y.

May 24, 2004), where the court declined to vacate an arbitration decision based on one

side's reimbursements to a fact witness.  In *Prasad*, Farr testified that he was not paid

19

to testify in any particular manner and his compensation of $125 per hour was because

he was self-employed and that was the rate he received in his consulting business.  *Id.*

at *2.  The court determined, "That a fact witness has been retained to act as a litigation

consultant does not, in and of itself, appear to be improper, absent some indication that

the retention was designed as a financial inducement or as a method to secure the

cooperation of a hostile witness, or was otherwise improper."  *Id.* at *6.  It is troubling

and indicative of improper conduct, in situations where neither counsel nor the witness

undertakes to disclose that a witness has been retained as a consultant either before or

during a deposition.  *Id.* at *7; *New York v. Solvent Chem. Co.*, 166 F.R.D. 284, 290

(W.D.N.Y. 1996) (where counsel instructed the witness not to bring the consulting

agreement to the deposition and made no attempt to correct the witness' statement that

he had not been retained as a consultant).

Defendant argues that Plaintiffs' attorneys' attempts to conceal the consulting

agreement and the fact that the October 14, 2009 engagement letter from Pepper

Hamilton was not disclosed until the end Carey's second deposition on March 7, 2011

are strong indicators of improper conduct.  The Court agrees that Plaintiffs' attorneys'

displayed some troubling behavior in their attempts to keep secret the October 14, 2009

letter, even after this Court granted Defendant's motion to compel, and the fact that they

did not produce the 1999 Consulting Agreement until September 20, 2011.[4]

Unlike *Solvent Chemical*, however, at the beginning of Carey's first deposition in

December 2009, Defense counsel asked Carey if he was being compensated to be at

---

[4] Plaintiffs claim that they produced this agreement "after a difficult search by Conrail,"
but give no explanation for why this "search" was not conducted years ago and in
compliance to the document production requests during discovery.

the deposition that day, and Carey answered "Yes."  Plaintiffs' Attorney, Matthew Lund,

then stated that "Mr. Carey has been retained as a consultant by the railroads for

purposes of this case."  Thereafter, Plaintiffs' counsel attempted to prevent Defense

counsel from questioning Carey about this consulting agreement or his compensation

under it, under the belief that this information was protected by the work-product rule.  It

was not until a motion to compel discovery on the matter that Defendant was allowed to

depose Carey on the topic.  Neither Carey nor Plaintiffs' counsel, however, lied or

attempted to conceal the fact that Carey was being compensated and that he had been

retained as a consultant.

　　　　While Plaintiffs were not forthcoming about the October 14, 2009 letter

agreement, the fact that there existed a letter that reconfirmed Carey's consulting

agreement is not the same as if Plaintiffs had attempted to conceal that Carey had been

retained as a consultant and Plaintiffs were compensating him.  Plaintiffs' attorney

should have stepped in and corrected Carey the first time that Carey responded that he

did not have an agreement with Pepper Hamilton in his March 7, 2011 deposition.  Mr.

Shiekman, however, did ultimately step in and produce the October 14, 2009 letter a

short time later in the deposition.  Carey explained that he "misspoke" about having an

agreement with Pepper Hamilton because he did not have to sign the October 14, 2009

letter, as he normally does when entering into an agreement.  He recognized that the

letter was, in fact, an agreement and that he had been mistaken.

　　　　The Court finds that there is no reason not to believe Carey on this matter.  He

revealed from the beginning that he was being compensated by Plaintiffs pursuant to a

consulting agreement.  The Court finds that it is more than possible that he paid no

21

attention to which document or letter controlled the terms of that agreement.

Defendant argues that the fact that Plaintiffs approached Carey to be a consultant after Defendant sent out its notice of depositions is indicative of improper conduct. This Court disagrees. Although the Court recognizes that Plaintiffs approached Carey after Defendant sent out its notice of depositions, Plaintiffs identified Carey in their initial disclosures a few weeks prior to that and Carey's testimony indicates that he had worked with Jonathan Broder and Mr. Shiekman over a period of years. The fact that Plaintiffs retained Carey as a consultant five months after Defendant sent out its notice of depositions is not enough to infer that his retention was improper. *See Prasad*, at *6 (finding that the fact that Farr was retained as a consultant after he was approached by the opposing party to testify as a witness is insufficient to establish that retaining him was improper as a matter of law).

Even assuming that Carey's retention as a consultant was proper, any compensation must be reasonable, so as to avoid affecting, even unintentionally, the content of a witness's testimony. ABA Formal Op. 96-402. In determining the reasonableness of the compensation, in situations where the witness has not sustained any direct loss of income—for example, where the witness is retired or unemployed—"the lawyer must determine the reasonable value of the witness's time based on all relevant circumstances. Once that determination has been made, nothing in the Model Rules prohibits a lawyer from making payments to an occurrence witness as discussed herein." *Id.*

As in *Prasad*, Defendant here has presented no argument that Carey's compensation was unreasonable or that Carey received payments unrelated to either

22

his time or expenses.  Instead, Defendants assert that Plaintiffs and Carey intended to

deceive Defendant and the Court by representing that Carey was billing at a rate of $85

per hour, when in fact, he was paid $125 per hour.  It is true that Carey's Declaration left

the impression that he was being paid $85 per hour, pursuant to the terms of the 1999

Consulting Agreement.  It was not until his deposition in March 2011 that he testified

that he was billing at a rate of $125 per hour.  At the time Carey submitted his

Declaration, however, Carey had not yet billed Plaintiffs for any time, had received no

compensation, and was supposed to bill Plaintiffs directly, not Pepper Hamilton.

