UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSOLIDATED RAIL CORPORATION
and NORFOLK SOUTHERN RAILROAD
COMPANY,

       Plaintiffs/Counter-Defendants,

v.                                                      Case No. 09-cv-10179

GRAND TRUNK WESTERN RAILROAD          Honorable Nancy G. Edmunds
COMPANY,

       Defendant/Counter-Plaintiff/Third-
       Party Plaintiff,

v.

CSX TRANSPORTATION, INC.,

       Third-Party Defendant.

_____/

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER FOR DECLARATORY JUDGMENT**

From March 6 to March 16, 2012, this Court held a jury trial on two claims: (1) breach of Trackage Rights Agreement by Conrail and (2) breach of Trackage Rights Agreement by Grand Trunk. On March 16, 2012, the jury returned a verdict in Plaintiffs' favor. The verdict form asked, "Under the 1996 Trackage Rights Agreement, did Conrail (as agent for Norfolk Southern and CSX) have the right to use Grand Trunk Western Railroad Company's tracks to deliver freight to E.C. Korneffel Co.?" The jury answered "Yes" to this question. The verdict form then asked, "In what amount, if any do you find that

1

CSX and NS suffered damages as a result of Grand Trunk preventing Conrail from delivering freight to E.C. Korneffel Co. from May 14, 2008 forward?"  The jury awarded damages to NS for $39,816.80 and damages to CSX for $189,351.76.

An additional claim remained for declaratory judgment as Count II in Defendant's Second Amended Counterclaim.  The parties agreed that the declaratory judgment count would not be submitted to the jury and would, instead, be determined by the Court.  The March 5, 2012 Amended Joint Final Pre-Trial Order states, "This case is set for a JURY trial although the Court will determine the counts requesting declaratory judgment."  (Am. Joint Final Pre-Trial Order, 15.)  Defendant's Counterclaim states:

> It is appropriate for this Court to adjudicate and declare whether Conrail has the right under the TRA to use the GTW Trackage to provide service to Korneffel and thereby guide the parties' future actions, avoid future conflicts among the parties involving this issue, and determine the parties' liabilities.
> WHEREFORE, GTW respectfully requests that this Court enter a judgment:
> A.      Declaring that Conrail, Norfolk Southern and CSX do not have the right under the TRA to use the GTW Trackage to provide rail freight services to Korneffel;
> B.      Declaring that Conrail, in using the GTW Trackage to provide rail freight services to Korneffel as switching carrier for Norfolk Southern and CSX, had no legal right to do so under the TRA;
> C.      Declaring that Conrail is liable for all damages sustained by GTW as a result of Conrail's unauthorized use of the GTW Trackage;
> D.      Providing that Conrail and Norfolk Southern are required to pay GTW its reasonable attorney fees and costs for having to generate, file, and prosecute this Third-Party Complaint and defend against the frivolous claims asserted by Conrail and Norfolk Southern; and
> E.      Providing such other declarations of the parties' rights, obligations and liabilities and award GTW such other relief as this Court deems just, fair and equitable under the circumstances.

For the reasons discussed below, this Court finds that Plaintiffs have the right, under the Trackage Rights Agreement to use Defendant's trackage to provide rail services to E.C. Korneffel Co. and Conrail is not liable to Defendant for any damages.

## I.    Findings of Fact

### A.    Parties Involved in the Dispute:

1.  Norfolk Southern and CSX are independent railroad corporations. Each is a major freight railroad primarily engaged in the rail transportation of raw materials, intermediate products, and finished goods in the United States. *Third Amended Complaint at ¶ 2, Dkt. No. 165; CSX Counterclaim at ¶ 2, Dkt 198.*

2.  Conrail is a railroad company that is owned, in part, by Norfolk Southern, and in part, by CSX. *Joint Final Pre-Trial Order ("JFPTO") Stipulated Fact No. 4.*

3.  Grand Trunk is a common carrier railroad corporation, and is a wholly owned subsidiary of the Canadian National Railway Company ("Canadian National"). *JFPTO Stipulated Fact Nos. 5 and 6.*

4.  Huron Valley Steel Corporation ("HVS") is an active Michigan for-profit corporation incorporated in 1961, which had between March 12, 1986 and December 31, 1996 and July 20, 1998 and December 31, 2008 operated under the registered assumed name of "Trenton Steel Processing and Storage" as reflected by the records of the Michigan Department of Licensing and Regulatory Affairs ("MDLRA") of which this Court takes judicial notice. It has owned and operated, since 1974, an approximate 300,000 square foot steel warehousing facility known as "Trenton Steel Warehouse" at 1717 Fort Street, Trenton, Michigan where it would, on behalf of its customers, receive steel transported by rail and truck, unload it, and store it within the warehouse's

