UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSOLIDATED RAIL CORPORATION
and NORFOLK SOUTHERN RAILROAD
COMPANY,

       Plaintiffs/Counter-Defendants,

v.                                                                    Case No. 09-cv-10179

GRAND TRUNK WESTERN RAILROAD                Honorable Nancy G. Edmunds
COMPANY,

       Defendant/Counter-Plaintiff/Third-
       Party Plaintiff,

v.

CSX TRANSPORTATION, INC.,

       Third-Party Defendant.

_____/

## ORDER DENYING GRAND TRUNK'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR NEW TRIAL OR REMITTITUR [229]

This case's central issue has been whether Plaintiffs Consolidated Rail Corporation and Norfolk Southern Railroad Company ("Plaintiffs" or "Conrail") had the right to use Defendant Grand Trunk's tracks to cross a property either called "Trenton Steel Warehouse" or on which "Trenton Steel Warehouse," a building, was located, to serve non-party E.C. Korneffel Company, not located on the property at issue. From March 6 to March 16, 2012, the Court held a jury trial on whether Conrail or Grand Trunk breached the contract establishing the traverse rights, the 1996 Trackage Rights Agreement (1996 TRA). On March 16, 2012, the jury returned a verdict in Conrail's favor. The jury determined that

Conrail (as agent for Norfolk Southern (NS) and CSX Transportation (CSX)) had the right to use Grand Trunk's tracks to serve Korneffel. (Dkt. 206.) The jury found that NS and CSX suffered damages as a result of Grand Trunk's preventing Conrail from delivering freight to Korneffel. (*Id.*) The jury awarded NS $39,816.80 and CSX $189,351.76. (*Id.*)

Before the Court is Grand Trunk's motion for judgment as a matter of law, or alternatively, for a new trial or remittitur. (Dkt. 229, Grand Trunk's Mot.) Grand Trunk first argues that it is entitled to judgment as a matter of law because the 1996 TRA only grants Contrail the right to serve Huron Valley Steel (HVS) (a steel company on the property) or its successor and the Court and the jury impermissibly rewrote the 1996 TRA. (*Id.* at ii.) Grand Trunk then argues that it is entitled to a new trial because the verdict was against the great weight of the evidence and because the Court improperly admitted Plaintiffs' damages evidence. (*Id.*) Grand Trunk lastly argues that is should at least be entitled to a new trial on damages or remittitur. (*Id.*)

The Court does not find Grand Trunk's arguments persuasive. The Court recognized and recognizes again that the issues presented in this case were close and contested, but the Court found that the 1996 TRA was ambiguous and submitted the case's central issue to the jury. After a ten-day trial, with both sides presenting testimony and submitting evidence to support their positions, the jury found Plaintiffs' arguments more persuasive. Evidence exists that supports Plaintiffs' position. The Court therefore will not disturb the jury's verdict. Nor will the Court grant Grand Trunk a new trial, much for the same reasons. And the Court finds that Grand Trunk is not entitled to a new trial on damages or remittitur—the Court properly admitted Plaintiffs' damages witnesses and Grand Trunk had

2

the opportunity, through cross-examination, to challenge the damages calculations. Grand Trunk did not sway the jury with its argument.

For those reasons, and the reasons more fully addressed below, the Court DENIES Grand Trunk's renewed motion for judgment as a matter of law or, in the alternative, for new trial or remittitur.

## I.   Standards

### A.  Rule 50 standard

"Rule 50 limits renewed motions for judgment as a matter of law to issues that were previously raised." *Hillside Productions, Inc. v. County of Macomb*, 06-11566, 2008 WL 4058512, at *3 (E.D.Mich. Aug. 28, 2008) (citing Fed.R.Civ.P. 50(b) and *American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159-60 (6th Cir. 1997)).  A judgment as a matter of law in a jury trial, "is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury." *Id.* (citations omitted).  "A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." *Id.* (citation omitted).

"Judgment as a matter of law may be granted if, when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012) (quoting *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005)).  Where a party raises a Rule 50(b) motion on the basis that the jury's decision was against the weight of the evidence, "[t]he evidence should not be weighed, and the

credibility of the witnesses should not be questioned.  The judgment of [a] court should not be substituted for that of the jury[.]" *Id.* (Citation omitted).

### B. Rule 59 standard

Rule 59 permits a court to "grant a new trial on all or some of the issues–and to any party–"after a jury trial, for any reason for which a new trial has . . . been granted in [federal court,] and in a "non jury trial, for any reason for which a rehearing has . . .been granted . . . in federal court." Fed.R.Civ.P. 59.  "Generally courts have interpreted this language to mean that a new trial is warranted when a jury has reached a 'seriously erroneous result as evidenced by (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion; *i.e.*, the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045-46 (6th Cir. 1999) (citations omitted).