Additionally, Carey testified that his rate was $85 until he had a conversation with

Jonathan Broder, indicating that he had conducted other consulting work in the recent

past in which he had charged $125, so Mr. Broder agreed to increase Carey's

payments.  There is no indication that this conversation was relayed to anyone at

Pepper Hamilton until just before his March 7, 2011 deposition, when Carey produced

his log of hours and a calculation of amount owed based on $125 per hour.

In Plaintiffs' counsel's letter to Defense counsel, it indicates that Carey had that

conversation with Mr. Broder "months after submitting his affidavit."  This supports the

argument that Carey and Plaintiffs' counsel did not intend to mislead Defendant or the

Court in asserting that Carey was being paid $85 per hour and that it was, in fact, true at

the time it was stated. More importantly, Carey's testimony indicates that the $85 rate

was established in 1999 and that sometime in the 12 years since then, he had

increased his fee to $125 per hour.  Given that this is the rate Carey charged another

party, the rate does not appear to be excessive or unreasonable.  *See Prasad*, at *7.

In light of all the evidence, the Court finds that neither Plaintiffs nor their counsel

23

paid Paul Carey "for" or "because of" his testimony.  Carey has been reimbursed for his expenses and reasonably compensated for lost time spent on this matter.  Furthermore, the Court precludes Defendant from introducing evidence for the purpose of trying to show that Plaintiffs or their counsel "bought" the testimony of Paul Carey or otherwise engaged in any unlawful or unethical conduct.  Defendant is permitted, however, to cross examine Paul Carey on his consulting agreements with Plaintiffs.

Defendant's motion to preclude Paul Carey from testifying at trial is DENIED.

## IV.   Defendant's Motion to Exclude Evidence of Conrail's Damages and Norfolk Southern's Lost Profits

### A.   Conrail's Damages

Because this Court granted Defendant's motion for summary judgment against Conrail's claim for breach of the TRA [171], Defendant's motion to preclude Plaintiffs from presenting evidence of Conrail's damages is GRANTED.

### B.   Norfolk Southern's Lost Profits

#### 1.   Facts

Defendant seeks to exclude Plaintiffs from presenting testimony and proofs of Norfolk Southern's alleged lost profits because they are too speculative.  Defendant asserts that Norfolk Southern should not be allowed to seek lost profits as to the deliveries from Nucor-Yamato because such damages are impermissibly speculative, as there is insufficient evidence that Norfolk Southern would have made those deliveries if the lockout had never occurred.

James Schaaf testified that prior to the lockout, Plaintiffs had minimal business from Nucor.  He stated, "I believe in late '06 – late '06 we handled five cars from Nucor-

24

Yamato to – late fourth quarter of '08, I believe we handled four cars." (Schaaf Dep. 212:5-9, April 21, 2010.) Additionally, Schaaf testified that Plaintiffs never had a long-term agreement with Nucor to provide freight to Korneffel. (Id. at 227:12-19.)

Meghan Achimasi, who dealt with Nucor on behalf of Norfolk Southern, testified that she did not recall that Nucor made any inquiries with her about steel going into Trenton, Michigan for Korneffel. (Achimasi Dep. 224:25-225:2, Aug. 4, 2010.) Brad Payne, one of Achimasi's contacts at Nucor, could not recall if Nucor shipped to Korneffel at Trenton through Norfolk Southern and that Korneffel indicated that CSX was its "serving railroad." (Payne Dep., 40:24-41:4; 49:14-50:6, Aug. 6, 2010.)

James Schaaf testified that in order to obtain business from Nucor, Norfolk Southern would have needed to win in a competitive bidding process and that he came up with the figure he used for the hypothetical price for Nucor by estimating the price from what Norfolk Southern would charge for a similar move. (Schaaf Dep. 219:21-220:22.)

### 2.    Analysis

Lost profits are not recoverable in a breach of contract action if they cannot be proven "with a reasonable degree of certainty as opposed to being based on mere conjecture or speculation." *Body Rustproofing, Inc. v. Michigan Bell Telephone Co.*, 385 N.W.2d 797, 800 (Mich. Ct. App. 1986).

Defendant argues that Norfolk Southern assumed a revenue figure for deliveries from Nucor, which is not reliably based on facts or experience. Furthermore, the damages figure speculates, with no apparent foundation, that Norfolk Southern would have captured 100% of Nucor's business to Korneffel. Norfolk Southern had

moved, at most, nine cars from Nucor before the lockout and Nucor's employee, Brad

Payne, testified that Korneffel identified CSX as its servicing railroad, not Norfolk

Southern.  The assumption that Norfolk Southern would have acquired 100% of Nucor's

business during the time of the lockout, then, appears to be unfounded.

Defendant's motion to exclude Norfolk Southern's lost profits based on forecasts

and projections is DENIED as moot and Defendant's motion to exclude Nucor-Yamato's

figures from Plaintiffs' lost profits is GRANTED.

## V.    Conclusion

For the foregoing reasons, Plaintiffs' motion to exclude evidence of

reconsignment discussions after the lockout is DENIED; Plaintiffs' motion to exclude

evidence of the Cornue memorandum is GRANTED in part and DENIED in part;

Defendant's motion to preclude Carey from testifying at trial is DENIED, and;

Defendant's motion to exclude evidence of Conrail's damages and Norfolk Southern's

alleged lost profits should be GRANTED in part and DENIED in part.



                         s/Nancy G. Edmunds_____
                         Nancy G. Edmunds
                         United States District Judge

Dated:  February 16, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of
record on February 16, 2012, by electronic and/or ordinary mail.

                         s/Carol A. Hemeyer_____
                         Case Manager