3

confines. The warehouse was, at the time of its purchase by HVS in 1974, located on an 85 acre parcel of property. From the time of its acquisition by HVS, Trenton Steel Warehouse was afforded rail service by trains that would traverse industrial track owned by HVS. *Def. Ex. 592; Tr. 3/12/12, 90:2-7; 3/13/12 Tr. 4:4-5:13.*

5. Grand Trunk had previously constructed a sidetrack that extended off of the north-south mainline and connected to the private track on the Trenton Steel Warehouse property. *Testimony of Paul Ladue, Tr. Vol. 6 at 4.*

6. Korneffel is an active for profit Michigan private corporation engaged in the construction of bridges and similar structures which is owned and primarily managed by members of the Korneffel family. *MDLRA, Pretrial Order D/E 203 § III.* It is an independent and separate corporation from and unrelated to HVS and is not owned by and has no corporate affiliation whatsoever with HVS. *Tr. 3/9/12, 51:14-22.*

7. Korneffel's corporate office is located at 2691 Veterans Parkway, Trenton, Michigan and in late 2006 it began operating a self-described "rail yard" at 700 Harrison Avenue, Trenton, Michigan for the receipt of rail freight shipments and structural steel which it stored at the rail yard for subsequent use at various job sites ("Korneffel Storage Area"). *Def. Ex 542; Tr. 3/9/12, 8:15-20.*

**B.    Background**

8. In the late 1800s, Conrail's predecessors-in-interest operated parallel rail lines that extended south of the City of Trenton, Michigan and north to Detroit. *Opinion and Order Granting in Part and Denying in Part Plaintiffs' and Defendant's Motions for Summary Judgment (Dkt. No. 149)("January 6, 2012 Order") at 1-2.*[1]

---

[1] Plaintiffs' and Defendant's predecessors-in-interest will be referred to as "Plaintiffs" and "Defendant," respectively.

4

9.  By 1897, Grand Trunk had tracks to the southwest of the Trenton area and sought to extend those tracks northward to Detroit and construct a new line of railroad in the vicinity of Trenton that would, in part, run parallel to the north-south lines owned by Conrail.  *Id. at 2.*

10.  On November 11, 1897, Conrail and Grand Trunk entered into an Agreement (the "1897 Agreement") allowing Grand Trunk to put in an interlocking system "at or near Trenton" in order to cross Conrail's lines. The 1897 Agreement allowed Grand Trunk to cross Conrail's lines and extend its railway toward Detroit as Grand Trunk desired. The 1897 Agreement also gave Conrail the right to cross Grand Trunk's new line, preventing Conrail's lines from being walled in.  *Id. at 2-3; see also Pls. Ex. 2; Testimony of Paul Carey, Tr. Vol.2 at 62.*

11.  In early 1993, Conrail became aware of Huron Valley Steel Corporation being considered for the award of a large contract involving its receipt and storage of significant amounts of steel at the Trenton Steel Warehouse for a member of the automobile industry which would have in turn afford a railroad the potential annual revenue of $6 million through the transporting of such steel to the warehouse. *Tr. 3/7/12, 55:19-24; 3/8/12, 23:1-5.*

12.  By letter dated June 7, 1993, Conrail notified Grand Trunk that it intended to exercise its rights under the 1897 Agreement to cross Grand Trunk's tracks.  The letter was written by G.M. Spiegel, General Manager – Transportation and Customer Service at Conrail, to David L. Wilson, Vice President of Operations for Grand Trunk.  *January 6, 2012 Order at 4; Pls. Ex. 3.* Although Mr. Wilson delegated certain research and other responsibility to his subordinates William Litfin and Paul Ladue, he was directly

involved in the dispute due to the unique nature of the dispute. *Testimony of David Wilson, Tr. Vol. 3 at 34, 38-39.*

13.   In its letter, Conrail set forth its position that the 1897 Agreement granted "Conrail the right to cross the GTW to access existing or new industry on [Conrail's] Detroit-Toledo corridor." The letter further stated that "Conrail intends to apply the right by installing a diamond to cross [Grand Trunk's] tracks and sidetrack to access Trenton Steel Storage located just North of Harrison Street" and that "Trenton Steel Storage seems to be leaning towards truck transit instead of rail and Conrail's access is required to eliminate this operational change." *Pls. Ex. 3; Def. Ex. 502.*

14.   Grand Trunk disputed Conrail's right to cross, and notified Conrail accordingly. *Testimony of David Wilson, Tr. Vol. 3 at 40.*

15. Numerous letters disputing the issue were exchanged between Mr. Wilson on behalf of Grand Trunk, and individuals at Conrail, including Paul Carey, Conrail's General Manager of Contracts. *Testimony of Paul Carey, Tr. Vol. 2 at 64.* Nearly all correspondence on this matter was either addressed to Mr. Wilson or sent by Mr. Wilson, and all revolved around Conrail's demand to cross so that it could access "Trenton Steel Warehouse." *Pls. Ex. 7-18, 19-21.*