### C. Remittitur

Generally, a court will not set aside or reduce a jury verdict or find it excessive "unless it is beyond the maximum damages that the jury could find to be compensatory for a party's loss." *Sykes v. Anderson*, 625 F.3d 294 at 322 (6th Cir. 2010) (citations omitted).  A district court has discretion to remit a compensatory damages "verdict only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." *Id.* (citation omitted).  "If there is any credible evidence to support a verdict, it should not be set aside." (citation omitted).

### II.   Analysis

4

**A. Defendant is not entitled to judgment as a matter of law or a new trial because Plaintiffs presented evidence at trial that supported their case**

Grand Trunk argues that it is entitled to judgment as a matter of law because the 1996 TRA only grants Conrail the right to serve HVS or HVS's successor. (Dkt. 149, Grand Trunk's Mot. at 3.) Grand Trunk first explains that the TRA's plain terms solely grant Conrail the right to serve one specific customer. (*Id.*) Grand Trunk then goes through an exhaustive recitation of Michigan contract interpretation law. Grand Trunk does so to argue that the TRA is unambiguous and reads the way Grand Trunk has allegedly argued throughout the entire case.

Plaintiffs argue that evidence supports the jury's finding at trial, that Grand Trunk is impermissibly offering a new interpretation of the 1996 TRA, and that, even if the Court entertained the new interpretation, the Court has already considered and rejected this alleged new interpretation.

The Court rejects Grand Trunk's argument, again. On January 6, 2012, the Court addressed the parties' arguments as to the central issue in this case: whether the 1996 TRA gives Conrail the right to access the entire property owned by Huron Valley Steel on Grand Trunk's sidetrack, as Plaintiffs contend, or just the specific warehouse facility, as Grand Trunk maintains. (Dkt. 149, January 6, 2012 Order at 7.) The Court held that the TRA was ambiguous. The Court described the parties' TRA background:

On May 1, 1996, Plaintiffs and Defendant entered into the "Trackage Rights Agreement Between [Defendant] & [Plaintiffs] to Service Trenton Steel Warehouse" ("1996 TRA"). The 1996 TRA states, "[Plaintiffs] wish to effectuate the Arbitration award by reaching agreement on terms to use the certain portions of the aforesaid line of railway of

[Defendant] and [Defendant] is willing to grant such use on the following terms and conditions . . . ."  Section 1 of the 1996 TRA explicitly states that Plaintiffs have the right to use certain segments of Defendant's railroad "for the sole purpose of serving Trenton Steel Warehouse [(TSW)] or its successor."   Section 6 of the 1996 Agreement delineates restrictions on use.  This section states:

> The Trackage Rights herein granted are subject to the following restrictions:
> (a) [Plaintiffs] shall use the Trackage for the sole purpose of delivering or picking up rail cars to and from (including the switching of such cars) [TSW] located adjacent to "FN." . . .
> (c) Except as provided in above subparagraph (a) [Plaintiffs] shall not move any rail cars of any kind, other than those cars moving to or from [TSW] or perform any local freight or switching service of any kind whatsoever, and shall not serve any other rail customers along the Trackage.

Additionally, the 1996 TRA provided that Plaintiffs must pay Defendant a monthly retainer fee as well as certain rates "for each rail car loaded or empty delivered to or spotted" at TSW.  (Dkt. 149, January 6, 2012 Order at 4-5.)

The Court then discussed:

> Looking at the contract itself, "Trenton Steel Warehouse" appears four times in the TRA.  It first appears twice in titles of the TRA itself, which read "Trackage Rights Agreement Between [Defendant] & [Plaintiffs] to Service Trenton Steel Warehouse" and "General Conditions to Trackage Rights Agreement Dated as of May 1, 1996, Between [Defendant] and [Plaintiffs] Relating to Trackage Rights for [Plaintiffs] to Service Trenton Steel Warehouse at Trenton, Michigan."  Third, in Section 1, the TRA states:

> > [Defendant] hereby grants to [Plaintiffs] the right to operate . . . in either direction over the following segments of [Defendant]'s railroad for the sole purpose of serving Trenton Steel Warehouse or its successor (hereinafter referred to as 'Industry'), shown on the plan attached hereto, made a part hereof and marked 'Exhibit A' (hereinafter referred to as the 'Trackage').

> The reference to a successor seems to suggest that "Trenton Steel Warehouse" may be a company or entity doing business.

6

The final place "Trenton Steel Warehouse" appears in the TRA is in the map attached as Exhibit A. This map shows a simplified depiction of the Trackage, over which Defendant would grant Plaintiffs access pursuant to the TRA. On the map, the words "Trenton Steel Warehouse" are boxed in, and beyond Defendant's property line, to the East. The fact that "Trenton Steel Warehouse" is boxed in on Exhibit A indicates that in the TRA, Trenton Steel Warehouse is meant to describe the actual physical warehouse on that property.