16.   On July 3, 1993, Conrail's Joint Facilities Assistant Manager Vyto Dailide sent an e-mail to various other employees of Conrail, including John Cornue (who played an integral role in the negotiation and drafting of the TRA), in which Dailide referred to "Trenton Steel Storage" as "this customer." *Def. Ex. 504.*

17.   On July 5, 1993, Conrail's General Manager of Contracts, Paul Carey (who, as described below executed the TRA on behalf of Conrail), referred to "Trenton

6

Steel" in a handwritten notation on an internally circulated Conrail memorandum as an "ACCOUNT" with a "$6 MIL. POTENTIAL" for Conrail and Carey testified at trial that "account" was a "general term that we [i.e. Conrail] frequently used to describe new *customer* opportunities." *Def. Ex. 503; Tr. 3/8/12, 21:1-23:5*.

18.  On July 19, 1993, Conrail employee William Bayliff sent Conrail employee J.R. Turner a fax, which depicts a layout of the trackage in the Trenton area and has the label "HURON VALLY STEEL TRENTON WHSE." on the warehouse building itself. *Def. Ex. 507*.

19.  On September 30, 1993, Carey wrote a letter to Wilson referring to "Trenton Steel Warehouse," as "this industry." *Def. Ex. 508*.

20.  Ultimately, Conrail and Grand Trunk decided to submit the dispute to arbitration. *Testimony of David Wilson, Tr. Vol. 3 at 43-44; Testimony of Paul Carey, Tr. Vol. 2 at 63; Pls. Ex. 16, 17.*

21. Within Grand Trunk, the decision to agree to binding arbitration was made by David Wilson. *Testimony of Paul Ladue, Tr. Vol. 6 at 91; Testimony of David Wilson, Tr. Vol. 3 at 43-44.*

**C.   The June 23, 1994 Agreement**

22. On June 23, 1994, Conrail and Grand Trunk signed an agreement providing that if Conrail prevailed at the Arbitration, Grand Trunk would grant immediate access to the "premises" through a grant of trackage rights over the existing Grand Trunk sidetrack. Specifically, the agreement provided as follows:

> In the event the arbitrators decide that Conrail may cross GTW to serve Trenton Steel Warehouse, GTW will permit Conrail immediate access to Trenton Steel Warehouse. GTW agrees that Conrail will effect the crossing

7

and access to Trenton Steel Warehouse by operating over GTW trackage to the extent necessary to cross from Conrail's right-of-way to the premises of Trenton Steel Warehouse in an operationally practicable and efficient way that is consonant with Conrail's desire to provide rail service. . . .

*Pls. Ex. 21.*

23.  The June 23, 1994 Agreement defined "Trenton Steel Warehouse" as: "the facility of Trenton Steel Processing and Storage, d/b/a Huron Valley Steel Corporation (and its successors and assigns) ("Trenton Steel Warehouse"), located in the Trenton Commercial Industrial Park." *Def. Ex. 521.*

24.  The agreement further provided that the use of the Grand Trunk trackage would be pursuant to a trackage agreement incorporating the provisions of the June 23, 1994 Agreement, and standard terms and conditions:

The parties will cooperate in good faith to execute a trackage agreement incorporating the foregoing provisions and standard terms and conditions, and will execute such an agreement promptly upon receiving the arbitration decision so as not to delay Conrail's access to the Trenton Steel Warehouse.

*Pls. Ex. 21.*

25.  The agreement was signed on behalf of Grand Trunk by David Wilson, and signed on behalf of Conrail by Paul Carey. *Id.* Paul Ladue, who worked under David Wilson, played no role in the June 23, 1994 Agreement and was not aware of its existence until after it had been executed. *Testimony of Paul Ladue, Tr. Vol. 6 at 123.*

26.  The purpose of the agreement was to provide Conrail access to the Trenton Steel Warehouse property. *Testimony of Paul Carey, Tr. Vol. 2 at 73; Testimony of David Wilson Tr. Vol. 3 at 51.*

27.  The intention of the parties was to provide Conrail the same access to the site that Conrail would have enjoyed had it built its own connection to the private

industry track. *Testimony of Paul Carey, Tr. Vol. 2 at 71; Testimony of David Wilson Tr. Vol. 3 at 53.*

### D.     The Arbitration

28.  On July 13, 1994, Conrail and Grand Trunk made a joint submission to the arbitration tribunal. *Pls. Ex. 22.*

29.  In their joint submission, the parties sought to have the arbitrators decide the following question:

> Does Conrail have the right, pursuant to the Agreements, to cross the tracks, facilities, right-of-way, and other property of GTW/CNNA in or near Trenton, Michigan for the purpose of providing Conrail access to and the ability to provide rail freight transportation service to the Trenton Steel Warehouse?