The map itself, however, is not a completely accurate depiction of the area. The TRA indicates that the Trackage includes the tracks "up to but not extending bey+ond . . . [Defendant] property line." The line that extends from Defendant's property line to the boxed in "Trenton Steel Warehouse" is not part of the Trackage. On the map, however, that line is depicted in the same thick, solid black line that the key indicates shows the Trackage. Additionally, if the boxed in "Trenton Steel Warehouse" is the building on that property, the map incorrectly depicts that the railroad tracks run east-west, running directly into the east side of the building. In fact, the tracks curve around and enter the warehouse building on the south side.

The TRA as a whole, then, does not appear to give a clear, unambiguous meaning to Trenton Steel Warehouse. The two most plausible meanings that the TRA suggests for Trenton Steel Warehouse are the actual warehouse building and the company doing business on that property.

(Dkt. 149, January 6, 2012 at 19-25.) Because the Court held that the 1996 TRA was ambiguous, it permitted the parties to submit depositions and outside evidence to show the parties' intent in the 1996 TRA. (*Id.* at 21.) The Court held that the outside evidence did not shed light on the issue and denied the motion, stating that there were "genuine issues of fact as to whether Plaintiffs violated the TRA when it delivered steel to Korneffel, via HVS's property." (*Id.* at 23, 25.)

Grand Trunk now argues that the evidence at trial established that the customer "Trenton Steel Warehouse" was intended to denote HVS. (Grand Trunk's Mot. at 5.) The Court rejects Grand Trunk's argument, again. The Court's January 6, 2012 order addressed this issue. The Court discussed how the 1996 TRA's reference to a successor could have suggested that "Trenton Steel Warehouse" may be a company or entity doing

business, such as HVS, as Grand Truck now proposes.  Despite that discussion, the Court found that the reference to the map rendered the "successor" language ambiguous.  That ambiguity was one issue that the jury had to resolve at trial to come to its determination that Plaintiffs could service Korneffel.

The 1996 TRA is as it was from the outset of this case—ambiguous.  The Court sees no reason to alter its holding in that respect.  Given the ambiguity, the Court, at trial, allowed the parties to present evidence as to the parties' true intent in drafting the 1996 TRA.  While the parties presented conflicting evidence at trial, whether "Trenton Steel Warehouse" referenced a building, or, as Grand Trunk now argues, a business, or the entire 85-acre property, Plaintiffs swayed the jury with their evidence that the intent of both parties entering into the 1996 TRA was to give Plaintiffs access to the entire 85-acre property.

During trial, three main witnesses testified as to the parties' history leading up to the 1996 TRA and the intent of the 1996 TRA:  David Wilson, Grand Trunk's Vice President of Operations and Paul Carey, Conrail's General Manager of Contracts, testified on Plaintiffs' behalf;  Paul Ladue, who was Wilson's subordinate at Grand Trunk during the relevant period, and whom Wilson instructed to prepare the 1996 TRA, testified on Grand Trunk's behalf.  John Cornue also played a role in drafting the 1996 TRA on Plaintiffs' behalf, but he was unavailable at trial, so his deposition was read into the record.

The testimony presented at trial mirrored the evidence presented at the summary judgment stage.  The testimony and exhibits also showed the background of the parties' dispute, a background that was integral in determining the parties' intent in drafting the 1996 TRA.

8

In 1897, Grand Trunk and Conrail entered into an agreement. (Testimony of Paul Carey, Tr. Vol. 2 at 62.) The 1897 agreement allowed Grand Trunk to cross Conrail's lines and also gave Conrail the right to cross Grand Trunk's new line, preventing Conrail's lines from being walled in. (*Id.*)

Four years shy of a century later, in 1993, Conrail notified Grand Trunk that it intended to exercise its rights to cross Grand Trunk's lines under the 1897 Agreement. (February 26, 2012 Order at 4; Pls.' Ex. 3.) On Grand Truck's side, Wilson testified that he was directly involved in the dispute between the parties, although he delegated research and other responsibilities to his subordinates William Litfin and Paul Ladue. (Testimony of David Wilson, Tr. Vol. 3 at 34, 38-40.)

Grand Trunk disputed Conrail's alleged right. (Testimony of David Wilson, Tr. Vol. 3 at 40.) Grand Trunk, through Wilson, and Conrail, through Paul Carey, Conrail's General Manager of Contracts, exchanged letters disputing the parties' rights. (Testimony of Paul Carey, Tr. Vol. 2 at 64.)