The term "Trenton Steel Warehouse" was previously defined in the parties' joint submission as being "the facility of Trenton Steel processing and storage, d/b/a Huron Valley Steel Corporation (and its successors and assigns) . . . located in the Trenton Commercial Industrial Park." *Id.* The only area identified at trial as a commerce park within the 85 acre parcel owned by Huron Valley Steel was a small section in the northeast corner of the 85 acre parcel. *Def. Exh 90.* Neither the private Huron Valley Steel industrial track nor the warehouse building is located in that portion of the 85 acre parcel. *Id.*

30.  On July 7, 1995, Conrail and GTW jointly submitted stipulations of fact to the arbitrators in which Conrail and GTW jointly stated: "Trenton Steel Warehouse, d/b/a Huron Valley Steel Corporation, is a steel storage and warehousing facility located in the Trenton Commercial Industrial Park, in Trenton, Michigan. Its location relative to the properties of the parties relevant to this arbitration and certain other landmarks is as

shown on the map attached hereto as Exhibit A." *Def. Ex. 523*.  Exhibit A is a map created by Grand Trunk for submission to the Arbitrators and labels the warehouse building itself as "TRENTON STEEL."  *Def. Ex. 524*; *Testimony of Paul Ladue, Tr. Vol.6 at 22*.

31.  The Arbitration was not limited to access to a specific customer or to a single building on the property. *Testimony of Paul Carey, Vol. 2 at 79, 80; Testimony of David Wilson, Tr. Vol.3 at 60-61*.

32.  Grand Trunk understood that, in seeking "access to and the ability to provide rail freight transportation service to the Trenton Steel Warehouse," Conrail sought access to the property where Trenton Steel Warehouse was located. *Testimony of David Wilson Tr. Vol.3 at 59; Testimony of Paul Ladue, Tr. Vol. 6 at 110-112,133.*

33.  The disputed rights in the 1897 Agreement – the rights which were the principal focus of both the Arbitration and of the parties' dialogue preceding the Arbitration – were not specific to a single customer, building or site, but rather conferred a general right to cross. *Pls. Ex. 2*; *Testimony of David Wilson Tr. Vol.3 at 60-61; Testimony of Paul Carey Tr. Vol. 2 at 61, 62.*

34.  On January 21, 1996, the Arbitration panel issued a decision in Conrail's favor, answering the agreed-upon issue in the affirmative.  *Pls. Ex. 25*.

**E.    The Trackage Rights Agreement**

35.  After the Arbitration Award was issued, David Wilson instructed Paul Ladue to prepare the trackage rights agreement that Grand Trunk had previously agreed upon with Conrail. *Testimony of David Wilson, Tr. Vol.3 at 62*.  Mr. Wilson did not instruct Mr. Ladue to narrow the rights agreed upon with Conrail in the June 23, 1994 Agreement.

10

*Id.* Wilson was relieved of his responsibilities at GTW by the end of February 1996 and did not participate in any way in the negotiations or drafting of the TRA. *Id. at 61:14-18, 95:19-23, 96:9-11.*

36. Paul Ladue understood that the trackage rights agreement was to be drafted based upon the June 23, 1994 Agreement. He further understood that, through the June 23, 1994 Agreement, Conrail and Grand Trunk agreed to effectuate the Arbitration award through a grant of trackage rights, rather than through construction by Conrail of a connecting track. *Testimony of Paul Ladue, Tr. Vol. 6 at 29.*

37. Mr. Ladue drafted the trackage rights agreement and sent a copy of it to John Cornue, who worked for Paul Carey. *Paul Ladue Testimony, Tr. Vol. 6 at 30-31.* Carey did not participate in the drafting but left both of these tasks to Mr. Cornue with Carey having no recollection of even contributing any comments to Cornue during his continuous negotiations and drafting of the TRA with Ladue. *Tr. 3/13/12, 30:25-31:9; Tr. 3/8/12, 4:19-6:3.*

37. Mr. Ladue recalls receiving no written comments from Conrail, and recalls speaking with no one at Conrail other than John Cornue. *Paul Ladue Testimony, Tr. Vol. 6 at 30-31.*

38. Mr. Cornue does not recall reviewing, receiving or having drafts of the trackage rights agreement. *John Cornue Testimony, Dep. at 322-323.*

39. On May 1, 1996, Conrail and Grand Trunk entered into the "Trackage Rights Agreement between [Grand Trunk] & [Conrail] to service Trenton Steel Warehouse" (the "1996 TRA"). *Pls. Ex. 26.* The Agreement was signed on Conrail's behalf by Paul Carey and on Grand Trunk's behalf by Paul Ladue. *Pls. Ex. 26 at 8.*

11

40.   The recitals at the beginning of the 1996 TRA recognize that the agreement was entered into to effectuate the prior Arbitration Award.  *Pls. Ex. 26 at 1.*

41.   Section 1 of the 1996 TRA states that Plaintiffs have the right to use a defined segment of Defendant's railroad track "for the sole purpose of serving Trenton Steel Warehouse or its successor (hereinafter referred to as 'Industry')."  *Id.*

42.   The reference to a "successor" demonstrates that "Trenton Steel Warehouse" was intended to denote a company or entity doing business. *Def. Ex. 149, SJ Opinion, p. 22*.