Notwithstanding the correspondence, the parties could not resolve the dispute, and decided to submit it to binding arbitration. (Testimony of David Wilson, Tr. Vol. 3, at 43-44; Testimony of Paul Carey, Tr. Vol. 2, at 63.) David Wilson made the decision on Grand Trunk's behalf. (Testimony of David Wilson, Tr. Vol. 3, at 43-44; Testimony of Paul Ladue, Tr. Vol. 6, at 91.)

On June 23, 1994, Conrail and Grand Trunk signed an agreement that provided that, if Conrail prevailed at arbitration, Grand Trunk would grant immediate access to Trenton Steel Warehouse. David Wilson signed the agreement on Grand Trunk's behalf and Paul Carey signed the agreement on Conrail's behalf. Paul Ladue played no role in the 1994

9

agreement.  (Testimony of Paul Laude, Tr. Vol. 6, at 123.)

The 1994 agreement's purpose was to provide Conrail access to the Trenton Steel Warehouse property.  (Testimony of Paul Carey, Tr. Vol. 2 at 73; Testimony of David Wilson, Tr. Vol. 3, at 53.)  The parties intended to provide Conrail the same access to the site that Conrail would have had had it built its own connection to the private industry track. (Testimony of Paul Carey, Tr. Vol. 2, at 71; Testimony of David Wilson, Tr. Vol. 3, at 53.)

Carey and Wilson stated that the arbitration was not limited to access to a specific customer or to a single building on the property.  (Testimony of Paul Carey, Tr. Vol. 2, at 79; Testimony of David Wilson, Tr. Vol. 3, at 60-61; Testimony of Paul Ladue, Tr. Vol. 6, at 110-112, 133.)

On January 21, 1996, the arbitration panel issued a decision in Conrail's favor.  (Pls.' Ex. 25.)

After the arbitration panel issued its decision, David Wilson instructed Paul Ladue to prepare what would become the 1996 TRA.  (Testimony of David Wilson, Tr. Vol. 3, at 62.)  Wilson testified that he did not instruct Ladue to narrow the rights agreed upon in the June 23, 1994 agreement.  (*Id.*)  Grand Trunk relieved Wilson of his responsibilities at Grand Trunk in February, 1996; he did not participate in the negotiations or drafting the 1996 TRA.  (*Id.* at 61, 95-96.)  Wilson testified that he had the intent personally that Trenton Steel Warehouse meant the entire 85-acre property, but he also testified that he may not have conveyed his intent to anyone.  (*Id.* at 92-93.)

Paul Ladue testified that he understood that he was supposed to base the 1996 TRA on the June 23, 1994 agreement.  (Testimony of Paul Ladue, Tr. Vol. 6, at 29.)  He also testified that he understood that, through the June 23, 1994 agreement, Conrail and Grand

10

Trunk agreed to effectuate the arbitration award through a grant of trackage rights, rather than through Conrail constructing a connecting track.  (*Id.*)

Ladue testified that he drafted the 1996 TRA and then sent a copy of it to John Cornue, who worked for Paul Carey, of Conrail.  (Testimony of Paul Ladue, Tr. Vol. 6, at 30-31.)  Carey testified that he did not participate in drafting the 1996 TRA, instead, he left the task to Cornue. (Testimony of Paul Carey, Tr. Vol. 3, at 4-6.)  Carey added that he had no recollection of contributing any comments to Cornue during Cornue's negotiations with and drafting of the TRA with Ladue.

Ladue testified that he never received written comments from Conrail, and he testified that he did not remember speaking with anyone from Contrail save Cornue. (Testimony of Paul Ladue, Tr. Vol. 6, at 30-31.)  Cornue stated that he did not recall reviewing, receiving, or having drafts of the 1996 TRA.  (John Cornue Testimony, Dep. at 322-23.).

On May 1, 1996, Conrail and Grand Trunk entered into the 1996 TRA.  (Pls.' Ex. 26.) Paul Carey signed the 1996 TRA on Conrail's behalf; Paul Ladue signed on Grand Trunk's behalf.  (Pls.' Exs. 26, 8.)

The recitals at the beginning of the 1996 TRA recognize that the parties entered into the 1996 TRA to effectuate the 1996 arbitration award.  (Pls.' Ex. 26, at 1.)

Carey testified that Conrail's Dearborn Division and marketing department referred to the entire property at issue as the "Trenton Steel Warehouse."  (Testimony of Paul Carey, Tr. Vol. 2, at 75.)   He also testified that Grand Trunk never described the access that it was going to convey to Conrail as limited to a structure, building, or warehouse.  (*Id.*)

As Conrail's signatory, Carey testified that the 1996 TRA gave Conrail access to the

entire 85-acre property. (Testimony of Paul Carey, Tr. Vol. 2 at 87-88.) Carey added that he would not have signed the 1996 TRA had it limited Conrail's access rights to a single building. (*Id.*)

As Grand Trunk's signatory, Paul Ladue testified that he understood the 1996 TRA conferred access only to "Trenton Steel Processing and Storage doing business as Huron Valley Steel and its building and warehouse." (Testimony of Paul Ladue, Tr. Vol. 6, at 37.)