43.   In the custom and usage of the railroad industry, a reference to an "industry" is a reference to a specific customer to which, or from which, a railroad intends to deliver freight.  *Tr. 3/12/12, 89:2-14; Tr. 3/14/12, 19:1-9; Def. Ex. 542.*

44.   Sections 3 and 6 of the 1996 TRA describe the "Industry" as being "located adjacent to FN Interlocking." *Id. at 3, section 3(a); see also id. at 6, section 6(a).*

45.   A trackage rights agreement is usually an agreement that allows one railroad to traverse over the track of another railroad from a "Point A" to "Point B." Any restrictions that may be imposed by the trackage agreement cease after "Point B" is reached. *Testimony of David Wilson, Tr. Vol. 3 at 55.*

46.   The segment of track governed by the 1996 TRA is defined as the trackage that extends "up to, but not . . . beyond [the Grand Trunk] property line. . . ." *Pls. Ex. 26 at 2; Testimony of Paul Carey, Vol. 2 at 81*. This is further illustrated on a diagram attached to the 1996 TRA, where the "trackage" extends only to the Grand Trunk property line. *Pls. Ex. 27; Testimony of Paul Carey, Tr. Vol. 2 at 83.*

47.  The Grand Trunk property is separated from the Huron Valley Steel property by land owned by Detroit Edison. *Pls. Ex. 125.*

17. Section 6 of the 1996 TRA sets forth restrictions on Conrail's use over the Trackage. This section states:

> The Trackage Rights herein granted are subject to the following restrictions: (a) Conrail shall use the Trackage for the sole purpose of delivering or picking up rail cars to and from (including the switching of such cars) the Industry located adjacent to "FN."
> . . . . (c) Except as provided in above subparagraph (a) Conrail shall not move any rail cars of any kind, other than those cars moving to or from the Industry or perform any local freight or switching service of any kind whatsoever, and shall not serve any other rail customers along the Trackage.

*Pls. Ex. 26. at 6.*

48.  "Trenton Steel Warehouse" was used by Conrail in documents because that was the way Conrail's Dearborn Division and marketing department referred to the property. *Testimony of Paul Carey Vol. 2 at 75.*

49. In 1996, Huron Valley Steel was the owner of 85 acres of property that the parties referred to as Trenton Steel Warehouse. *Testimony of Paul Carey, Tr. Vol. 2 at 99.* Huron Valley Steel's Trenton Steel Warehouse operation was the only business operating on the property. *Testimony of Paul Carey, Tr. Vol. 2 at 75; Testimony of Kevin Stanko, Tr. Vol. 7 at 37.*

50.  Grand Trunk never described the access that was to be conveyed to Conrail as being limited to a structure, building, or warehouse. *Testimony of Paul Carey Vol. 2 at 75.*

51.  As Conrail's signatory to the contract, Mr. Carey understood that the 1996 TRA gave Conrail access to the entire 85 acre property owned by Huron Valley Steel.

13

He would not have signed the TRA if it had limited Conrail's access rights to a single building. *Testimony of Paul Carey, Tr. Vol. 2 at 87-88.*

52.  As Grand Trunk's signatory to the contract, Mr. Ladue understood that the 1996 agreement conferred access only to "Trenton Steel Processing and Storage doing business as Huron Valley Steel and its building or warehouse." *Testimony of Paul Ladue, Tr. Vol. 6 at 37.*

53.  The 1996 TRA provided that Conrail pay Grand Trunk an initial monthly retainer fee of $600 as well as a per car rate of $12.50 "for each rail car loaded or empty delivered to or spotted" at the Industry. *Pls. Ex. 26 at section 3.* The retainer fee and per car rates are adjusted yearly for inflation.  *Id.*

### F.    Korneffel Property and Agreements to Receive Rail Freight

54.  E.C. Korneffel Company ("Korneffel") is a company in Trenton, Michigan that constructs foundation systems under refineries, steel mills and new power plants. It is also in the business of bridge construction. *Testimony of Curtis Korneffel, Tr. Vol. 4 at 7.* Korneffel's president is Curtis G. Korneffel. *Id.*

55.  In October 2001, Erie Development Company, a single member LLC owned by Mr. Korneffel's wife, purchased property in Trenton from Huron Valley Steel for use by Korneffel.  *Testimony of Curtis Korneffel, Tr. Vol. 4 at 9; Pls. Ex. 31.*

56.  In looking for properties in the early 2000 time period, Mr. Korneffel found the Huron Valley Steel property desirable in terms of Korneffel's business needs due to "the ability to use the existing [Huron Valley Steel] rail facility and to expand the rail facility onto the property that we bought." *Testimony of Curtis Korneffel, Tr. Vol. 4 at 9.*

57.  The Korneffel property, prior to being split off and sold to Erie, was

part of a larger parcel of property owned by HVS consisting of approximately 59 acres to the south and east of the warehouse building, with Korneffel's new property as the southernmost portion of the original Huron Valley Steel property. *Testimony of Curtis Korneffel, Tr. Vol. 4 at 10-11*; *Def. Ex.* 590.