Given the above testimony, Grand Trunk cannot prevail on its motion for judgment as a matter of law/for new trial. Evidence at trial supports Plaintiffs' position. Grand Trunk had its chance at trial to put forth competing evidence as to the intent of the parties' in drafting the 1996 TRA. Grand Trunk failed in persuading the jury that the parties intended the 1996 TRA to limit Plaintiffs' access rights to a building or a business. Testimony from both parties exists that the mutual intent of the 1996 TRA was to give Plaintiffs the right to the subject property, not just the warehouse on that property.

Grand Trunk also argues that it is entitled to judgment or a new trial because the Court impermissibly admitted testimony. (Grand Trunk's Mot. at 11-12.) Conrail argues that the Court may not grant a motion for judgment as a matter of law on the basis that it improperly admitted evidence at trial. (Conrail's Resp. at 10.) Conrail is correct. *See Douglass v. Eaton Corp.*, 956 F.2d 1339, 1343 (6th Cir. 1992) (citing cases and authority for the proposition that a "judge cannot grant a judgment notwithstanding the verdict by ignoring evidence he has admitted on the ground that the admission was error.") *overruled on other grounds by Weisgram v. Marley Co.*, 528 U.S. 440 (2000). The *Douglass* court found that "it is wholly improper for a district judge to ignore evidence admitted at trial from its consideration in granting a judgment notwithstanding the verdict." *Id.* The Sixth Circuit

12

quoted that, "[a] motion for judgment notwithstanding the verdict, like a motion for directed verdict, does not raise questions relating to the competency or admissibility of evidence." *Id.* at 1343-44 (citation omitted).  The Court therefore rejects Grand Trunk's arguments that the Court should grant its motion due to allegedly improperly admitted evidence.  *See also Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) (stating that, on a Rule 50(b) motion, a court does not reweigh the evidence or assess witnesses' credibility.  And stating that the review is limited to the evidence that was admitted at trial.) (citations omitted). The Court therefore does not entertain Grand Trunk's admissibility argument.

### B.    Grand Trunk is not entitled to a new trial as to damages or remittitur

Grand Trunk requests a new trial as to damages.  (GT's Mot. at 16.)  Grand Trunk asserts that the Court "improperly admitted" NS and CSX's damages evidence "because that evidence was not the best available evidence of the damages alleged."  (*Id.* at 16-17.) Grand Trunk alternatively argues that, if the Court does not grant a new trial as to damages, it should remit both damages awards.  (*Id.* at 20.)

At trial, John Koch, Director of Sales at CSX, testified as to lost profits. (Testimony of John Koch, Tr. Vol. 5 at 15.)  Koch testified that CSX suffered damages of approximately $189,000.00.  (*Id.* at 20.)  He stated that he calculated an "operating ratio" that "identifie[d] what [CSX's] cost was for operating for each dollar of revenue, and [CSX's] operating ratio at that particular time . . . was approximately 75 percent [of operating costs.]"  (*Id.* at 22.) To come up with the lost profit, Koch multiplied the ratio by the "revenue numbers describing  . . . the volume that moved via the Canadian National Grand Trunk to Korneffel in each of [the contested] years."  (*Id.*)  John Koch testified that CSX had been handling 100% of the Nucor steel delivery business to Korneffel prior to the lockout.  (Tr. Vol. 5 at

13

30.)  Koch testified that he took the same assumption for the lost profit damages he calculated.  (*Id.*)  But he also admitted that he could not be sure that CSX would have received 100% of Korneffel's business.  (*Id.* at 33.)

He testified that others prepared the documents that he explained at trial. (Testimony of John Koch, Tr. Vol. 5 at 35-36.)

Grand Trunk extensively cross-examined John Koch regarding CSX's methodology. (Tr. Vol. 5 at 27-41.)  Grand Trunk elicited testimony trying to discredit Koch's calculation of damages.  (*Id.* at 40.)

On re-direct, Koch explained why he used his operating ratio calculation. (Testimony of John Koch, Tr. Vol. 5 at 41.)  He stated that the operating ratio calculation took into consideration "all of the moves that may be very profitable [and those that may not be] as profitable.  (*Id.*)

James Schaaf testified as to NS's damages.  Schaaf testified that he was Group Vice President, Metals and Construction, of NS.  (Testimony of James Schaff, Tr. Vol. 5 at 43.)  Schaaf stated that his job was to "maximize Norfolk Southern's participation from a unit revenue and contribution perspective in the metals and construction arena."  (*Id.* at 44.)