58.  This 59 acre parcel was known as the Huron Valley Steel Parcel. [*Def. Ex.* 590, 537]  Trenton Steel Warehouse was situated on a smaller parcel of adjacent property to the west, also owned by HVS, consisting of 23 acres.  *Def. Ex. 590.*  This 23 acre parcel was known as the "Trenton Steel Storage Parcel."  *Def. Ex. 590.*

59.  HVS owns and continues to own all of the real property that the Trenton Steel warehouse building is on and all the private tracks leading to that warehouse. *Def. Ex. 590*; *Tr. 3/9/12, 67:9-17.*

60.  As part of the purchase, Huron Valley Steel agreed to grant Korneffel a permanent easement onto Huron Valley Steel's adjoining property so that Korneffel could build a sidetrack splitting off the Huron Valley Steel track, and extending to the Korneffel property.  *Pls. Ex. 31 at ¶37.*

61.  On October 2, 2006, HVS also granted Korneffel a revocable license "to use the southerly most railroad siding on [Huron Valley's] adjoining property for the purpose of sending and receiving shipments of goods and materials by rail."  *Pls. Ex. 31 at ¶37.* The License Agreement was for Korneffel's use of the private Huron Valley track.  *Pls. Ex. 39.*

62.  The Huron Valley Steel private track was in substantial disrepair at the time, and Korneffel spent approximately $100,000 to refurbish and repair it.  *Testimony of C. Korneffel, Tr. Vol. 4 at 18.*

63. The License Agreement was solely between the two private land owners/users (Huron Valley Steel and Korneffel) and no railroad was involved in any way in the negotiation or execution of the license agreement. *Testimony of Curtis Korneffel, Tr. Vol. 4 at 19-20.*

64. Effective December 1, 2006, Korneffel executed a Side Track Agreement with Conrail for delivery of freight to the Huron Valley Steel private track. *Pls. Ex. 41; Testimony of C. Korneffel, Tr. Vol. 4 at 22.*

65. In January 2007, Korneffel requested a Side Track Agreement from Grand Trunk for delivery of freight to the Huron Valley Steel private track, and Korneffel's consultant sent Canadian National a map and joint inspection of the track that had been performed by Conrail. *Pls. Ex. 43, 44.*

66. In February 2007, Canadian National determined that Korneffel "is located in the old Huron Steel facility in Trenton, Michigan," and that Korneffel is the "only industry" that will be using the track leading from the mainline tracks to the facility. *Pls. Ex. 46.*

67. Effective October 2, 2007, Korneffel executed a Side Track Agreement with Grand Trunk Western for delivery of freight to the Huron Valley Steel private track. *Pls. Ex. 49; Testimony of C. Korneffel, Tr. Vol. 4 at 23.*

68. Korneffel signed both the Conrail Side Track Agreement and the Grand Trunk Side Track Agreement for potential deliveries to the Huron Valley Steel private track to be unloaded by crane. *Testimony of C. Korneffel, Tr. Vol. 4 at 22, 23.*

69. Having Side Track Agreements with both railroads, Korneffel selected Conrail for delivery of rail freight. *Testimony of Curtis Korneffel, Tr. Vol. 4 at 23.*

70. In late 2007 and early 2008, Korneffel constructed its own private track, as

16

contemplated by its permanent easement agreement with HVS, which granted an easement to Korneffel "for the sole purpose of constructing, using and maintaining a single railroad track spur and switch (collectively the "Erie Spur") to provide railroad service to the Erie Parcel." *Pls. Ex. 110.*

71.  The "Erie Spur" referenced in the agreement is the track that Korneffel built onto the property it purchased from Huron Valley Steel. *Testimony of C. Korneffel, Tr. Vol. 4 at 39.* The Erie Spur connects to a portion of the track owned by Huron Valley Steel on the Huron Valley Steel property. *Id. at 40-41.*

72.  Korneffel paid for the side track and switch. *Id.* Korneffel pays for the maintenance on this track. *Id.*

73.  In May of 2008, HVS revoked its October 2, 2006 License Agreement with Korneffel and Korneffel now receives rail deliveries on the Erie Spur, as opposed to the Huron Valley track on which it had previously received rail deliveries. *Id. at 40, 63.*