Schaaf stated that he "worked in conjunction with Meghan Achimasi," one of his employees, to create the damages calculation.  (Testimony of James Scaaf, Tr. Vol. 5 at 46.)  He stated that NS was claiming damages of $71,399.20.  (*Id.* at 47.)  He explained how he created the damages calculation.  (*Id.*)  On cross, he stated that his calculations assumed that NS would have had 100% of the SDI shipments because, before the lockout, NS had had 100% of that business. (*Id.* at 69-70.)

Grand Trunk also extensively cross-examined Schaaf and attacked his calculations. (Tr. Vol. 5 at 56-73.)

Gordon Gustafson, Grand Trunk's expert, testified that, as a part of his career, he evaluated revenue and costs associated with railroad track.  (Testimony of Gordon Gustafson, Tr. Vol. 7 at 89.)  He testified about the problems he had with Plaintiffs' damages methodology and calculations.  (*Id.* at 94-95, 98-99, 106-07, etc.)  He explained how he went about doing his own research. (*Id.* at  95.)

1.    **The Court properly admitted Koch and Scaaf's testimony under Federal Rule of Evidence 701 and the parties established the testimony with enough certainty for admissibility**

Grand Trunk explains that neither NS's damages witness, James Schaaf, nor CSX's damages expert, John Koch, had the personal knowledge to testify as to how much steel either SDI or Nucor would have shipped to Korneffel through NS and CSX if not for Grand Trunk's refusal to allow Conrail to deliver freight to Korneffel.  (Grand Trunk's Mot. at 17.) Grand Trunk maintains that NS and CSX offered hearsay to support their damages requests, including spreadsheets of damage calculations, which improperly included 100% lost traffic volume assumptions.  (*Id.*)

Grand Trunk maintains that the offered evidence could have been proper, if Schaaf and Koch were expert witnesses.  (Grand Trunk's Mot. at 17.)  But Grand Trunk asserts that, because they were not expert witnesses, the Court should have limited their testimony to include only Schaaf and Koch's own perceptions and the reasonable inferences from those perceptions.  (*Id.*)

Grand Trunk proffers that CSX, in particular, did not present any "significant historical data or other evidence" "to suggest that CSX would have won 100% of the traffic

15

from Nucor to Korneffel, which CSX's damages calculation . . . assumed it would." (Grand Trunk's Mot. at 18.)  Grand Trunk maintains that "CSX had only ever moved 14 cars from Nucor to Korneffel in the year and a half preceding the [l]ockout, none of which were the type of cars that moved after the [l]ockout[.]" (*Id.*)  Grand Trunk further maintains that CSX "would have had to compete with both [Norfolk Southern] and [Conrail/Grand Trunk] for future traffic and that, in three of the four years for which CSX sought damages, [Conrail/Grand Trunk] would have beat CSX/Conrail on price." (*Id.*)

Grand Trunk also stated that the evidence at trial established that NS would also have had to compete for Korneffel's future business from SDI with a number of other railroads. (Grand Trunk's Mot. at 19.)

Grand Trunk finds further fault with offered evidence of damages.  (Grand Trunk's Mot. at 19.)  Grand Trunk argues that Plaintiffs did not put forth the best available evidence of their costs, "the other half of the equation necessary to determine their lost profits with any reasonable degree of certainty." (*Id.*)   Grand Trunk concedes that NS used the Uniform Rail Costing System, which is a recognized methodology in the railroad industry. (*Id.*)  But Grand Trunk maintains that CSX "intentionally avoided using any recognized methodology at all for determining its costs." (*Id.*)  Grand Trunk asserts that CSX "improperly used its system-wide operating ratio . . . of roughly 75% as a proxy for its costs, when the record was clear . . . that its costs vary per move throughout the system depending on the route and the commodity moved." (*Id.*)

Grand Truck argues that its qualified expert witness, Gordon Gustafson, determined that NS would have lost money carrying the traffic from SDI to Korneffel.  (Grand Trunk's Mot. at 19.)  Grand Truck further argues that, while Gustafson had no opportunity to make

his own CSX damage calculation, Gustafson did demonstrate that CSX did not support its calculations with fact and were based on faulty assumptions.  (*Id.* at 19-20.)

Plaintiffs argue that Grand Trunk's argument that Schaaf and Koch presented opinion testimony is flawed.  (Pls.' Resp. at 15.)  Plaintiffs maintain that Schaaf and Koch provided fact testimony "on matters on which they were competent to testify."  (*Id.* at 16.) Plaintiffs state that Schaaf and Koch's testimony established that each was familiar with the departments they ran, and each had personal knowledge of their railroads's prior relationships with the shippers for the delivery of steel to Korneffel.  (*Id.*)  (See Testimony of James Scaaf, Tr. Vol. 5 at 43-45; Testimony of John Koch, Tr. Vol. 5 at 17-20.)