**G.    The Lockout**

74.  In 2007 and 2008, Conrail made sporadic deliveries to Korneffel on the Huron Valley Steel track. *Testimony of Curtis Korneffel, Tr. Vol. 4 at 27.* Prior to each use of the Grand Trunk track to reach Korneffel, a Conrail operator notified a Grand Trunk dispatcher. *Testimony of Paul Ladue, Tr. Vol.6 at 115-16; Testimony of Paul Carey Vol. 2 at 90, 91.*

75.  Prior to May of 2008, Grand Trunk never prevented any Conrail deliveries to Korneffel on the Huron Valley Steel track. *Testimony of Curtis Korneffel, Tr. Vol. 4 at 28.*

76.  On May 14, 2008, Grand Trunk Western, at the direction of Paul Ladue, placed a lock on the switch that allowed access to the location, thus preventing Conrail from delivering a 26-car train to Korneffel.  *Testimony of Paul Ladue, Tr. Vol. 6 at 106.*

77.  Since May 2008, only Canadian National has delivered steel to Korneffel at this location.  *Testimony of Curtis Korneffel, Tr. Vol. 4 at 37.*

## II.   Conclusions of Law

78.  It is well-settled that if the language of a contract is clear and unambiguous, it is to be construed according to its plain sense and meaning, but if it is ambiguous, extrinsic evidence can be offered to explain the ambiguity. *New Amsterdam Cas. Co. v. Sokolowski*, 374 Mich. 340, 342 (1965); *see also Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 111 (1999).

79.  "The role of the court is to ascertain and effectuate the intent of the parties at the time of contract formation."  *Turner Holdings, Inc. v. Howard Miller Clock Co.*, 657 F. Supp. 1370, 1379-80 (W.D. Mich. 1987); *see also Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F. Supp. 1003, 1013 (W.D. Mich. 1997).

80.  "When interpreting contracts, courts look to the objectively manifested intent of the parties. Courts do not look to the subjective intent of the parties to the agreement. Thus, this court must interpret the contractual language without reference to . . . self-serving, after-the-fact, assertions [by a party to the contract] as to what its subjective intent was." *Bagsby v. Lewis Bros., Inc.*, 820 F.2d 799, 803 (6th Cir. 1987) (Ryan, J. concurring). *See also Turner*, 657 F. Supp. at 1380 ("It is the expressed, and not secret intent which is operative. . . . [O]ne party's uncommunicated understanding concerning the specialized meaning of contract language is not binding on the other party.")

18

81.  Michigan follows the "objective" doctrine of contracts. Under this doctrine, Michigan courts "use an objective test, looking to the expressed words of the parties and their visible acts" to determine if there is mutual assent to a contract "and ask whether a reasonable person could have interpreted the words or conduct in the manner that is alleged." *Rood v. Gen. Dynamics Corp.*, 444 Mich. 107, 119 (1993). Courts look "to all the relevant circumstances surrounding the transaction, including all writings, oral statements, and other conduct by which the parties manifested their intent." *Id.*  Subjective, unexpressed intent is irrelevant to establish the intent of a contracting party. *See Goldman v. Century Ins. Co.*, 354 Mich. 528, 535 (1958).

82.  Evidence of the parties' prior conduct is relevant to the interpretation of ambiguous contract terms. *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 470 (2003).

83.  The intent of the parties' in the TRA is found in the prior written agreement from which the 1996 TRA evolved. The 1996 TRA was not executed as a stand-alone transaction. Rather, it was the ultimate resolution of a dispute that began in 1993.

84.  The June 23, 1994 Agreement was a binding contract between Grand Trunk and Conrail. *Testimony of Paul Ladue, Tr. Vol. 6 at 113* (confirming that the agreement was a binding commitment by Grand Trunk).  Through the Agreement, the parties resolved the means and extent of Conrail's access to Trenton Steel Warehouse over the Grand Trunk track.

85.  Both parties understood that the Trackage Rights Agreement was to be drafted based upon the terms of the June 23, 1994 Agreement, and that, through the June 23, 1994 Agreement, Conrail and Grand Trunk agreed to effectuate the Arbitration

19

award through a grant of trackage rights rather than through construction by Conrail of a connecting track. *Testimony of Paul Ladue, Tr. Vol. 6 at 29, 84, 113.*

86.  The signatories from both Conrail and Grand Trunk testified that purpose of the agreement was to provide Conrail access to the property of the Trenton Steel Warehouse. *Testimony of Paul Carey, Tr. Vol. 2 at 73; Testimony of David Wilson, Tr. Vol. 3 at 51.*

87.  The intent of both railroads was to provide Conrail the same access that it would have enjoyed had it gone forward with its plan to build its own track connecting the main line to the private industry track. *Testimony of David Wilson, Tr. Vol. 3 at 53, 55-57; Testimony of Paul Carey, Tr. Vol. 2 at 75.*  Such access would include the ability to serve any customer at any location on the property that could be accessed by or from the private Huron Valley Steel track. This access would include Korneffel. *Testimony of Paul Ladue, Tr. Vol.6 at 86; Testimony of Paul Carey, Tr. Vol.2 at 74, 93; Testimony of David Wilson, Tr. Vol. 3 at 50.*

88.  Conrail and Grand Trunk expressly agreed that the substance of the June 24, 1994 letter would be incorporated in any subsequent Trackage Rights Agreement. *Id. at ¶2.* ("The parties will cooperate in good faith to execute a trackage agreement incorporating the foregoing provisions and standard terms and conditions . . . .").