Plaintiffs state that Schaaf testified that, prior to lockout, NS  "delivered one hundred percent of the steel from SDI to Kornell.  (Pls.' Resp. at 16.)  (Testimony of James Scaaf, Tr. Vol. 5 at 52.)  Plaintiffs also offer that Koch testified that CSX "delivered one hundred percent of the steel from Nucor-Yamato to Korneffel."  (*Id.*) (Testimony of John Koch, Tr. Vol. 5 at 21, 30.)

Plaintiffs then state that Schaaf and Koch each testified that, "if their respective railroads[] delivered at the same rate, their railroads would have received a certain amount of revenue, which, when reduced to profit, would yield the amount set forth in their respective damages exhibits."  (Pls.' Resp. at 16.) (Testimony of James Schaaf, Tr. Vol. 5 at 55, Tr. Vol. at 20.)

Plaintiffs also argue that, even if Schaaf and Koch's testimony was opinion, the opinions would still be admissible under Federal Rule of Evidence 701.  (Pls.' Resp. at 16.)

The Court agrees with Plaintiffs, the Court properly admitted Koch and Schaaf's testimony pursuant to Federal Rule of Evidence 701 and established case law.

17

Rule 701 provides that:
If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
(a) rationally based on the witness's perception;
(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c) not based on scientific, technical, or other specialized knowledge with the scope of Rule 702.

The commentary to Rule 701 envisions testimony of damages by officers of businesses:

For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Case law has applied and supports Rule 701's applicability to business owners or officers and their testimony as to their business's damages. *See Station Enter., Inc. v. Ganz, Inc.*, 07-14294, 2009 WL 3059148 (E.D.Mich. Sept. 24, 2009) (allowing the owners of a business who ran the day-to-day business dealings to testify as to projected profits and/or resulting damages, basing the decision on FRE 701 and the Advisory Committee Notes.) (and citing authority for the proposition that an author, when preparing a damages report, "may incorporate documents that were prepared by others, while still possessing the requisite personal knowledge or foundation to render his lay opinion admissible under [Rule] 701.") (citations omitted).

Grand Trunk addresses Conrail's argument that courts have allowed business owners to testify as to the lost profits of that business.(Grand Trunk's Mot. at 17-18, n. 13.) Grand Trunk accepts that courts have permitted business owners to testify as to their businesses's lost profits caused by a breach of contract. (*Id.*) But Grand Trunk states that

18

it is "unaware of any case in which the owner of a business has been permitted to testify as to the quantity of goods that another business would have shipped to a third business using [a] plaintiff's services if not for the defendant's breach of contract." (*Id.*)  Grand Trunk argues that this type of quantity calculation requires "either direct testimony from the buyer and the seller or some type of expert witness employing an acceptable methodology." (*Id.*)

Plaintiffs argue that Schaaf testified that he has worked for NS as a group vice president for metals and construction since 2008.  (Pls.' Resp. at 17.) (Tr. Vol. 5 at 43.) Plaintiffs point out that Schaaf testified that he manages a staff of 30 sales and marketing professionals and that he worked with Meghan Achimasi to prepare NS's damages calculations.  (*Id.*)  (Tr. Vol. 5 at 44-45, 46.)  Plaintiffs state that Schaaf relied on his 25 years of experience in the railroad industry working for Conrail and NS, to describe for the jury "a calculation of damages based upon his personal knowledge."  (*Id.*)

As for Koch, Plaintiffs state that he has worked for CSX since 1996 and that one of the sales people who prepared the CSX damages calculation works directly for him.  (Pls.' Resp. at 17.)   Plaintiffs argue that Koch testified with personal knowledge about the damages.  (*Id.*)

Plaintiffs also argue that Grand Trunk had the opportunity to cross-examine Schaaf and Koch and that Grand Trunk presented an expert witness, Gustafson, to analyze the damage calculations and present a competing calculation.  (Pls.' Resp. at 17.)  Plaintiffs maintain that Grand Trunk had its chance to persuade the jury and failed.  (*Id.*) *See Paul v. Henri-Line Mach. Tools, Inc.*, 10-10832, 2012 WL 6642494, at *5 (E.D.Mich. Dec. 20, 2012) (Cook, J.) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence.") (quoting *Daubert v. Merrell Down Pharm., Inc.*, 509 U.S 579, 596.).

Again, the Court agrees with Plaintiffs.  The Court finds that Plaintiffs established that Koch and Schaaf had the threshold knowledge and ability to testify as to the damages their companies suffered.  The Court also finds that Grand Trunk had the opportunity to expose any deficiency in Koch or Schaaf's testimony.  Grand Trunk failed to persuade the jury that there was such a deficiency.  The Court will not grant Grand Trunk a new trial as to damages when the jury awarded Plaintiffs the amounts they requested when they showed with a formula how they calculated the amounts and Grand Trunk had an opportunity to expose any problems with that formula.