89.  There is no evidence that the parties ever agreed upon, or even discussed modification of those rights.  The parties were contractually bound to execute a Trackage Rights Agreement based upon the terms of access set forth in the June 23, 1994 Letter Agreement.

20

90.  While "Trenton Steel Warehouse" is not a precisely defined term in the 1996 TRA, the events leading up to the TRA and other references in the contract support the conclusion that it was intended to refer to the location and property that would have been accessible to Conrail if it had built its own track.

91.  After the 1996 TRA defines Trenton Steel Warehouse as "Industry," the contract describes it as being "located adjacent to the FN interlocking." *Pls. Ex. 28 at 3, Section 3(a)*("referring to the Industry as being "located adjacent to FN interlocking at the south end of the Trackage")*; and 6 at Section 6(a)* (referring to the Industry as being "located adjacent to 'FN'")*.

92.  When interpreted as a property, "Trenton Steel Warehouse" is located adjacent to FN interlocking. *Pls. Ex. 128; Def. Ex. 593.*  However, when interpreted as a building, Trenton Steel Warehouse is not located adjacent to the FN Interlocking. Evidence submitted by all parties reflects the warehouse building as being noticeably set back from the FN Interlocking, on the far northwest side of the Huron Valley Steel property. *Testimony of Paul Ladue, Tr. Vol. 6 at 93*; *see also Pls. Ex. 128; Def. Ex. 593.* No evidence reflects the warehouse building as reasonably adjacent to the FN Interlocking.

93.  The parties understood "Trenton Steel Warehouse" to refer to the location accessible to Conrail if Conrail had built its own connecting track (i.e., the entire 85 acre area owned by Huron Valley Steel).

94.  A typical trackage rights agreement allows one railroad to traverse over the track of another from a beginning point to an ending point. *E.g., Testimony of David Wilson, Tr. Vol. 3 at 55; Testimony of Paul Carey, Tr. Vol. 2 at 89.* Any restrictions

21

imposed by the granting railroad cease after the ending point is reached. *Testimony of David Wilson, Tr. Vol. 3 at 55.*

95.  Although Mr. Ladue testified that he believed the 1996 TRA to be "unique," the contract is, nonetheless, a trackage rights agreement. The nature of the agreement is reflected in both its title and its terms. *Pls. Ex. 26.*

96.  Similar to what was described as a typical trackage rights agreement, the 1996 TRA defines the "Trackage Rights" as the right to operate "over" certain defined segments of track. *Id. at 1.* The contract then specifically defines the segments of "Trackage" that are governed by its terms. *Id.* The beginning point and the ending point are clearly defined in the section of the agreement entitled "Grant of Trackage Rights." *Pls. Ex. 26 at 2.* Pertinent to this analysis, the "Trackage" ends at the GTW property line. *Id.; see also Pls. Ex. 27.*

97.  Mr. Jim Binder, a long-time employee of Grand Trunk, testified that the unloading of Korneffel's steel shipments would necessarily take place on Huron Valley Steel's private property and industry track, not Grand Trunk's. He also testified that a railroad has no say what landowners do amongst themselves on private property. *E.g., Testimony of Jim Binder, Tr. Vol. 7 at 45-46.*

98.  The Huron Valley Steel private track, the Korneffel property and Korneffel's "Erie Spur" are not located along or on the "Trackage." Thus, the 1996 TRA does not prohibit Conrail from operating over the track to serve Korneffel.

III.   **Conclusion**

For the foregoing reasons, in resolution of the request for declaratory judgment plead by Grand Trunk, the Court finds that: (1) Conrail, Norfolk Southern and CSX have

22

the right under the TRA to use the Grand Trunk trackage to provide rail freight services

to Korneffel; (2) Conrail, in using the Grand Trunk trackage to provide rail freight

services to Korneffel as switching carrier for Norfolk Southern and CSX had a legal right

to do so under the 1996 TRA; and (3) Conrail is not liable to Grand Trunk for any

damages.

 

 

                s/Nancy G. Edmunds                                  
                Nancy G. Edmunds
                United States District Judge

Dated:  August 29, 2012

I hereby certify that a copy of the foregoing document was served upon counsel
of record on August 29, 2012, by electronic and/or ordinary mail.

                s/Carol A. Hemeyer                                  
                Case Manager