Grand Trunk also argues that Plaintiffs did not prove the amount of damages with certainty.[1]   Plaintiffs object to Grand Trunk's certainty argument.  (Pls.' Mot. at 18.)

---

[1]"Lost profits, if properly proven, are an appropriate element of damages."  *Body Rustproofing, Inc. v. Mich. Bell Tel. Co.*, 385 N.W.2d 797, 800 (Mich.Ct.App. 1986) (citation omitted).  "Before lost profits are recoverable, they must be proven with a reasonable degree of certainty as opposed to being  based on mere conjecture or speculation."  *Id.* (citation omitted).  But a "reasonable degree of certainty" is not an inflexible standard, for the "law does not require impossibilities" and "does not require a higher degree of certainty than the nature of the case permits."  *Id.* (citation omitted).  Where a case "permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount."  *Id.* (citation omitted).  "In order for past profits to be safely taken as a measure of future profits, all the various contingencies by which such profits would probably be affected should be taken into account by the jury and allowed such weight ast he jury, in the exercise of good sense and sound discretion, believes they are entitled to."  *Id.* (citation omitted). "Damages are not speculative simply because they cannot be ascertained with mathematical precision.  Further, the certainty requirement is relaxed when damages have been established but the amount of damages remains an open question.  Although the result may only be an approximation, it is sufficient if a reasonable basis for computation exists.  Questions regarding what damages may be reasonably anticipated is an issue better left to the trier of fact."  *VIP Customs Brokerage Serv., Inc. v. ADESA Importation Serv., Inc.*, 259386, 2006 WL 2482904, at *8 (Mich.Ct.App. Aug. 29, 2006) (citations

Plaintiffs argue that the jury resolved the disputed fact issues and that the Court should not substitute whatever it may feel for the jury's damages resolution.  (*Id.*)

Plaintiffs alternatively argue that they did prove damages with certainty.  (Pls.' Mot. at 18.)  They maintain that NS and CSX each established that they had established business of shipping to Korneffel and that they held all of the business of shipping to Korneffel until the business was taken away.  (*Id.*) (Testimony of Koch, Tr. Vol. 5 at 30; Testimony of Scaaf, Tr. Vol. 5 at 52-53.)  Plaintiffs addressed Grand Trunk's argument that NS and CSX would have had to compete with Grand Trunk for service to Korneffel.  (*Id.*) Plaintiffs argue that they presented testimony that Grand Trunk "never once made a sales pitch or undertook any efforts to compete in the marketplace for this business."  (*Id.*) (Testimony of Richard Long, Tr. Vol. 5 at 75, Long Dep. at 49.)  Plaintiffs recommend that the Court should not disturb the jury's determination that NS and CSX would have retained 100% of Korneffel's business.  (*Id.*)

As to CSX's method of calculating damages, Plaintiffs argue that the jury, again, was presented with two methods of calculating profits, and that the jury found that CSX's calculation was persuasive. (Pls.' Resp. at 19.)

The Court again agrees with Plaintiffs.  They presented a method and calculation of their damages.  Neither the method nor the calculation was unreasonable.  Grand Trunk had the opportunity to challenge both method and calculation.  Grand Trunk did not persuade the jury.  The Court therefore does not disturb the award.  *See Amway Global v. Woodward*, 744 F.Supp.2d 657, 678-79 (E.D.Mich. 2010) (Rosen, C.J.) ("As the courts

omitted).

21

have confirmed, an expert's failure to account for all possible causes or factors goes only to the weight, and not the admissibility, of his testimony . . . and once this threshold of admissibility is met, it is up to the trier of fact to determine the weight to be given to the expert's testimony.") (citations omitted).

The jury awarded those damages that Plaintiffs presented. The award was therefore directly related to the testimony. A new damages trial is not warranted. *See Tezak v. Montgomery Ward & Co., Inc.*, 33 F.App'x 172, 178 (6th Cir. 2002) ("[G]ranting a Motion for New Trial is appropriate where the jury's award bears no relation to the evidence of damages." And quoting, "[a] trial court may not grant a new trial on the ground of insufficient damages unless the jury verdict is one that could not reasonably have been reached.") (citations omitted).

Because the jury awarded those amounts Plaintiffs requested and Plaintiffs presented the means by which they calculated their damages, the Court finds that remittitur is not appropriate. The award is not clearly excessive and there is nothing in the verdict that is clearly excessive, resulted form passion, bias or prejudice, or is so excessive that it shocks the Court's conscience.

## IV.   Conclusion

For the above-stated reasons, the Court DENIES Grand Trunk's renewed motion for judgment as a matter of law or, in the alternative, for new trial or remittitur.

s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  August 12, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 12, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer